## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Victoria Bibbs  Pro Se,** | ) | **Civil Action** |
| **Plaintiff** | ) | **NO. 05- CV-41E** |
| **Vs.** | ) | **Susan P. Baxter** |
| **Susan D. Strohmeyer, et al.,** | ) | **Maurice B. Cohill., Jr.** |
| **Defendant** | ) | |

### PLAINTIFF'S  REPLY TO THE  DEFENDANTS' COUNSEL'S MOTION OF PARTIES IN THIS CIVIL ACTION FOR  MORE DEFINITE  STATEMENT AND AMEND THE RECORDS TO REFLECT CHANGE  TO CO-DEFENDANTS INCLUDE  STRICT LIABILITY ON  BOTH PARTY'S  IN THE  CAPTION COMPLAINT PURSUANT TO NO. 05-CV-41E/ AND C.A. NO. 04-349 ERIE AND JOIN PARTIES TOGETHER

ALL INVOLMENTS IN THESE CAPTIONS ARE HEREBY STRICKLY LIABLE FOR ALL OCCURANCE PERTAINING TO THIS COMPAINT Action Pursuit

**Be it known enacted and enforced the directions of this act this 26 day of August  in the year of our Lord 2005.**

Now comes, Victoria Bibbs , through the United States Constitution and the President of the United States, acting as the Minister of her estate:

### Preface

In preparing this consolidated edition of The strictly liable clause to the amending complaint, in hope to include every one involve in the endangering the welfare of the public's good faith and sponsored into it the remedy of reformation  and incorporate all the relative parts in these chapters as, for to address every saga in every event as it occur

On behalf of the families of children  mothers and fathers torn apart because of this breach in security which has affected  all facet of our society of people

### Acknowledgment:

We acknowledge with thanks the work of those who contributed chapters and parts to this addition by reason of the free enter-prise and the Freedom of Information Act. Provided for the sole purpose within this complaint to expose to you the terrible pain and suffering it has caused

Part One    The Bill Of Rights

INTRODUCTION: A plan for a safer world

Overview.  Guaranteed Rights


ON AUGUST 23, 1775 KING GEORGE III

PROCLAIMS THE COLONIES TO BE IN OPEN REBELLION


i.   WHEREAS MANY OF OUR SUBJECTS IN DIVERS PARTS OF OUR COLONIES AND PLANTATIONS IN NORTH AMERICA, MISLED BY DANGEROUS AND ILL

ii.  DESIGNING MEN, AND FORGETTING ATHE ALLEGIANCE WHICH THEY OWE TO THE POWER THAT HAS PROTECTED AND SUPPORTED THEM;

iii. AFTER VARIOUS DISORDERLY ACTS COMMITTED IN DISTURBANCE OF THE PUBLICK PEACE TO THE OBSTRUCTION OF LAWFUL COMMERCE, ASND TO THE OPPRESSION OF OUR LOYAL SUBJECTS CARRYING ON THE SAME;

iv.  HAVE AT LENGTH PROCEEDED TO OPEN AND AVOWED REBELLION, BY ARRAYING THEMSELVES IN A HOSTILE MANNER, TO WITHSTAND THE

EXECUTIVE OF THE LAW, AND TRAITROROUSLY PREPARING, ORDERING, AND LEVYING WAS AGAINST US:

v.   AND WHEREAS, THERE IS REASON TO APPREHEND THAT SUCH REBELLION HATH BEEN MUCH PROMOTED AND ENCOURAGED BY THE TRAITOROUS CORRESPONDENCE, COUNSELS AND COMFORT OF DIVERS WICKED AND DESPERATE PERSONS WITHIN THIS REALM:

### CHAPTER ONE

### WE WILL HOLD ANY PERSON OR REIME THAT HARBORS OR SUPPORTS TERRORISTS AS GUILTY OF TERRORISM AS THE TERRORISTS THEMSELVES

the defendants have a responsibility to their office and duty to their citizens, there has been cited a breach of duty in that the defendants neglected their responsibility in refusing to administering equal protection under the law and conspiring to commit malicious willfully misconduct . The defendant s were given information needful and necessary to the protection of plaintiffs civil AND FREEDOM rights liberties information regarding to the plaintiff innocence information discarded, but for intents and purposes to do otherwise Wherein:

1.    On April 26, 2005 Corporal Munch filed a Criminal Complaint Accusing Plaintiff , who lives at the address set forth above(in the Police Criminal Complaint)(Docket No: CR- 72-04, Date Filed April 26, 2004, the OTN: H 872 475-2)

2. Stated on line (1) of the P.C.C. in Exhibit "C" taken from a copy of Attorney Patrick M. Carey, "Motion to Dismiss and/or Motion for More definite Statement …"the Corporal police Officer said I, Cpl. F. Munch Officer badge # MPD #22 of Millcreek Township Police Dept. Police Agency Operator's Registration number PA 0250300, Originating Agency Case number 2004-3674, do hereby state: (appropriate checked #1.) accuse the above named defendant, who lives at the address set forth above (See Exhibit C. pg.(1) of 3)

3. (Continue from page 1-3 of the Police Criminal Complaint) In Millcreek Township County on or about From 1994 thru February 2004 ( The complaint's instrument asks if there were other participants involved) Participants were: another besides myself was stated.

4. **Line (2) of Pg.1 of Munches Complaint it Talks about the acts committed by the accused. that of;**
   a) Endangering Welfare of Children Sec: 4304 (a)
                    Pa. CC F-3 (Held over to Court)
   b) Recklessly Endangering Another Person sec:
                         Sec: 2705 Pa. CC M-2  ( dismissed 9/7/04)
   c) Simple Assault Sec: 2701 (a) (1) Pa. CC M-1

5. **Page(2) of the complaint that of the accusing officer**
        states to this degree: (See exhibit C-pg.3)
   a) the parent of said child under the age of 18  years old
   b) the accused did knowingly commit these act over an extended period of time, being 1994 thru February of 2004
   c) that of seriously injury. scarring, using a belt or which could of cause serious bodily injury or death
   d) goes on to say;
   e) all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly,
   f) or in  Violation of ….( cites of these violations presented)

5. **Line (3) of the sworn complaint asks for:**

   a) A warrant of arrest (a attached affidavit of probable cause and sworn to before the issuing authority.)

6. **Line (4) He verify that the facts set forth:**

   (a) are true and correct to the best of his knowledge or information and belief
   (b) the verification made is subject to the  penalties of Section 4904 of the Crime Code (18 PA. C.S.§ 4904) relating to unsworn falsification to authorities.)

7. **The signature line bears witness to the affiant signature**

8. **Next , he certify the complaint has been:**
               1. <u>properly</u> completed
               2. properly verified

9. **Next, In order for a warrant to be issue:**

          **1. An affidavit of probable cause must**
be completed

10.    **The bottom line to this of this signed**
    **affidavit bears:**
        **1. the Magisterial district number**
    **that of 06-03-03**
        **2. the issuing Authority's signature,**
    **and seal that of Susan Stromeyer**

11.    **The Affidavit and probable cause section**
        **1. This sections lists the action involved in   this action and the**
actors in each discourse of the original event

        **2. Also, The Office they represents and**
    **(a) The responsible body**
    **(b) The places in action**
    **(c)  The office in action**

        **3.  In this criminal complaint's, Affidavit of Probable Cause (pg.**
3) presents:
    **(a)  Subject: <u>Probable Cause</u>**
    **(b) Text:**
        **#1- Origin Of the Crime**
        **#2- Facts of the Crime**
        **#3- Defendants Involvement**

12.    **By this the affiant requested a warrant as**
    **per the attached Criminal Complaint, then**
        **(a) Corporal Munch duly sworn according to law, depose and say**
that the facts set forth in the foregoing affidavit are true and correct to
the best of his knowledge information, and belief.
        **(b) Then he signed it into effect**

13.    **By this reason:**

        **1. A felony warrant was issued (See exhibit C. pg.6)**
        **2. In the name of the Commonwealth of  Pennsylvania**
        **3. Commanding the custody of the any  authorized person and,**
        **4. Bring the accused before Susan Stromeyer to,**

5. Answer the Commonwealth or Millcreek TWP Police
6. Upon the complaint or citation of Fred, Munch
7. Charging the accused with Statue 18 § 4304 Endangering the Welfare of Children
8. And further to be dealt with accord to the law and for such purpose, ( the warrant became sufficient for his intent and purpose)
9. The Warrant Items, especially:
(a) The Control No # 0656919
(b) The Docket No# CR-0656919
(c) The Commonwealth vs. Accused
(d) The Offense Date – 1/01/94

10. The Warrant's Additional charges (See exhibit C. Pg. 8) (Mag. Dist. No: 06-3-03 and OTN: # 872475-2) Docket No. CR-0000072-04 S 18 § 2701 §§A1

Consolidated Statue of Pa's Penalties of Section 4904 of the Crimes Code (18 PA C.S § 4904) relating to unsworn falsification to authorities

I.    **THE Unfounded Alleges Were Taken To the Extreme**

Reference to that fact  (See page 10 of this interviewing complaint of office and responsible body ) : Corporal Fred Munch (et,al).

Part Two: Constitution Guaranteed

Introduction:    The Responding body and the office in action

Overview:   Breach of warrant / Security and duty

Chapter Two

AMERICA WILL NOT WAIT FOR NEW THREATS TO GROW AND FESTER, WE WILL FACE NEW CHALLENGES-SWIFTLY, SURELY, AND WITH STEELY RESOLVE

The Departments responding body Corporal Munch states in his report that the plaintiff had been abusing her children for over a period of 10 years within the providence and borough of Mill creek Township on said premise of 6023 glade Drive

The initial call to this was about a retarded ( bordered line   retarded child with a learning disability determined by the school district's definition) child of mine had been cited as attempting to sell marijuana in the school.

The respondent body; Corporal Munch, was called by the school's principal, this was done without a parent or lawyer present ,nor was his Miranda Right's read to him

The counselor question him extensively, he was sent home for out of school suspension, no one at that time contacted me
He went back to school, sat in the office, as if nothing had happen
He didn't want to get arrested, his counselor advised him about what he could do to make it easy for him.

In and around about the month of march in and around that time I came home from work, A truck parked outside my front door I proceeded to go into my home , approached by my son , as I walked in the inside door  he seemed  tired and  upset, he said he was suspended and lies were said about him selling drugs in school, which a lot of kids do, but that he didn't

Mr. Walczak introduced himself to me and asked if I would sign this lunch form he was given from the school, for me to fill out and sign, I refused.
a case worker from OCY  was to meet with me about "something, he said that happen in school today".

For the very first time I'm hearing a story from my son about him being suspended and that drugs were discovered in his locker

It was all determined to be the path to be taken after a call was made
WE CANNOT FORGET THAT THE TERRORISTS REMAIN DETERMINED TO KILL AS MANY AMERICAS AS POSSIBLE ,  BOTH ABROAD AND HERE AT HOME,

Home school  teachers terrorized

c.  The nature of that case was :  a civil right issue  that of the right's to direct the education of one's child and for false arrest stemming from it.

Also; a civil right issue (See Section C. for details)

d.  That  factual instance and many more testify and bear witness to the facts set forth  and these exhibit of confirmation affirms that responsible body of officials and offices in action did willfully misconduct ,violated      and obstruct the law and legal offices  involved conspiring   together in a direct breach of duty of which they represent.

Constitution, boundary, and commerce laws  was directly and indirectly breached and none should escape the  prosecution, herein is the  warning written for those who thought to be immune from the violations by breach the contract of protecting and serving the United State citizens:

Every person who, under color of any statute, ordinance, regulation,          custom, or usage, of any State or Territory or the District of          Columbia, subjects, or causes to be subjected, any citizen of the

United States or other person within the jurisdiction thereof to the    deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party injured in any      action at law, suit in equity, or other proper proceeding for redress.

For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## Part three The Revolt

Introduction: Empowered Parents
Over view: the War against Poverty
Chapter Three
We can not forget

8

### III.    WE CANNOT FORGET THAT THE TERRORISTS REMAIN DETERMINED TO KILL AS MANY AMERICAS AS POSSIBLE, BOTH ABROAD AND HERE AT HOME,

Plaintiff sought peacefully to  perform the duty for which she was assigned as  Head Start Policy Council President over 752 families children and over 16 Centers through out the county, this created quite a stir.

1.    In 1999 it was discovered that  the public schools Failed to live up to the Department of Education's Performance Standard Requirements.

2.    Parents were empowered, with decision making skills and assistance was given them in selecting ways and means to enable their children to learn much better, many children with learning disabilities were struggling the most and were in need of immediate intervention in order to be able to keep up with the demands.

3.    Studies shows that many children with neuralgic condition are sometimes hard to manage, but nothing that a little time, patience, effort and some tender-living care won't cure.

Plaintiff lived in the Millcreek location at below stated location the plaintiff took up residence in the Mill creek's Township on or about April 5th 2001,  for only approximately 3yrs. at the time when these  alleges said to have took place the fact that, right up  until this present day ( See exhibit C.)In fact;

The defendant repeatedly states in his Initial report, and signed affidavit and probable cause testimony, that: The plaintiff resided in the Township of Millcreek at the address of 6023 Glade Drive, since the length stated, which is untrue as so is all the other adjoining alleges in his complaint ,affidavit and The warrant.

(See Section  (A)) Titled Facts, line 7. paragraph 2 and compare) Tells the story of conspiracy amongst the responsible body of officials.

9

Part Four The National Agenda
Introduction:   Agenda for America under attack
Overview:   A more definite statement

## Chapter Four

**IV.   AND WOULD LIKE NOTHING MORE THAN TO USE THE WORLD'S MOST DEADLY WEAPONS AGAINST US**
          **With SUCH AN ENEMY,**

**Concerning, The motion to dismiss or for a more definite statement**
**Refer to: Doc. (10):**
**a. The verification is subjected to the penalties of**

**Section 4904 of the Crimes code (18 PA. C.S §4904)**
**relating to unsworn falsification to authorities.**

**. Misleading Information**

**1. On the Sworn Affidavit of probable cause**
    **A.  Defendant willful and intentionally lied**
    **and deceive the courts about:**
        **1.  The Origin of the crime**
        **2.  The facts of the crime**
        **3.  And plaintiff's involvement**
        **4.  Dates and timeline**

## Home School Remedy Needed

The schools were calling me all the time into a conference meeting, my pre-scheduled campaign meetings engaged most of my time, from local board and center meetings to regional, statewide and national conference made my life full with much to do politically, socially, and personally from 1994-up until...made me unavailable much of that time.

**C.  The Economic War draft**

10

The war against poverty occupied the majority of my time and seeking out ways to make it better for low-Income struggling parents, and underprivileged children, from welfare reform and the transition from welfare to work ideals involvements extended throughout those years , the schools demanded to hear from me I, responded as much as possible.

**D.** **The Attack**

Frustrated as they were not being able to find the right program tailored to the special needs of disabled and disadvantage children, I answered the call and challenge the task that of leaving no child behind initiative and being empowered to do so thus became the target of attack.

**E.** **On-going oppositions**

It was always something new to try out on my children in order to justify nor having to teach them in their facilities.
One teacher advised me to medicate my children says their behavior was unbearable.
When checked by the doctor, he stated it was the case of children just being children and that they will grow out of that stage eventually.

**F.** **Warning: Home school Forbidden**

**Was the message I received when I removed one of my children from the school district's registration.**

**1.**

**Investigation states that all that he acclaim to is correct) ( when in fact all is incorrect, a flat out lie)**
                            **On the contrary**

                            **Refer to: Doc. (10)**

          **1. Corporal Munch states in his criminal complaint filed on April 26, 2004 accusing the plaintiff of allegedly violating a statute and ordinance. (See Exhibit C.- Police Criminal Complaint)**

2. The acts so said committed were as said set forth in a summary of facts sufficient to advise plaintiff of the nature of the offense charged (see report Exhibit C.)

3. The defendant Corporal Munch goes on to say that he accused the plaintiff for engaging in these activities in Millcreek Township county on or about (and he specifically states and I quote from his complaint,) From 1994 thru February 2004 , he swore that the complaint he complete was verified
   a. The verification is subjected to the penalties of

Section 4904 of the Crimes code (18 PA. C.S §4904) relating to unsworn falsification to authorities.

. **Misleading Information**

1. On the Sworn Affidavit of probable cause
   A. Defendant willful and intentionally lied and deceive the courts about:
      1. The Origin of the crime
      2. The facts of the crime
      3. And plaintiff's involvement
      4. Dates and timeline

A.    **Empowered Parents**
      In 1999 it was discovered that the public schools Failed to live up to the Department of Education's Performance Standard Requirements.

      Parents were empowered, and assistance was given them in selecting ways and means to enable their children to learn, many children with learning disabilities were struggling the most and were in need of immediate intervention in order to be able to keep up with the demands.
      Studies shows that many children with neuralgic condition are sometimes hard to manage, but nothing that a little time, patience, effort and some tender-living care won't cure.

**B.**

1. First thing happened, I was brought into court on some trumped up charges of truancy violation

(a)  This incident was uncalled for , seeing that the K12 academy personally sent notice of the enrollment of the child

2.  Next thing happen, I was told my child could not step foot on the school's property for no certain reason what-so-ever

(a)  Once while I meet with some teachers at a conference for another certain child, the one son remained in and around the car talking to past class mates ,  the police were called, and I was asked by the principal Mr.Cavanagh not to ever bring him on the school property again.

**C.  <u>Public School Drama</u>**

They were tried out in just about every remedial class in Erie
Then while my one of my children was put in a class under constant surveillance
A school official said, "he  wondered outside the building  an incident occurred acclaiming he took part in ,there seems to be no desire to train special need child.

Removing him from the on-going pressures of public school drama he seem to be facing more than seem to be imaginable, was a every day expectation, a change has got to come was my desire so I placed him along with another child of mine into another environment, The Christian Academy School there they did well until one day an incident occurred about one of the teachers purse
OCY was called a threat to call the police and press theft charges was made

That's when the child allege, they said , that he was afraid to go home, they found out he lied to them and expunged the matter from  system, so they said and closed the case
The Academy said they encountered trouble from them in the past and did not want any more trouble said, they just wanted my son's gone from there.

Eventually I moved here in Mill Creek  and trying to get away from the madness in Erie County against my son's, more drama occurred.

In April of 2001 I moved, and here is where I come to get some peace and tranquility.

<u>Now this:</u>

# <u>Home School under attack</u>

report from the Office in Action of this part(II.) page (8) and The Responsible Body in  part (III) of exact same page , that of (8)  Out of  this office
came  forth  the  report  drafted  up  by  the  department  police's  Corporal admitting as such.


was all determined to be the route to be taken after a call was made fact that the plaintiff took up residence in the Mill creek's Township on or about April 5th 2001 until the present day ( See exhibit of fact
the township of Millcreek at 6023 glade Drive the Plaintiff repeatedly states in his Initial report, and signed affidavit and probable cause testimony,that Turn with me to Section  (A) Titled Facts, line 7.
pargraph 2 and compare


Part  Five  Our Public at Risk
Introduction:  A Plan for a safer world

Chapter  Five

V.     NO NEGOTIATED PEACE IS POSSIBLE;  NO POLICY OF CONTAINMENT OR DETERRENCE WILL PROVE EFFECTIVE


THE PRESIDENT OF THE UNITED STATES PROCLAIMS   "A PLAN FOR A SAFER WORLD.. A MORE HOPEFUL AMERICA"


HIS MESSAGE TO THE ENDS OF THE WORLD THROUGHOUT THE NATION AND COUNTRIES IN THE UNITED STATES:

ON October 26, 2004 PRESIDENT GEORGE W. BUSH,
PUBLISHED IN HIS SPEECH THAT:

"OUR NATION, THIS GENERATION, WILL LIFT A DARK THREAT OF VIOLENCE FROM OUR PEOPLE AND OUR FUTURE.  WE WILL RALLY THE WORLD TO THIS CAUSE, BY OUR EFFORTS AND BY OUR COURAGE. WE WILL NOT TIRE, WE WILL NOT FALTER, AND WE WILL NOT FAIL."...

FOLLOWING THE TERRORIST ATTACKS OF SEPTEMBER 11, 2001, HE SAID, THAT:

14

I.     "WE WILL HOLD ANY PERSON OR REIME THAT
HARBORS OR SUPPORTS TERRORISTS AS GUILTY OF TERRORISM AS
THE TERRORISTS THEMSELVES

II.     AMERICA WILL NOT WAIT FOR NEW THREATS TO GROW AND
FESTER,  WE WILL FACE NEW CHALLENGES-SWIFTLY, SURELY, AND
WITH STEELY RESOLVE

### In light of all that have been said

A. The defendant Munch was aware of all of the improper
conduct and the unconstitutional violations of which he
committed and should be prosecuted for his part as so should the
other actor's in this  conspiring revolt so to deter such type  of
behavior and practices from spreading like a contagious deadly
disease.

B.    Recent  document of evidence about the altering of records,
such as in the case of B. L's death , these point's were pointed
out in my style of complaining and calling the attention to various
officials commission to aid went un attended to. And the ignoring
of the cry for help, has now brought us to this point, shocking
reports about these office's in action, and their failure to comply
to standard procedures and negligence.
This has always been the office in this action's trail of practice,
from 1978- said the news media , concerning the mishandling of
sensitive documents,   the report notes , " At Dec. 31, 1978, $4,975,803 of
unquestioned cost are reflected in the financial  statements,  These cost
were questioned because adequate documentation was not available"
By Jeff Pinski Morning News staff reporter. A private accounting firm has
questioned $5 million in expenditure in an audit of Erie County Children Services
$5.2 million 1978 budget the firm of Salvia, Schaffner and Biglow Inc,
to sign a " clean audit" Stands to reason how recently in 2005's discourse of
investigations , their enormous amount of
" hush, hush money give-away, On July, 24,1992 County settles negligence suit,
April 1, 1978 headlines reads,
 Triola: Security breach' most devastating' the past director Carl T. said Friday, the
security breach that allowed confidential documents to be deposited nightly in a
dumpster outside his office is
 " the most devastating thing that 's happened to me in 16 years of social work."

**(See Erie Times News articles) It's no new thing to them to continue on with their exposed corruption in the part 10 of a series disclosures shocks officials**
        **In the series of "sensitive Children's Service records found in trash"**
**During a month long investigation into operations of Children 's Services of Erie County, the Morning News were handed several hundred confidential agency documents relating to child abuse, shelter care, all obtained by a source outside the agency itself.**
**Although "breach of confidentiality" is one of the most serious offense under the Child Protective Service Law (Act 124), the NEWS source said had "no difficulty" obtaining the documents.**
**All the defendants in this action have been named in a just recently on-going investigaton. From murder, to neglect, to bribery, to , you name it., from Erie County through-out Millcreek Country, shifting the blame as to who done it. (" they all are involved this conspiracy, (read the news).**


**Conspiracy Statue;   Which is the guideline by**
                **Which such crimes are govern.**


**-CITE-**
# 18 USC Sec. 241
**01/06/97**
**–EXPCITE-**
**Title 18- Crimes and Criminal Procedures**
**Part I-Crimes**
**Chapter 13- Civil Rights**


**-HEAD-**
**Sec.241.** *Conspiracy* against *rights*


**-STATUTE-**


**If two or more persons conspire to injure,**
**Oppress, threaten, or**
**Intimidate any person in any State, Territory,**
**Commonwealth,**
**Possession, or District in the fee exercise or enjoyment**
**of any fright or privilege secured to him /her by the**
**Constitution or laws of the United States, or because**
**of his /her having so exercised the same;**


**Or**

**If two or more persons go in disguised on the
highway, or on the premise of another, with intent to
prevent or hinder his free exercise or enjoyment of
any right or priviledge so secured-**

### THEY SHALL BE FINED
### UNDER FINED THIS TITLE OR
### IMPROSONED NOT MORE
### THAN
### TEN YEARS, OR BOTH;

**And if death results from the acts committed
In
Violation of this section or if such acts include
kidnapping or an
Attempt to kidnap, aggravated sexual abuse or
An attempt to commit
Aggravated sexual abuse, or an attempt to kill,**

### THEY SHALL BE FINED
### UNDER THIS TITLE OR
### IMPRISONED FOR ANY
### TERM OF YEARS OR FOR
### LIFE,
### OR BOTH, OR MAY BE
### SENTENCED TO DEATH.

### -SOURCE-

**(June 25, 1948, ch. 645, 62 Sta. 696; Apr. 11, 1968, Pub. L. 90-284, title
I, sec. 7018(a), (b)(1), Stat. 4396; Sept.13, 1994, Pub. L. 103-322, title VI,
Sec. 60006 (a), title XXXII, Sec. 320103 (a), 320201(a), title XXXIII, Sec.
33016(1)(L), 108 Stat. 1970, 2109, 2113, 2147; Oct. 11, 1996, Pub. L. 104-
294, title VI, Sec. 604(b)(14)(A), 607(a), 110 Stat. 3507,3511.)**

### Chapter Six

**VI.    WE WILL  EITHER FIGHT THE TERRORISTS ABOARD, OR FACE THE
CONSEQUENCES AT HOME**

**Chapter Seven**

**VII.    IN THE LONG RUN, OUR SECURITY IS NOTGUARANTEED BY FORCE ALONE**

**WHAT SHOULD WE DO**

RECALL,  the defected product, and bring out, A New ORDER.

1. Out with the Old and in with the New.

These offices' and their responsible bodies;

Operated 'outside the perimeter' of the doctrine of "Qualified Immunity" and worked  in the place and position , that of "unqualified forbiddance".
 All the attempts to justify their behavior are disregarding to the fact findings that;
The defendants and their offices acted irresponsible and their conduct must be punished and they should be found liable for that individual, as well as that related part.
        Are we to believe that these individual (corporal police, magistrate, school principle and guidance counselor, district attorney, county executive, social workers, and attorney at law) officials responsible body's and their office in this action are clue less of this illegal and gross negligence that occurred under their watch?

**Chapter Eight**

**VIII.   WE MUST WORK TO CHANGE THE CONDITIONS OF HOPELESSNESS AND RESENTMENT THAT PROVIDE FERTILE GROUND FOR TERROIST RECRUITMENT**

**II.    OFFICE IN  ACTION**

**A.  Corporal Police**

    B.  **District Justice**
    C.  **Assistant Principal**
    D.  **Guidance Counselor**
    E.  **District Attorney**
    F.  **County Executive**
    G.  **Children /Youth**
    H.  **Attorney at Law**

## III.   RESPONSIBLE BODY

    A.   **Frederick G. Munch**
    B.   **Susan D. Strohmeyer**
    C.   **John Cavanagh**
    D.   **Kathy Zborgrowski**
    E.   **Bradley Foulk**
    F.   **Rick Schenker**
    G.   **Gene Walczak**
    H.   **Michael R. Cauley**

## IV.  PLACE IN ACTION

    A.   **Mill Creek Police Station**
    B.   **District Justice**
    C.   **J.S Wilson**
    D.   **Erie County**

## V.  EVIDENCE IN ACTION

    A.   **Sworn Statement**
    B.   **Testimony**
    C.   **Witness**
    D.   **Victim**
    E.   **Evidence**
    F.   **Exhibits**
    G.   **Affidavit**

**Chapter Nine**
**IX.   ABOVE ALL, THIS REQUIRES BRINGING FREEDOM TO PEOPLE FROM WHOM IT HAS BEEN TOO LONG DENIED,**

## Introduction:  Consolidated complaint
### Overview:        Strictly Liable

AND NOW, comes the litigant in this here complaint to incorporate the
adjoining parts along with the amended act.
Presented to the Counsel  for the parties of this action to become familiar with the intent and purposes for which it is ordained to be enacted upon .
It is further provided with the need for the congregation an Legislation's vote of        acceptance accompanied with a seal of approval.


**The Story in this Action,**

In relation to the confusing issues, one might wonder what actually happen?

As we tract over the documents presented ,  by-way of review , we must start        with the first piece of presented evidence starting with the exhibit entitled :

1.      Police Criminal Complaint, next;
2.      Sworn Affidavit OF Probable Cause, next,
3.      The Warrant of Arrest, next
4.      Additional Charges
5.      Case Report
6.      The Narration of the events,
7.      The Case Supplemental Investigation Reports
8.      The Responsible body statement
9.       The Office in Action General Practice
10.     The Cover-Up and Suppressed Evidence


Now, turning our attention to the confirming evidence about this confusing of issues

The Issues of these alleging tales came of from cover-up's of corruptible acts of insubordination and if I may add, that needs to be dealt with immediately

**Chapter Ten**
**Introduction:  The Resolution**
**Overview; The Amendment Acts**

**X.      FOR FREE PEOPLE DO NOT SUPPORT TEROR".**


**RESOLUTION**

        We the People of The People declares that all mankind are created equal
  Whereas,    No man kind  shall take away the rights and liberties which are guaranteed by
the United States constitutions of a peaceful stay in their homes, schools, workplaces,
communities and throughout the United States ,in the waters,  across the waters , from sea to
shining seas, to distant lands and across the borders if international countries and in foreign
and domestic lands.


Whereas ,    No Laws shall be made restricting the people from their duly obligation and
rights to privileges govern by the constitutionality, in  respect to free exercised in freedom of
choice, which governs our ability to choose what religion we should select for worshiping the
God we know to be the one  and only true God, which states that all men were created equal

Whereas,    We reserve the right to worship our God in the beauty of holiness and in the
bond of peace without any interference or intrusion or any interruption in the performance
of our Solomon duty.

Whereas,    Our children can grow up being fully educated without fear of learning to much
and being threaten by tyrants to squash the noise of their laughter at home, at school, at play
Under constant fear of enjoying oneself and being intimidated for having too much laughter

Whereas,    Opportunity for a life of privileges provided for US by the provision stated in the
declaration of Independence ,  the Civilians rights to freedoms of all kind protected by the
constitutionality  guaranteed with providential protection  provided under the United States
Flag with Canon Law protection  to ensure its enforcing of the law which governs our
National Anthem, Our Nations Pledge, and Our Nations Motto, In God We Trust.

Whereas,

        Accusations alleging what went on in Milcreek County in the home of said
        Plaintiff for over a period of 10, years from 1994-2004 to be as quoted, in the legal
binding document, that of the sworn statements, affidavit, complaints, criminal accusations
in the Police Criminal Complaint and that of sworn affidavit, (See Exhibit C. pages 1-3).

Whereas,

The Responsible body's and their Office in action, grossly neglected to check the, contradictory evidence which declared that <u>a previous unfounded report was expunged In that same month just one year before this all occurred ,</u> and backed up by the fact stated on the issuing letter from the , "Child Line & Abuse Registry from the Department of Public Welfare in Harrisburg Pa.
Whereas,

The Office of Children and Youth. And responsible body's Gene Walczak, Rick Schenker, Michael Cauley, they were aware "<u>that the incident did not occur</u>", the records were not retain, and that the address of a 10year ordeal did not exist as being the location Cited in the investigation, but rather that of 1725 West 14th Street, Erie Pa. 16505, ( See attached letter as exhibit of evidence) where I previously resided for some years the address (as you may have noticed),     "Was not that of MillcreekTownship", which just became my residence in 2001.  Contrary to the sworn legal binding document, that of (Exhibit of C. pages, 02, 03, 06 and 07) of document (10),  it was examined and signed by Susan Strohmeyer's  her office's legal signature and seal officiated the act.

Whereas,
The Office of Bradley Foulk , looked and talked about the document agreed with its contents and approved of its mission, intentions and purpose to prosecute the accused(plaintiff) to the height of 3rd degree felony (See The Warrant of Arrest in the name of the Commonwealth of Pennsylvania, stating that I should answer to the Commonwealth or Millcreek TWP Police, acting upon the complaint of the responsible body, that of Fred Munch, charging me(And Now, the plaintiff in this matter) with – S 18 § 4304, that of Endangering Welfare of Children, and  further to be dealt with according to the law ( See doc. (10) Section C. pg. 06)  approved by Bradley Foulk's Office and signed into effect by him  the warrant was issued.

Whereas,

The statement " further to be dealt with according to the law",  was one of the worst nightmare statement ever stated , to be experienced in all  my  life's "come across", the struggles, the battles, the conflicts, the meet with, the come upon , you name it, I been through it, contrary to what the law states about the dealing with process, it was un believable, unreal, unorthodox, upright, unholy, unacceptable, undevout, unconstitutional, inhumane, I've been dealt with unmerciful.  Time after time letters were sent to offices in action, responsible body's , but to none availing any further than a put down, let down exile feeling, my lawyer turned away from their wrath , I understood that he would not take sides with me against them seeing that he have to work side-by-side with them everyday, whether or not that the truth of the evidence in this matter was staring him in the face, he just couldn't do it

Whereas,

The Attorney I hired to defend my cause and plead my case had bailed out on me  this is after several attempts to get them to let up off me ,by recording the whole court 's

preliminary trail hearing, and listening to testimony of innocence, even from the alleging victims, and the charges all "shoot down ", the office of the District Attorney said no way she go free", then Mill creek's Magistrate Susan Stromeyer said , I will bound here over to you, do what you will with her, I was detained on a fifty thousand dollar bond, from a R.O.R bond to this and yet again my lawyer pleaded ,this time for a bail reduction, Judge DiSantis after hearing reasonable affirmations about the quality of my character and nothing to affirm a flight risk nor a threat nor danger to the community the bond was reasonably reduced to the appropriate amount, this he did in spite of oppositions from the office of Foulk's administration. (may God bless his soul) After the thousand of dollars given to the attorney, I retain to defend me he bailed out on me when I asked him to motion for acquittal at a hung jury's decision , he stated , " It's not possible , it can't happen, the District Attorney wants a new trial, now pay me more money and I'll see what I can do about a plea bargain, Foulk's office says your guilty, so your guilty, but what about the evidence to the contrary, it doesn't matter they say your guilty, well, what say you, your guilty, and what about all this proof to say otherwise, I, can't help that,. then why did you allow me to go this far and take my money under a false pretense if you didn't believe in me, I could have gotten another lawyer who would at least look at my presenting evidence and sit and talk the case over with me, but you your would not even answer my calls, set up an appointment to see me refusing to hear that, he said oh well, we left from out of his office.

Whereas,

        The further dealings of the law, became more intense, in that now the children the very same ones told to be victims were escalating from once was one now it's said to be three (3), Orders from the court was obtained in removing the other children and allegations of abuse , neglect, and endangerment seem to be the biz word for getting them all out of the house and away from me. Now instead of just Corporal Munch accusing others such as the office of children and youth jumps onto the band wagon accusing myself of these such like acts, the new allegation were surfacing from where I did not know.
        Alledgements, from everything imaginable were accusing, mud slinging my name In order to accomplish the main intent " keeping me from home schooling my child" I have heard of this type of social defaming practices against parents who home school their children all across the nation it is happening where social workers be bringing false alleges against parents to help the school district maintain their required quota and subsidy funds needed to succeed. In Horn v. Brown, a case of a civil right's violated through wrongful arrest. ( See attachment)

Whereas

        Gene Walczak has brought some hideous reports against plaintiff, proclaiming child exploitation, solicitation, drug abuse, mental illness, sexual abuse , unheard of stories to keep me from accomplishing my mission toward my children. The need for the proven documentation is hereby asked about for presentation to be examined.
No, one brought up this matter in the court, not were their witness to these matters. In light of the fact in the early course of this matter the victim would not implicate the plaintiff in the assault at the September 7, 2004 of the preliminary hearing held in front of DJ Stromeyer

(See  attachment) and on `In April 15, 2004 the victim was question as to whether or not he received any beaten from mother (plaintiff) he so no, there was no family member there, frighten as he was after being threaten by the agency worker walczak and perhaps feeling he need someone to see his fright and help relieve him from their terror, all this happen while he was threaten to fix up a story, when Peterson pressed Bibbs for a name of the caseworker he says struck him he named a  Mr. Fritz see (Exhibit (5) paragraph (8) for details and one neither occasions were he ever threaten by me to recant or speak freely about my non-involvement, one the other hand as court documents notes the fact that he came to court after the on two separate occasions with a busted lip claiming that the staff in Peruses House had body slammed him , the court documented the statement and the busted infected lip was seen.  The D. A office said you just have to learn to listen or listen to the staff and do what you're told,  this type of intimidation was in the attempt to get him to say what the wanted to hear, as was plainly stated At the preliminary hearing when Raquel cross said, (while she was prompting him for a testimony) " Remember what we talked about, remember what we said".


Whereas,

        I question that if these children are so neglected, abused, and endangered
By plaintiff (mother) then  why are they not treated with tender loving care, gently handled and safe and in the best of care since they've been away from me.

Endangerment has been their constant companion, fear, terror, negligence, and inspire of what one therapist said in a disposition hearing about one of my sons sheltered environment , that of juvenile detention, " he is to young for all this , he needs to be in some one's home, not in this placement" , now his expert advise did not  go over well , nor was anything positive done about finding him a relatives home to live until this is over with , not even in spite of the fact one of his older sibling was interview , and given a list of things to do in order to qualify her home for his temporarily home place residence , nothing became of that attempt only another way of trying to find some one to testify against me. In spite of the fact she is certified with the Act 22 Clearance requirements and a Certified certificate still she's  not approved, whether or not it is all with good intentions for their purpose of delaying his Transitional move (from youth jailed confinement to a loving familiar home with family members who cares) stands within the reasonable fact that:
        The goals designed for him in his placement plan, is first and far most, written by the
        agency,  is to:
                (a)  Admit to being abused
                (b)  Come out of denial
                (c)  maintaining a group level

and the such like, first to torture a child into a confession of things which never happen is unconstitutional , in that he has a right to a peace, joy and happiness, the right to enjoy all the pleasure that other children his age benefit from.
High expectation goals with false and deceitful promises once reach only to find out he can't obtain the benefit and privileges, provided only for those juveniles who are placed their for

childhood crimes and he is sheltered there because they refuse to let him come home for fear I would place him back in the Pennsylvania Virtues Charter School with internet Cyber training his freedom of choice experience at a early age is not good.    The anger from my choosing to home school him rather publicly has cost my children and myself a great deal of misery, and the phrase " further dealings of the law"' has cast us all into the fiery furnaces of test and trials and our faith in the God, and the United States Constitution s Guarantees won't fail to provide us with all the benefits that was purchased with the blood, sweat and tears of  former written proclamations  That one thing hold true " all men were created equal" (Man and Woman) and with-out discrimination we will prevail towards our Freedom Right's Inheritance, predestine to be upheld, with Liberty And Justice for all of us, THIS REBELLION MUST COME TO AN END!

In the course of this attempt endeavored through the act ion responding to the call and the empowering for the mission of "no child left behind act" , Opposition from those who oppose me as a black woman citizen and every attempt to discourage , shut down and close me out has been done. From the altering of records, falsifying  docketing statements, badgering  and cruelly punishment to children, gaining public influence to buy into these lies and much, much more.

**#1.   Relating to section of the former complaint and responses,**

**(a)    Relating to the announcement from the Corporal's office**
In respect to the instrument (The criminal complaint, Affidavit of Probable Causes and Arrest Warrant) used to conduct the investigation and decide the validity of the whole matter in question

**(b)    Amend these documents as unfounded and untrue and expunge from off the record and out of the data system base**

**(c)    Notice the comparison of these items against their relative parts**

**(d )    <u>For example:</u>**

**1.    On April 26, 2005 Corporal Munch filed a Criminal Complaint Accusing Plaintiff , who lives at the address set forth above(in the Police Criminal Complaint)(Docket No: CR- 72-04, Date Filed April 26, 2004, the OTN: H 872 475-2)**

2. Stated on line (1) of the P.C.C. in Exhibit "C" taken from a copy of Attorney Patrick M. Carey, "Motion to Dismiss and/or Motion for More definite Statement ..."the Corporal police Officer said I, Cpl. F. Munch Officer badge # MPD #22 of Millcreek Township Police Dept. Police Agency Operator's Registration number PA 0250300, Originating Agency Case number 2004-3674, do hereby state: (appropriate checked #1.) accuse the above named defendant, who lives at the address set forth above (See Exhibit C. pg.(1) of 3)

3. (Continue from page 1-3 of the Police Criminal Complaint) In Millcreek Township County on or about From 1994 thru February 2004 ( The complaint's instrument asks if there were other participants involved) Participants were: another besides myself was stated.

4. Line (2) of Pg.1 of Munches Complaint it Talks about the acts committed by the accused, that of;

1. Endangering Welfare of Children Sec: 4304 (a) Pa. CC F-3 (Held over to Court)

2. Recklessly Endangering Another Person sec: Sec: 2705 Pa. CC M-2 ( dismissed 9/7/04)

3. Simple Assault Sec: 2701 (a) (1) Pa. CC M-1

5. Page(2) of the complaint that of the accusing officer states to this degree: (See exhibit C-pg.3)
1. That I being the parent of said child under the age of 18 years old
2. The accused did knowingly commit these acts over an extended period of time, being 1994 thru February of 2004
3. That of seriously injury. scarring, using a belt or which could of cause serious bodily injury or death

4. Goes on to say; all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary

to the Act of Assembly, or in   Violation of ....( cites of these violations presented)

5.   Line (3) of the sworn complaint asks for:

> a)   A warrant of arrest (a attached affidavit of probable cause and <u>sworn</u>   <u>to before the issuing authority</u>.)

6.   Line (4) He verify that the facts set forth:

> (a) are true and correct to the best of his knowledge or information and belief
>
> (b)   the verification made is subject to the penalties of Section 4904 of the Crime Code   (18 PA. C.S.§   4904)   relating   to   unsworn   falsification   to authorities.)

7.   The signature line bears witness to the affiant signature

8.   Next , he certify the complaint has been:
> (1) <u>properly</u> completed
> (2) properly verified

9.   Next, In order for a warrant to be issue:
> (1.) An affidavit of probable cause must be completed

10.   The bottom line to this of this signed affidavit bears:
> (1) the Magisterial district number that of 06-03-03
> (2) the issuing Authority's signature, and seal   (that of Susan Stromeyer)

11.   The Affidavit / probable cause section
> 1. This sections lists the action involved in this action and the actors in each discourse of the original event

27

    2. Also, The Office they represents and
        (a) The responsible body
        (b) The places in action
        (c) The office in action

    3. In this criminal complaint's, Affidavit
       of Probable Cause (pg. 3) presents:
        (a) Subject: <u>Probable Cause</u>
        (b) Text: #1- Origin Of the Crime
            #2- Facts of the Crime
        (c)    #3- Defendants Involvement

12. By this the affiant requested a warrant as
       per the attached Criminal Complaint, then
        (a) Corporal Munch duly sworn
         according to law, depose and say
        that the facts set forth in the
        foregoing affidavit are true and
        correct to the best of his knowledge
        information, and belief.
        (b) Then he signed it into effect

13. By this reason:

    1. A felony warrant was issued (See exhibit
      C. pg.6)
    2. In the name of the Commonwealth of
      Pennsylvania
    3. Commanding the custody of the any
      authorized person and,
    4. Bring the accused before Susan
      Stromeyer to,
    5. Answer the Commonwealth or
      Millcreek TWP Police
    6. Upon the complaint or citation of
      Fred, Munch
    7. Charging the accused with Statue 18
      § 4304 Endangering the Welfare of
      Children
    8. And further to be dealt with accord-

to the law and for such purpose,( the warrant became sufficient for his intent and purpose)

9. **The Warrant Items, especially:**
   (a) The Control No # 0656919
   (b) The Docket No# CR-0656919
   (c) The Commonwealth vs. Accused
   (d) The Offense Date – 1/01/94

10. **The Warrant's Additional charges** (See exhibit C. Pg. 8)(Mag. Dist.No: 06-3-03 and OTN: # H  872475-2) Docket No. CR-0000072-04 S  18 § 2705/ S  18 § 2701 §§A1

**Where this enactment of these acts resolve some issues: the act as follows is presented this day to be present as my form of action:**

No. 2001-35    AN ACT

**SB 485**

Amending the act of March 10, 1949 (P.L. No. 14), entitled  "An act relating to the public school system, including certain provisions applicable as well to private and parochial school; amending, revising, consolidating and changing the laws relating thereto," further providing for definitions and for classification of school districts; providing for schools that  provide Internet instruction and for national assessment tests; further for public school directors' business relations with school district, for management information reports, for distressed first class school districts, for instructional equipment, for duty to employ qualified professionals, for continuing  professional development, for proof of residency, for cost of tuition for maintenance of certain exceptional children in approved institutions, for agricultural education, for funding for charter schools, for financial program and reimbursement on payments, and for additions to removals from the education empowerment list; providing for the use of certain undistributed funds and for the dissolution of certain community colleges; further providing for teachers' and employees' retirement plans, for payments on equipments account of pupils enrolled in vocational curriculums, for vocational education equipment grants, for community college " support and for small district assistance; providing for basic education funding for the 2001-2002 school year; further providing for payments to intermediate units and temporary assistance to school districts losing revenue from reassessments; and providing for approved reimbursable annual rental for lease of buildings and facilities for charter school use.

The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follow

Section 1. Section 102(6) of the act of March 10, 1949 (P.L. 30, No.14), known as the Public School Code of 1949, added May 10, 2000 (P.L.44, No. 16), is amended to read:
Section 102. Definitions.—When used in this act the following words and phrases shall have the following meanings:
***

(6) "Pennsylvania System of School Assessment test" or "PSSA test" shall mean a test developed and implemented by the Department of Education to determine only academic achievement relating to objective Academic standards in the areas of reading, writing, mathematics and science.

Section 2. The act is amended by adding a section to read:

Section 113. Study of Public Schools that Provides Internet Instruction—(a) The Department of Education shall conduct a study of public schools that provide instruction primarily through the Internet. The study shall include:

(1) a review of academic accountability methods and systems;

(2) a summary of governance structures, approval processes and oversight mechanisms of each public school that provides instruction primarily through the Internet;

(3) an analysis and verification of the actual and reasonable instructional cost per student for each public school that provides instruction primarily through the Internet; and

(4) recommendations regarding funding alternatives.

(b) The Department of Education shall prepare a report that includes it's findings and recommendations from the study and shall provide the report , to the chairman and the minority chairman of the Education Committee of the Senate and chairman and minority chairman of the Education Committee of the House of Representatives by October 30, 2001.

(c) In he event that the report required under subsection (b) is not provided by October 30, 2001, no school district shall pay to any public school that provides instruction primarily through the Internet an amount to exceed two thousand dollars (2,000) per resident student enrolled.

Section 3. Section 202 of the act. Amended December 19, 1980 (P.L.1123, No.199) and December 19, 1980 (P.L. 1314. No.237). is amended to read;
Section 202. Classification.—The several school districts of the Commonwealth are herby divided into five classes, as follows:

Each school district having a population of [one million five hundred thousand (l,500,000)] one million (1,000,000), or more, shall be a school district of the first class;

Each school district having a population of [ three hundred fifty thousand (350,000)] *two hundred fifty thousand (250,000)*, or more, but of less than [one million five hundred thousand (1,500,000)] *one million (1,000,000)*, shall be a school district of the first class A;

Each school district having a population of thirty thousand (30,000), or More, but of less than [three hundred fifty thousand (350,000)] *two* Hundred fifty thousand (250,000), shall be a school district of the second class;

Each school district having a population of five thousand (5,000), or More, but of less than thirty thousand (30,000), shall be a school district of the third class.

Each school district having a population of less than five thousand (5,000) shall be a school district of the fourth class,

Section 4. the act is amended by adding a section to read:

*Section 219. National Assessment Tests.—A school district selected to participate in a national assessment of public school students' education progress authorized by the Federal Department of Education shall administer the assessment.*

Section 5. Section 324. of the act, amended January 18, 1968 (1967 P.L.963, No.429), is amended to read:

Section 324.    Not to be Employed by or do Business with District: Exceptions.—*(a)*   No school director shall, during the term for which he was elected or appointed, as a private person engaged in any business transaction with the school district in which he is elected or appointed, be employed in any capacity by the school district in which he is elected or appointed, or receive from such school district any pay for services rendered to the district except as provided in this act; Provided, That one who has served as a school director for two consecutive terms, of six years each, may be elected to the position of attorney or solicitor for the board of which he was a member by the unanimous vote of all the other members of the board, and, after resigning his office as school director, shall be entitled to receive such pay for his services as solicitor as the board of school directors may determine: Provided, however, That a school director may be appointed to of which he was a member during the term for which he was elected or appointed upon the unanimous consent of all the other member of the board after resigning his office as school director, and he shall be entitled to receive such pay for his services as secretary as the board of school directors, shall determine: And provide further, That one who has served as a school director may, after resigning from office as a school director, be elected to the position of teacher by the board of which he was a member by a vote of

at least two-thirds of all other members of the board and shall be entitled to receive such pay for his services as a teacher as the board of school directors may lawfully determine.

(b)  No school board shall draw, cause to be drawn or accept a specification for any item to be purchased by the school district that would limit the purchase of the item to the firm, corporation, partnership or other business entity of the item to firm, corporation, partnership or other business entity of which a school director is an officer, agent or employe and exclude all other persons who could submit quotations or bid on an equivalent item.

*(c) It shall not be a violation of this section for a school district to contract for the purchase of goods or services from a business with which a school director is associated to the extent permitted by and in compliance with 65 Pa.C.S. Ch.. 11 (relating to ethics standards and financial disclosure).*

Section 6. Section 613 of the act is amended by adding a subsection to read:

Section 613. Management Information Reports.—***

*(f) Beginning with the 2001-2002 school year and each school year thereafter, the mandatory reporting requirements of this section shall apply, as prescribed by the department, to area vocational-technical schools, intermediate units and charter schools, to the extent that funding is available. Area vocation-technical schools, intermediate units and charter schools shall apply for funding in a form and manner prescribed by the department.*

Section 7. Section 696(k)(1) of the act is repealed.

Section 8. Section 923-A heading, (c) and (d) of the act, amended or added July 12, 1972 (P.L.863, No.195), August 1, 1975 (P.L.,f183, No.90) and August 24, 1977 (P.L.199, No.59), are amended to read:

Section 923-A.      Loan of Textbook, Instructional Materials and *Instructional* Equipment, Nonpublic School Children.—***

(c) Loan of Textbooks [ *and* ], Instructional Materials *and Instructional Equipment.*     The Secretary of Education directly, or through the intermediate units, shall have the power and duty to purchase textbooks individual request, to loan them to all children residing in the Commonwealth who are enrolled in grades kindergarten through twelve of a nonpublic school. Such textbooks [ *and* ], instructional materials *and Instructional equipment* shall be loaned free to such children subject to such rules and regulations as may be prescribed by the Secretary of Education, due regard being has to the feasibility of making loans of particular instructional materials *and instructional equipment* on an individual basis.

(d)      Purchase of Textbooks [ *and* ],  Instructional Materials *and*

*Instructional Equipment.* The secretary shall not be required to purchase or otherwise acquire textbooks, pursuant to this section, the total cost of which , in any school year 1973-1974, fifteen dollars ($15) for the school year beginning July 1, 1974 and twenty dollars ($20) for each school year thereafter or instructional materials *and instructional equipment,* the total cost of which, in any school year, shall exceed an amount equal to ten dollars ($10), multiplied by the number children residing in the Commonwealth who on the first day of October of the school year immediately  preceding are enrolled in grades kindergarten through twelve of a nonpublic school.

Section 9.    Section 1106 of the act, amended June 24, 1981 (P.L.109, No.36), is amended to read:

Section 1106.  Duty to Employ.—The board of school directors in every School district shall employ the necessary qualified professional employes, substitutes and temporary professional employes to keep the public schools open in their respective districts of the first class and first class A which may require residency requirements *for other than professional employes, substitutes and temporary professional employes,* no other school district shall require an employe to reside within  the school district as a condition for appointment or continued employment.

Section 10. Section 1113(b.1) of the act, amended August 5, 1991 (P.L.219, No.25), is amended to read:

Section 1113. Transferred Programs and Classes.—***

(b.1) Professional employes who are classified as teachers and who are not transferred with the classes to which they are assigned or who have received a formal notice of suspension shall form a pool of employes within the school entity.   No new professional employe who is classified as a teacher shall be employed by a school entity assuming program responsibility for transferred students while there is:

(1) a property certificated professional employe who us classified as a teacher suspended in the receiving entity; or

(2) if no person is qualified under clause (1), a properly certificated member of the school entity pool who is willing to accept employment with the school entity assuming program responsibility for transferred students. Members of the pool shall have the right to refuse employment offers from such school entity and remain in the pool. [Refusal to accept work under this subsection shall not be grounds for denial of unemployment compensation under sections 401 and 402 of the act of September 5, 1936 (2nd Sp.Sess., 1937 P.L.2897, No.1). know as the "Unemployment Compensation Law," *For purposes of sections 401 and 402 of the act of December 5, 1936  (2nd Sp.Sess., 1937, P.L.2897, No.1), known as the "Unemployment Compensation Law," an employer policy is hereby established under which members of the pool are not required to accept employment offers from the school entity assuming program responsibility for transferred students.*

33

***

**Section 11.**    sections 1205.1(c) and (e) and 1205.2(k) of the act, Amended or added November 23, 1999 (P.L.529, No.48) and May 10, 2000 (P.L.44, No.16), are amended to read :

**Section 1205.1    Continuing Professional Development.—***

(c)    The professional education plan of each school entity shall be designed to meet the educational needs of that school entity and its professional employes. A school entity shall annually review its plan to determine whether or not it continues to reflect the needs of the school entity and its strategic plan and the needs of its professional employes, students and the community. The plan shall be amended as necessary to ensure that the plan meets the requirements of this subsection. The plan shall specify the continuing professional educational courses, programs, activities and other leaning experiences approved to meet continuing professional development requirements under section 1205.2(c)[.], *including efforts designed to improve teacher knowledge in subject areas covering the academic standards listed in 22 Pa. Code.Ch. 4 (relating to academic standards and assessment).*

***

(e) The requirements of this section and section 1205.2 do not apply to a professional educator not employed by a school entity who serves as an evaluator of a home education program authorized under section 1327.1(e)(2) *or who provides private tutoring services as part of a home education program under section 1327.1.*

**Section 1205.2 Program of Continuing Professional Education.—***

(k) A professional or temporary professional employ may apply to the department for inactive certification. Inactive certification shall:

(1) Suspend the requirements of this section until inactive certification is removed by the department. Upon the removal of inactive certification, professional educator shall have the same number of hours of continuing professional education and the same amount of time in which to complete those hours as existed for the professional educator at the time inactive certification was granted.

(2)    Be removed by the department upon the application of the professional educator and evidence of the completion of thirty (30) hours of continuing professional education within the immediate preceding twelve (12) months. The department shall establish guidelines to approve courses that will authorized the removal of inactive certification.

(3) Disqualify an individual from being employed by a school entity as a professional or temporary employe. An individual with inactive certification may be employed as a [temporary] substitute teacher, *principal, superintendent or assistant superintendent in accordance with the endorsement on the individual's certificate or letter of eligibility* for no more than ninety (90) days during a school year.

***

34

Section 12. Section 1302 of the act, amended June 25, 1997 (P.L.297, No. (30), is amended to read:

Section 1302.   Residence and Right to Free School Privileges.—A child Shall be considered a resident of the school district in which his parents or the guardians of his person resides. Federal installations are considered a part of the school district or districts in which they are situate and the children residing on such installations shall be counted as resident pupils of the school district. When a resident of any school district keeps in his home a child of school age, not his own, supporting the child gratis as if it were his own, such child shall be entitled to all free school privileges accorded to resident school children of the district, including the right to attend the same manner as though such child were in fact a resident school child of the district, and shall be subject to all the requirements placed upon resident school children of the district. Before such child may be accepted as a pupil, such resident shall file with the secretary of the board:

(1)    appropriate legal documentation to show dependency or guardianship; or

(2)    a sworn statement that he is resident of the district, that he is supporting the child gratis, that he will assume all personal obligations for the child relative to school requirements, and that he intends to so keep and support the child continuously and not merely through the school term. *The school board, pursuant to guidelines issued by the Department of Education, may require other reasonable information to be submitted by the resident to substantiate the sworn statement.*

Section 13. Section 1329 of an act. Amended December 28, 1959 (P.L.2021, No.742), is amended to read:

Section 1329.    Excuses from Attending school.—*(a)* The board of school directors of any school district may upon certification by any licensed practitioner of the healing arts or upon any other satisfactory evidence being furnished to it showing that any child or children are prevented from attending school, or from application to study, on account of any mental, physical, or other urgent reasons, excuse such child or children from attending school as required by the provisions of this act, but the term "urgent reasons" shall be strictly construed and shall not permit of irregular attendance. In every such case, such action by the board of school directors shall not be final until the approval of the Department of Public Instruction has been obtained. Every principal or teacher in any public, private, or other school may, for reasons enumerated above, excuse any child for no-attendance during temporary periods.

*(b)    Pursuant to the requirements of 22-Pa. Code § 11.41 (relating to school district policies and rules), the board of school directors shall formally adopt, as part of its written rules governing pupil absences and excusals, a policy permitting a student to be excused for participation in a project sponsored by an organization that is eligible to apply for a grant under section 5(3) of the act of July 8, 1986 (P.L.437, No.92), known as*

the *"Pennsylvania Agricultural Fair Act."*

Section 14. Section 1376(a) of the act, amended June 7, 1993 (P.L.49, No. 16), is amended to read:

Section 1376.   Cost of Tuition and Maintenance of Certain Exceptional Children in Approval Institutions.—(a)     When any child between school entry age and twenty-one (21) years of age and resident in this Commonwealth, who is blind or deaf, or has cerebral palsy and/or neurological impairment and/or muscular dystrophy and/or is mentally retarded and/or has a serious emotional disturbance and/or has autism/pervasive developmental disorder and is enrolled, with the approval of the Department of Education, as a pupil in an approved private school approved by the Department of Education, in accordance with standards and regulations promulgated by the State Board of Education, the school district in which such child is resident *or, for students placed by a charter school, the charter school in which the student was enrolled* shall pay the greater of either twenty per centum (20%) of the actual audited cost of tuition and maintenance of such child in such school, as determined by the Department of Education, or its "tuition charge per elementary pupil" or its "tuition charge per high school pupil," *as calculated pursuant to section 2561,* and the Commonwealth shall pay, out of funds appropriated to the department for special education, the balance due for the costs of such child's tuition and maintenance, as determined by the department, For the school years 1989-1990, 1990-1991 and 1991-1992, the school district payment shall be no greater than forty percent (40%) of the actual audited costs of tuition and maintenance of such child in such school.    For the 1992-19932 school year and each school year thereafter, the school district *or charter school* payment shall be the greater of forty percent (40%) of the actual audited cost of tuition and maintenance of such child in such school, as determined by the Department of Education, or its "tuition charge per elementary pupil" or its "tuition charge per high school pupil," *as calculated pursuant to section 2561,* and the Commonwealth shall pay, out of funds appropriated to the department for approved private schools, the balance due for the costs of such child's tuition and maintenance, as determined by the department. The department will credit the district of residence with average daily Membership for such child consistent with the rules of procedure developed In accordance with section 2501.    If the residence of such child in a particular school district cannot be determined, the Commonwealth shall pay, out of money's appropriated to the department for special education, the whole cost of tuition and maintenance of such child. The Department of Education shall be provided with such financial data from approved private schools as may be necessary to determine the reasonableness of cost deemed tuition and room and board concerning Pennsylvania resident approved reimbursed students. The Department of Education shall evaluate such data and shall disallow any cost deemed unreasonable. Any costs deemed unreasonable by the Department of Education for disallowance shall be

36

considered and adjudication within the meaning of Title 2 of the Pa. C.S. (relating to administrative law and procedure) and regulations promulgated thereunder.
    ***

Section 15.   Section 1311-A of the act, added November 22, 2000 (P.L.672, No.91), is amended to read:

section 1311-A    Standing.—(a) If a student in a school district of the first class is a victim of an act of violence involving a weapon on school property and the student who possessed the weapon was not expelled under section 1317.2 , parent or guardian of a victim of an act of violence in a school in a school district of the first class to modify, clarify or eliminate a consent decree that is related to discipline in the district if, in consultation with the advocate, the Office of General Counsel believes that the action is in the best interests of the students of the school district.

    (b) The Office of General Counsel shall have standing to bring an action on behalf of a victim or the parent or guardian of a victim of an act of violence in a school in a school district of the first class to modify, clarify or eliminate a consent decree that is related to discipline in the district if, in consultation with the advocate, the Office of General Counsel believes that the action is in the best interests of the students  of the school

    (c) the Secretary of [the Budget] *Education in consultation with the General counsel* may designate a portion of the funds provided for the sale Schools advocate for contracts for legal services for proceedings under Subsection (a). The Secretary of the [the Budget] *Education in consultation with the General Counsel* may designate a portion of the funds provided for the advocate to challenge a consent decree under subsection (b) or to bring an action under sections 1310-A(c)(5) and 1312-A(a).    The designation of attorneys to receive funds under this subsection shall be within the safe discretion of the Office of General Counsel after consultation with the safe schools advocate.   Designated funds which are not expended under this subsection shall lapse to the General Fund.

    (d)   Legal proceeding under this section shall be conducted by an attorney designated by the Office of General Counsel in consultation with the safe schools advocate. The attorney must be a member of the bar in good standing.

    (e)   The appropriation for the Office of School Victim Advocate in section 202 of the act of May 24, 2000 (P.L. 1086, No.21A). known as the "General Appropriation Act of 2000," shall be used to implement this section and sections 1310-A and 1312-A.

    (f)   As used in this section, "low-income parents or guardian" shall mean a parent whose family income is no greater than two hundred fifty per centum (250%) of the Federal poverty level.

Section 16.   Section 1613 of the act, amended December 15, 1986 (P.L.1602, No.178), is amended to read:

Section 1613.   High School Certificates.—(a)  The board of school directors, joint board or joint school committee operating any high school

shall issue a certificate to each pupil satisfactorily completing the prescribed course of instruction in the high school.

(b) For those pupils graduating at the close of the school year 1989-1990, and each year thereafter, the following minimum courses in grades nine through twelve established as a requirement for high school graduation in schools operated by a bona fide church or other religious body:

(1) Four years of English.
(2) Three years of mathematics.
(3) Three years of science.
(4) Three years of social studies.
(5) Two years of arts and humanities.

(c) A child enrolled in a day or boarding school accredited by an accrediting association which is approved by the State Board of Education shall be deemed to have met the requirements of subsection (b).

*(d) The Department of Education, in a form and manner that is* shall *prescribe* may *issue a Commonwealth secondary school diploma to an individual confined in a State-operated juvenile or adult correctional facility located within this Commonwealth if the individual has completed the required secondary school curriculum specified by the department. If a Commonwealth secondary school diploma is not issued, the department may award academic credit for completed coursework.*

Section 17.    Section 1725-A(c) of the act, added June 19, 1997 (P.L.225, No.22), is amended to read:

(c)    The Commonwealth shall create a grant program to provide temporary transitional funding to a school district due to the budgetary impact relating to any [student attending] *student's first-year attendance at* a charter school. [A school district that approves one or more charter schools may apply for a grant under this subsection.] The department shall develop criteria which shall include, but not be limited to, the overall fiscal impact on the budget of the school district resulting from students of a school district attending a charter school.    The criteria shall be published in the Pennsylvania Bulletin. [Payments under this subsection shall be made for the first year of operation of the charter school. The authority to make a grants under this subsection shall expire on June 30, 1999.] This subsection shall not apply to a public school converted a charter school under section 1717-A(b). *Grants shall be limited to funds appropriated for* this purpose.
        ***

Section 18.    Section 1795-B(a)(2) of the act, added May 10, 2000 (P.L.44, No.16), is amended to read:

Section 1704-B.    Board of School Directors.—(a)    The board of school directors shall implement the school district improvement plan. Notwithstanding any other provision of law to the to the contrary, the board of school directors of a school district on the education empowerment list may

do any of the following consistent with the school district improvement plan:

***

(2)   Designate any school of the district as an independent school operating under an agreement with the board of school directors, granting operational control to the governing body of the independent school. The governing body of the independent school, including its membership and selection process, shall be established by the board of school directors. The governing body shall include representatives of parents and teachers. A school designated as independent under this paragraph shall have the authority to decide all matters related to the operation of the school, including the exercise of powers provided under this article. The agreement between the board of school directors a and the independent school shall do the following, consistent with the school district improvement plan:

(i)   Describe the governance structure of the independent school,

(ii)   Prescribe the educational goals and mission of the independent school and the curriculum to be offered.

(iii)   Describe the academic, fiscal and other goals and objectives for which the independent school will be held accountable and the evaluation criteria and procedures that will be employed to determined whether the school is meeting its goals and objectives.

(iv)   Grant the independent school allocation of and control over its funding and budget.   [An independent school shall be considered a charter school for purposes of funding pursuant to section 1725-A.] *The independent school's funding shall be determined by the agreement.*

(v) Grant the independent school control of the educational program and curriculum.

(vi)   Prescribe the authority of the independent school to establish working conditions, select and assign professional and nonprofessional employes, establish nonteaching duties, extend the length of the school year and schedule of the school day, including holding class after regular hours.

(vii)   Define the terms under which the agreement may be terminated, extended or renewed.

***

Section 19.   Section 1705-B(h) of the act, amended November 22, 2000 (P.L.672, No.91), is amended to read:

Section 1705-B. Education Empowerment Districts.—***

(h)   (1) A board of control established under section 692 shall be abolished upon certification of the school district as an education empowerment district. The school district shall be operated by a board of control established under subsection (a).   The secretary may appoint the same individuals serving on the board of control under section 692 to the board of control under subsection (b).

(2)   Section 691 and 692 shall not apply to a school district certified as an education empowerment district.

(3)   For a school district with a history of low test performance that is

certified as distressed for a minimum period of two (2) years under sections 691 and 692, the department shall waive the inclusion of the school district on the education empowerment list under section 1704-B(a) and immediately certify the school district as an education empowerment district.

(4) *The department may utilize up to $2,000,000 of undistributed funds not expended, encumbered or committed from appropriations for grants and subsidies made to the department to assist school districts certified as am education empowerment district under paragraph (3). There is hereby established a restricted account from which payments under this paragraph shall be paid. Funds shall be transferred by the Secretary of the Budget to the restricted account to the extent necessary to make payments under this paragraph Funds in the restricted account are hereby appropriated to carry out the purposed of this paragraph. This paragraph shall apply to fiscal years 2000-2001 and 2001-2002 and shall expire June 30, 2002.*

Section 20.   Section 1714-B of the act is amended by adding subsections to read:`

Section 1714-.  Mandate Waiver Program.—***

(1) *Beginning with the 2001-2002 school year, intermediate unit boards of directors and area vocational-technical boards shall be eligible to apply for mandate waivers under this section except for those in subsections (g) and (m).*

(m) *The following provisions shall not be subject to waiver for intermediate unit boards of directors and area* vocational-technical *schools pursuant to this section: Article IX-A and Article XVIII.*

Section 21.   Section 1855 of the act May 10, 2000 (P.L.44, No.16), is amended to read:

Section 1855.   Vocational Educational Equipment Grants.—For the 2000-2001 fiscal year *and the 2001-2002 fiscal year,* the Department of Education shall establish a grant program to assist area vocational-technical schools [and], **school districts** offering approved vocational-technical programs *and the Thaddeus Steven State College of Technology in* purchasing equipment that meets industry standards for the purpose of providing training to students. Grants shall be limited to the purchase of equipment in the following program area: automotive technology , auto body, diesel technology, precision machine technology, heating ventilation and air conditioning, printing, dental assisting, electronic, building trades and other program areas approved by the Secretary of Education. Grants shall be awarded by the Department of Education on a matching basis, two State dollars ($2) for every local dollar ($1), and shall be limited to funds appropriated for that purpose.

Section 22.   Section 1913-A heading and (b)(1) and (1.4) of the act, Amended or added July 1, 1985 (P.L.103, No.31), June 7, 1993 (P.L.49,

No.16) and May 10, 2000 (P.L.44, No.61), are amended to read:

Section 1913-A. Financial Program; Reimbursement [or] of Payments.— ***

(b) (1) [For the 1993-1994 fiscal year and for each fiscal year thereafter, the] *The* Commonwealth shall pay to a community college on behalf of the sponsor on account of its operating costs during the fiscal year from funds appropriated for that purpose an amount equal to:

(i) *for the 1993-1994 fiscal year through the 2000-2001 fiscal year,* the lesser of such college's variable State share ceiling as determined in clause (1.3) or such college's equivalent full-time student reimbursement as determined in clause (1.4)[.]; *and*

(ii) *for the 2001-2002 fiscal year and each fiscal year thereafter, the college's equivalent full-time student reimbursement as determined in clause (1.4).*

***

(1.4) The equivalent full-time student reimbursement of a community college shall be the sum of credit course, noncredit course and stipend reimbursements. These reimbursements shall be calculated using a reimbursement factor of one thousand and forty dollars ($1,040) for the 1993-1994 fiscal year, of one thousand eighty dollars ($1,080) for the 1994-1995 fiscal year and of one thousand one hundred eighty dollars ($1,180) for the 1995-1996 fiscal year and on thousand and two hundred and ten dollars ($1,210) for the 1996-1997 fiscal year and one thousand two hundred sixty dollars ($1,260) for the 1997-1998 fiscal year and the 1998-1999 fiscal year and one thousand three hundred dollars ($1,300) for the 1999-2999 fiscal year and one thousand four hundred dollars ($1,400) for the 2000-2001 fiscal year *and one thousand five hundred dollars ($1,500) for the 2001-2002 fiscal year* and for each year thereafter and shall be determined as follows:

(i) Credit course reimbursement shall be calculated by multiplying the reimbursement factor by the number of equivalent full-time students enrolled in credit courses as determined by an audit to be made in a manner prescribed by the State board of Education.

(ii) Noncredit course reimbursement shall be calculated as follows;

(A) eighty percent (80%) of the reimbursement factor multiplied by the number of equivalent full-time students enrolled in eligible noncredit courses for the 19993-1994 fiscal year, as determined by the audit referred to in paragraph (i);

(B) seventy percent (70%) of the reimbursement factor multiplied by the number of equivalent full-time students enrolled in eligible noncredit courses for the 1994-1995 fiscal year and for each year thereafter, ad determined by the audit referred to in paragraph (i); or

(C) one hundred percent (100%) of the reimbursement factor multiplied by the number of equivalent full-time students enrolled in eligible noncredit public safety courses that provide training for volunteers firefighters and

emergency medical services for the 1f995-1996 fiscal year and for each year thereafter, as determined by the audit referred to in paragraph (i).

(iii)    Stipend reimbursement on account of a community college's operating costs for all equivalent full-time students enrolled in the following categories of two-year or less than two-year occupational or technical programs, shall be the sum of the following:

(A)    One thousand one hundred dollars ($1,100) per full-time equivalent student enrolled in advanced technology programs. For the fiscal year 1995-1996, 1996-1997 and 1997-1998, the reimbursement rate shall be calculated at one thousand one hundred seventy-five dollars ($1,175) per full-time equivalent student enrolled in advanced technology programs. Advanced technology programs are programs using new or advanced technologies which hold promise for creating new job opportunities, including such fields as robotics, biotechnology, specialized materials and engineering and engineering-related programs.

(B)    One thousand dollars ($1,000) per full-time equivalent student enrolled in programs designated as Statewide programs. For the fiscal year 1995-1996, 1996-1997 and 1997-1998, the reimbursement rate shall be calculated at one thousand seventy-five dollars ($1,075)    per full-time equivalent student enrolled in programs designated as Statewide programs. For the fiscal year 1998-1999 and each year thereafter, the reimbursement rate shall be calculated at one thousand three hundred sixty dollars ($!,360) per full-time equivalent student enrolled    in programs designed as statewide programs. A Statewide program is a program which meets one or more of the following criteria:

(I)    Program enrollment from out-of-sponsor area is twenty per cent or more of the enrollment for the program.

(II)    A consortial arrangement exists with another community college to cooperatively operate  a  program  or  share  regions  in order  to avoid unnecessary program duplication.

(C)    Five    hundred    dollars    ($500)  per full-time    equivalent student enrolled in other occupational or technical programs. For the fiscal year 19995-1996, 1996-1997 and 1997-1998, the reimbursement rate shall be calculated at five hundred seventy-five dollars ($575) per full-time equivalent student enrolled in other occupational or technical programs. For the fiscal year 1998-1999 and each year thereafter, the reimbursement rate shall be calculated at eight hundred sixty dollars ($860) per full-time equivalent student enrolled in other occupational or technical programs.
***

Section 23. The act is amended by adding sections to read:

*Section    1914-A.    Dissolution    of    Certain    Community Colleges.—(a)    Notwithstanding the provisions of this section 19910-A, any community colleges that was approved as a community college by the State Board of Education after January 1, 1990, may be dissolved after a determination by the Secretary of Education that the majority of the*

education and training programs operated by the college are nonacademic in nature and upon notice of said determination to the community college.

(b) Upon the Secretary of Education's notice as described in subsection (a), a dissolved community college shall cease to be a public instrumentality. If the dissolved community college desires to continue to offer degree programs, provide specialized job training or provide professional development training, those programs must be transferred to a corporate successor organized as a nonprofit corporation under 15 Pa.C.S. (relating to corporations and unincorporated associations).

(c) The corporation successor of a dissolved community college had the continue to have the authority to grant associate degrees and certificates in those programs in which the dissolved community college had the authority to grant degrees during the last complete school year of operation as a community college. If a corporate successor desires to offer additional associate degree programs, it must apply to the Department of Education to obtain approval in accordance with applicable regulations. If a corporate successor desires to offer additional certificates, it shall apply for licensure to the State Board of Private Licensed Schools. A corporate successor of a dissolved community college is not authorized to award baccalaureate degrees.

(d) All indebtedness of any community college dissolved under this section shall be transferred to and become the responsibility of its corporate successor. Nothing in this section shall be construed so as to waive the obligations or debts of any dissolved community college to any entity other than the Commonwealth. Any indebtedness of a dissolved community colleges to the Commonwealth or to the department, determined pursuant to audits of the dissolved community college conducted under section 1913-A(k), shall be deferred for one fiscal year subsequent to dissolution. Thereafter the amount and terms of repayment of the indebtedness to the Commonwealth shall be determined by the Secretary of the Budget.

(e) Any Workforce Development Challenge Grant awarded to a dissolved community college prior to dissolution shall be transferred to and become an asset of its corporate successor.

(f) The Commonwealth shall retain the right to have access to and the authority to review financial records of any community college dissolved under this section, including records created up through dissolution until such time as all information required to be reviewed under section 1913-A(k) has been reviewed and any indebtness owed to the Commonwealth has been repaid. Any audits prepared as result of the review conducted

*under this section must be completed and issued to the corporate successor of dissolved community college within one year of dissolution.*

*Section 1915-A. Work Force Development Courses.—No later than January 1, 2002, the Department of Education shall, in consultation with the community colleges and the State Workforce Investment Board, establish criteria to identify noncredit courses which emphasize work force development and for which additional reimbursement may be required above the current noncredit reimbursement factor. The department shall also provide an estimate of the number of equivalent full-time students enrolled in noncredit courses which emphasize work force development had these criteria been in effect in the 2000-2001 fiscal year. This information shall be furnished to the chairman and minority chairman of the Appropriations and Education Committees of the Senate and the chairman and minority chairman of the Appropriations and Education Committees of the House of Representatives.*

Section 24.  Section 2013-A of the act, added November 12, 1982 (P.L.660, No.188), is amended to read:

Section 2013-A.  Teachers' and Employes' Retirement Plans.—Pursuant To the provisions of 24 Pa. C.S. § 8301 (relating to mandatory and optional Membership), all professional and other employes of the system and its Institutions shall be accorded the right to elect participation in the Pennsylvania Public School Employees' Retirement System or the State Employees' Retirements System. Alternatively, eligible employes shall have Association of America—College Retirement Equities Fund (TIAA-CREF) retirement plan(.)*or in an alternative retirement plan or plans offered by any insurance company authorized to issue annuity contracts in this Commonwealth or mutual fund company with investment options meeting the requirements of a qualified plan under the Internal Revenue Code of 1986 (Public Law 99-514, 26 U.S.C § 1 et seq.). The alternative retirement plans shall be selected by the system pursuant to the request-for-proposal process.*

Section 25.  Section 2501(14.1) of act, amended June 7, 1993 (P.L.49, No.16), is amended to read:

Section 2501.    Definitions.—For the purposes of this article the following terms shall have the following meanings:

\*\*\*

(14.1)    "Market    Value/Income Aid Ratio."  For Purpose of reimbursement to a school district under subsection (d), (e), and (f) of section 2502, section 2502.8, section 2502.22, section 2502.25, section 2501.26 and section 2592, or to an intermediate unit or area vocational-technical school, shall be the commonwealth's method of determining the combined market value and income wealth for each pupil, and shall be computed, for the school year for which reimbursement is being paid, as

follows:

(a) (i) Divide the market value per weighted average daily membership of the district, intermediate unit or area vocational-technical school by the market value per weighted average daily membership of the State;

(ii) Determine the product of (a)(i) multiplied by .5;

(ii) Subtract the resultant product in (a)(ii) from 1.000 to determine the market value portion of the aid ratio.

(iv) For purposes of the calculation described in (a)(i) through (a)(iii), the market value of a district shall be the real property valuation of the district for the calendar year that concluded during the school year immediately preceding the school for which reimbursement is being paid. The market value of an intermediate unit of area vocational-technical school shall be the sum of the real property valuations of each of its component districts for the calendar year that concluded during the school year immediately preceding the school year for which reimbursement is being paid. The weighted average daily membership of a district shall be the weight average daily membership for the school year immediatel preceding the school year for which reimbursement is being paid. The weighted average daily membership of an intermediate unit or area vocational-technical school shall be the sum of the weighted average daily memberships of each of its component districts for the school year immediately preceding the school year for which reimbursement is being paid.

(b) (1) Divide the income per weighted average daily membership of the district, the intermediate unit of area vocational-technical school by the average personal income per weighted average daily membership of the State:

(ii) Determine the product of (b)(i) multiplied by .5;

(iii) Subtract the resultant product in (b)(ii) from 1.000 to determine the income aid ratio.

(iv) For purposes of the calculation described in (b)(i) through (b)(iii), the income of a district shall be the personal income valuation of the district. The income of an intermediate unit or area vocational-technical school shall be the sum of the personal income valuations of each of its component districts. The weighted average daily membership for the school year immediately preceding the school year for which reimbursement is being paid. The weighted average daily membership of an intermediate unit or area vocational-technical school shall be the sum of the weighted average daily memberships of each of its component districts for the school year immediately preceding the school year for which reimbursement is being paid.

(c) Add sixty percent (60%) of the market value aid ratio to forty per (40%) of the income aid ratio to determine the market value/income

(d) For payments beginning in the 1989-1990 school year and each school year thereafter, the Department of Education shall utilize an adjusted personal income valuation for the 1987 tax year and each tax year thereafter

respectively in computing the market value/income aid ratio for such districts. The adjusted personal income valuation shall be calculated by dividing the total out-o-State tax credits claimed by the residents of a school district by the State personal income tax rate and subtracting that amount from the total personal income valuation for the individual school district. The State total personal income valuation shall remain that as certified by the Department of Revenue and shall not be adjusted to reflect out-of-State tax credits.

*(e)  For the purpose of determining  payments for the  1999-2000  school year and  each  school  year thereafter,  the department  shall utilize  the following calculation  for  any  school district  where the personal income  an determined by  the  Department  of  Revenue  under Article III  section 303(a)(3),(4), (7)  or  (8) of the act of  March 4,  1971 (P.L.6, No.2), known as the "Tax Reform  Code of 1971,"  increases  by at lease one thousand percent (1.000%) over  such income  reported  for the prior tax year: the total personal income  used to determined  the  personal  income  aid ratio and market  value/personal income aid ratio shall be  calculated  using an amount for personal income as  determined by the Department of Revenue under Article  III, section 303(a)(3), (4),  (7)  or (8)  of the "Tax  Reform Code of 1971"  that is ten  percent (10%)  higher  than such  income reported for the prior tax year.*

***

Section 26.  Sections 2502.8 and 2502.13 of the act, amended or added July 10, 1986 (P.L.1270, No.117), June 26, 1999 (P.L.394, No36) and May 10, 2000 (P.L..44, No.16), are amended to read:

Section 2502.8    Payments on Account of Pupils Enrolled in Vocational Curriculums.—(a)    For  the  purpose of reimbursement in accordance with This section, vocational curriculums are agriculture education, distributive Education, or any other occupational oriented program approved by the Secretary of Education.

(b)    For the 1981-1982 school year through the 1984-1985 school year, each school district so entitled shall be paid, in addition to any other subsidy to which it is entitled, an amount on account of resident pupils enrolled in vocational curriculums[—and,]; for the 1985-1986 school year [and each school year thereafter] *through the 1999-2000 school  year,*  each  school district and area vocational-technical school shall be paid an amount on account of students enrolled in vocational curriculums(—); *for  the 2000-2001 school  year and each  school  year  thereafter,  each  school district, area vocational-technical  school and  charter school shall  be  paid on amount  on  account  of  students  enrolled  in  vocational curriculums, determined as follows:*

(1) Determine the increase in the  weighted average daily membership by multiplying the number of students in average daily membership in vocational curriculums in area vocational-technical school by twenty-one

hundredths (.21) and the number of students in average daily membership in school district *and charter school* vocational curriculums by seventeen hundredths (.17).

(2) Multiply the lesser of the district's actual instruction expense per weighted average daily membership or the based earned for reimbursement by the market value/income aid ratio or by three hundred seventy-five thousandths (.375), whichever is greater.

(3)    Multiply the increase in weighted average daily membership determined in clause (1) by the result of clause (2).

(4) For the 1985-1986   [ *school year and each school year thereafter*] *through 1999-2000 school   years,* the Commonwealth shall pay the amount required by this section to the school district or area vocational-technical school which provides the program upon which reimbursement is based.

*(5) For the 2000-2001 school year and each school year thereafter, the Commonwealth shall pay   the amount required under this section to the School district, area vocational-technical school or   charter school which provides the programs upon which reimbursement is based.*

(c) For the school year 1998-1999 [and each school year thereafter]. any additional funding provided by the Common wealth over the amount provided for the school   year   1997-9198   will be distributed   to area vocational-technical schools and to school districts with eight (8) or more vocational programs based on subsection (b).

(d) For the school year 1999-2000 and each school year thereafter]. any additional funding provided by the Common wealth over the amount provided for  the school   year 1998-1999  will   be distributed to area vocational-technical schools,  to school districts with eight (8) or more vocational programs and   to    school   districts offering   a   vocational agricultural education program, based on subsection (b).

*(e) For the school  year 2000-2001 and each school  year  thereafter, any additional funding provided by the Commonwealth  over the   amount provided  for the school  year 1998-1999 will be distributed    to area vocational-technical schools, to school districts and charter schools   with eight (8) or more vocational programs and to school districts and    charter schools offering a vocational agricultural education  program  based   on subsection (b).*

Section 2502.13.  Small District Assistance.—For the 1984-1985 and 1985-1986 school years,  the Common wealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) of less and has a market value/income aid ratio to five thousand ten-thousandths (0.5000)  or greater, an amount equal to fifty dollars ($50) multiplied by that  district's average daily membership. For the 1998-1996 school year, no school district shall receive less on account of this section than it did for the 1984-1985 school year. For the school year 1986-1987, the Common wealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less

and has a market value/income aid ratio of five thousand ten-thousandths (0.5000) or greater, or received payments under this section for the 1985-1986 school year, an amount equal to seventy-five dollars ($75) multiplied by that district's average daily membership. For the school year 1987-1988, the Common wealth shall pay to each school district which has a average daily membership of one thousand five hundred (1,500) or less and a market value/income aid ratio of five thousand ten-thousandths (0.5000) or greater or received payments under this section for the 1986-1987 school year, an amount equal to eight-five dollars ($85) multiplied by that district's average daily membership. For the school year 1988-1989, the Common wealth shall pay to each school district which has an average daily membership of the thousand five hundred (1.500) or less and a market value/income and aid ratio of five thousand ten thousandths (0.5000) or greater, or received payments under this section for the 1987-1988 or 1988-1989 school year, an amount equal to one hundred five dollars ($105). For the school year 189-1990, the common wealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less and a market value/income aid ratio of five thousand ten-thousandths (0.5000) or greater, or received payments under this section for the 1987-1988 school year, an amount equal to one hundred fifteen dollars ($115) multiplied by the district's average daily membership as provided for in section 212 of the act of July 1, 1990 (P.L.1591, No.7A). known as the "General Appropriation Act of 1990." For the school year 1990-1991, the Common wealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less and a market value/income aid ratio of five thousand ten-thousandths (0.5000) or greater, or received payments under this section for the prior school year, an amount equal to one hundred seventy dollars ($170) multiplied by the that district's average daily membership. For the school year 1990-1991 each school district with a population per square mile of less than ninety (90), which otherwise meets the average daily membership and market value/income aid ratio requirements of this section, or received payments under this section for the prior school year, shall instead receive an amount equal to one hundred ninety dollars ($190) multiplied by that district's average daily membership. For the 1987-1988 school year through the 1990-1991 school year, no school district shall received less on account of this section than it did for the prior school year. For the school year 1994-1995, the Common wealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less and a market value/income aid ratio of five thousand ten-thousandth (0.5000) of greater, an amount equal to ninety five dollars ($95) multiplied by that district's average daily membership. For each of the school years 1997-1998 through 1999-2000, the Common wealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less and a market value/income aid ratio of five thousand ten-thousandths (0.5000) or greater an amount equal to seventy-five dollars ($75) multiplied

48

by that district's average daily membership.  *For the school year 2000-2001, the Commonwealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less an amount equal to seventy-five dollars ($75) multiplied by that district's average daily membership.*

Section 27.    Section 2502.30 of the act, amended June 26, 1999 (P.L.394, No.36), is reenacted and amended to read:

Section 2502.30.    Temporary Special Aid to School Districts Suffering Loss of Tax Revenue Due to Reduction in Assessed Valuation of Taxable Property.—(a)    Temporary special aid shall be paid in fiscal years 1994-1995, 1995-1996, 1996-1997, 1997-1998, 1998-1999 [and], 1999-2000  *and 2001-2002* to school districts experiencing a severe reduction in local revenue due to a decline in the assessed value of taxable properties. The allocation to these districts shall be determined by multiplying the reduction in assessed value between 1985-1986 and 1992-1993 by the 1992-1993 real estate mileage rate. This aid shall be paid from undistributed funds not expended, encumbered or committed from appropriations for grants and subsidies made to the Department of Education. No other funds shall be used for assistance under this section.  These funds shall be sufficient to provide temporary relief to seven school districts in fiscal year 1995-1996 to seventy-five per centum (75%) of the funds received in fiscal year 1994-1995, in fiscal year 1996-1997 at fifty per centum (50%) of the funds received in fiscal year 1994-1995, in fiscal year 1997-1998, 1998-1999 and a fiscal year 1999-2000 at twenty-five per centum (25%) of the funds received in fiscal year 1994-1995. *For fiscal year 2001-2002, to the extent funds are available as determined by the Secretary of the Budget, qualifying school districts shall receive twenty-five per centum (25%) of the funds received in fiscal year 1994-1995.*   The section shall expire October 1, [2000] *2002.*

(b)    Payments made pursuant to subsection (a) shall be paid from a restricted receipt account, which is hereby established, for such payments. Funds shall be transferred by the Secretary of the Budget to the restricted account only to the extent necessary to make the payments authorized by this section. The money in the restricted account is hereby appropriated from the account for purposes of this section.

Section 28.    The act is amended by adding a section to read:

*Section 2502.39.    Basic Education Funding for 2000-2001 School Year.—For the 2000-2001 school year, the Commonwealth shall pay to each school district a basic education funding allocation which shall consist of the following:*

*(1) An amount equal to the basic education funding allocation for the 1999-2000 school year pursuant to sections 2502.13, 2502.37 and 2502.38.*

*(2) A base supplement calculated as follows:*

49

*(i)* If the school district's 2001-2002 market          value/income aid ratio is equal to or greater than .7000:

*(A)* Multiply the school district's 2001-2002          market vale/income aid ratio by its 2000-2001 average daily membership.

*(B)* Multiply the product from (A) by $25,000,00.

*(C)* Divide the product from (B) by the sum of          the product of the 2001-2002 market value/income aid ratio multiplied        by the    2000-2001 average daily membership for all qualifying school districts.

*(ii)* If the school district's 2001-2002      market value/income   aid ratio is equal to or greater than .4000 and less than    .7000:

*(A)* Multiply the school district's 2001-2002      market value/income   aid ratio by its 2000-2001 average daily membership.

*(B)* Multiply the product from (A) by $77,000,00.

*(C)* Divide the product from (B) by the sum of the products of 2001-2002 market value/income aid ratio multiply by the 2000-2001 average daily membership for all qualifying school districts.

*(iii)* If the school district's 2001-2002 market value/income aid ratio is less than .4000:

*(A)* Multiply the school district's 2001-2002 market value/income aid ratio by its 2000-2001 average daily membership.

*(B)* Multiply the product from (A) by $12,000,000.

*(C)* Divide the product from (B) by the sum of the products of 2001-2002 market value/income aid ratio multiplied  by the 2000-2001 average daily membership for all qualifying school district's.

*(3)* An increasing aid ratio supplement to qualifying   school districts as follows:

*(i)* To qualify for   the increasing aid   ratio supplement,    a school district's 2001-2002 market value/income aid ratio must have    increased by .0100 or more over the 1994-1995 market value/income aid  ratio and the school district's 2001-2002 market value/income aid ratio must be greater than or equal to the median.

*(ii)* The increasing   aid ratio supplement shall be  calculated for qualifying school districts   as follows: multiply the school district's increase in market value/income aid ratio between 1994-1995 and 2001-2002 by its 2000-2001 average daily membership  and multiply this product by thirty-five million dollars (#35,000,000) and   divide the resultant product by the sum of the products of the increase   in aid ratio multiplied by the 2ooo-2001 average daily membership for all   qualifying school districts.

*(4)* A growth supplement is  calculated for qualifying school   districts as follows: