Exhibits A-C

# [D]isclosure shocks officials

CHILDREN'S SERVICES

## Sensitive Children's Services records found in trash

By BILL McKINNEY
NEWS Staff Reporter
(Part 10 of a series)

During a month-long investigation into the operations of Children's Services of Erie County, the Morning News was handed several hundred confidential agency documents relating to child abuse, shelter care and foster care, all obtained by a source outside the agency itself.

Although "breach of confidentiality" is one of the most serious offenses under the Child Protective Services Law (Act 124), the NEWS source said he had "no difficulty" obtaining the documents.

The documents included:

- copies of a Juvenile "Master's Report Regarding Allegation Hearing" documenting an alleged sexual assault of a child by the parents.
- confidential summaries regarding specific behavior problems of children under agency care.
- copies of pending complaint files on child abuse reports [illegible] ed," complete with the names of the [illegible] parents and the persons alleged to be the attack[illegible]
- copies of agency personnel documents, including personal histories of persons applying to the agency for employment.
- copies of documents which included the names of persons reporting alleged acts of abuse.
- documents identifying foster parents and the foster children in their homes.
- [illegible] pared [illegible] of agency involvement with families where abuse allegedly occurred — histories detailing the act alleged to have been committed against a child, naming the alleged perpetrator of the act, and documenting the emotional stability of the family of the child.

The documents were not obtained from a disgruntled agency employee, nor were they obtained by any sophisticated break-in.

The NEWS source who provided them said, "I just went to the dumpster outside the building and grabbed a bunch of papers."

He said he had obtained them the same way on a number of occasions.

The Morning News asked for a meeting with Erie County Judge Fred Anthony, County Executive Russell "Robbie" Robison, and state Sen. Quentin Orlando. On Thursday afternoon, the NEWS met with the three men in Robison's office, and turned over the documents to Judge Anthony and Robison.

All expressed shock at the sensitivity of the information on the documents that had been thrown into the trash.

"We'd better get this stuff taken care of before the word spreads and those pornography readers come down to get their kicks for free instead of paying for it," Robison said.

Judge Anthony was dismayed at the apparent violation of the spirit and the letter of the Child Protective Services Law. He said he recognized many of the names in the documents from cases that have come before him.

"I don't have control over the agency records, but our court records on these cases are of course all sealed in the clerk's office," Judge Anthony explained.

Holding documents detailing an illegitimate birth, which named both mother and father, and others on adoption proceedings, Anthony said, "These could be very embarrassing."

Sen. Orlando pointed out that the confidentiality of files under Act 124 was "wrecked by careless handling." He said people would be reluctant to deal with Children's Services if they knew their names could be "blowing in the wind."

"How can you insist on confidentiality, and then let something like this happen?" asked Sen. Orlando. "This is horrible. It can't be allowed to happen again."

Atty. John English, Sr., who was present at the meeting as chief counsel for the Times-News Publishing Co., cautioned that there was no way of telling who else might have

Please Turn To Page 1 Of Section B

OBISON

ckdown

# )CY expenses add to county's legal bills

...ty" Leone said.

...etainer is $31,000 a ... county's four as... ors each have an... ts of $25,000, ac... unty records. OCY ...e solicitor paid a ... a year as well as ...yers on retainers ... $82 to $71.75 an ... g to OCY records. ...s typically deal ...lfare issues for ...andles cases of ...glected children. ...at MacDonald, Il... county at a rate of ... hour in the Con... ling to the bill. The ...wer, Roger Taft, ...urs at an hourly ... an individual bill ...rest of the overall ...e work of the oth... expenses.

...y of the bill is not ...rato said he is sat... work of MacDon... the Schenker ad... hree years ago ... te the county's la... Taft has been the ... those cases.

...ggressively pur... case because, at ... was threatening ... gainst the coun... vil Service Com... rough a union

"We were ready to go," he said of the Civil Service case. "We were ready to win the case and I am convinced we would have won if it had gone forward."

Conley withdrew her claim because the proceeding was "not in her best interest," according to a letter on file with the Civil Service Commission. Conley last week said her lawyers have told her not to comment on her case.

The $56,371 spent on the Conley case is the second large expenditure the Schenker administration has paid over OCY personnel issues in the past year. In August, in an agreement the administration initially tried to keep secret, the county paid a $100,000 settlement to fired OCY caseworker David A. Dows.

Conley, 43, had worked for the county for 13 years, including the past four years at OCY, when she resigned Sept. 10.

Conley claimed the Schenker administration forced her to resign to get back at her for being a whistleblower. Conley's ouster came about a month and a half after she testified in court against her supervisor at OCY, whom Conley said altered court records. The Schenker administration has disputed that claim.

In her Civil Service appeal, Conley said county officials told her the day of her resignation that she had violated OCY rules by using her office e-mail to disclose the telephone number of an OCY client to the client's former caseworker. Conley said she did nothing wrong.

The Schenker administration disagrees. The county's personnel director, Peter Callan, said in an October memo that Conley disclosed a confidential OCY court order "with the intent of alerting" the pregnant mother who was the subject of it.

Onorato, in an interview last week, said the county has "mounted a vigorous defense" against Conley because of her "egregious breach of confidentiality" regarding the court order. He said the county does not want Conley to return to OCY.

"In essence," Onorato said of the $56,371 legal bill, "the fee was being spent in the defense of children."

**ED PALATTELLA** *can be reached at 870-1813 or by e-mail.*

# County settles negligence suit

Erie Co — ... — Children's & Youth Services EDT 7/24/92

**Couple said county agency responsible for protecting child during parental visits.**

Erie County has settled a lawsuit with an Erie family that charged the county's Office of Children and Youth was negligent concerning incidents of alleged sexual abuse against an adopted girl.

Under the settlement, the county will pay the girl and her adopted family $15,000.

The suit was filed in 1989 by a couple identified only as R.F. and P.F., and for their adopted daughter J.F.

The girl had been placed in the custody of Children and Youth in 1984 and was placed with foster parents, who eventually adopted her.

The couple claimed that J.F. was required to have supervised and unsupervised visits with her natural mother. During such visits, the couple alleged, the girl suffered physical and sexual abuse by the natural mother, the mother's boyfriend and the girl's brother.

The couple claimed in its suit that the county agency had a duty to protect the child from such abuse during visitations and should have recognized problems existed.

John Petulla, director of the Office of Children and Youth, said the settlement is not an acknowledgement that the agency erred in this case, but a sign that the agency agrees the parents need help in dealing with the child's special needs.

The couple filed suit after county officials refused a request for a state subsidy to help care for the child's special needs as a result of the abuse. Their lawyer, James J. Bruno, said the couple never sought anything more than the aid to which they believed they were entitled.

"These are very special people," Bruno said. "They weren't out for anything more than what this child was entitled to."

Eventually, the county did support the family's subsidy request and they were awarded $16,000 in back payments as well as a continuing monthly check.

The $15,000 settlement with the county, approved last week by Erie County Judge Roger Fischer, provides for legal, medical and other expenses incurred by the family.

Included in the expenses cited by the family is the cost of constructing a separate bathroom for J.F., for the needs of the child and the security of the couple's other children. Bruno said the separate bathroom was needed for the child's privacy and to prevent her from trying to act out similar molestations on the couple's other children.

He said the child and the family have been through a lot, but the girl is getting better.

# .aw firm: OCY expenses add to county's legal b

nued from 1A

ell, said John Onorato, the itor for the Schenker ad- stration.

.e county has a staff of in- e lawyers on retainer. The nker administration hired Donald, Illig to handle Con- case because of the firm's ex- se in labor law and because e unique circumstances of onley case, Onorato said.

orato said he and some of county's other in-house ers, including those at OCY, involved in the personnel n against Conley and were be witnesses in a case over ey's ouster. Defending the y in a case while being d as a witness would be "dif- and almost impossible," to said. He said he was sub- ed to testify at the hearing.

county's liability insur- or legal claims provides no age unless Conley were to court, Onorato said. But he e believes the state gov- ent will reimburse the for part of the bill.

$56,371 bill has become a n of County Councilman Leone, a frequent critic of chenker administration CY.

is their practice to go out- hen something like this s, then why do we have a solicitor's staff?" Leone said.

Onorato's retainer is $31,000 a year, and the county's four assistant solicitors each have annual retainers of $25,000, according to county records. OCY has a full-time solicitor paid a salary of $71,620 a year as well as three other lawyers on retainers ranging from $82 to $71.75 an hour, according to OCY records. Those lawyers typically deal with child-welfare issues for OCY, which handles cases of abused and neglected children.

The lawyers at MacDonald, Illig charged the county at a rate of $175 to $165 an hour in the Conley case, according to the bill. The case's lead lawyer, Roger Taft, worked 163 hours at an hourly rate of $175 for an individual bill of $28,525. The rest of the overall bill covered the work of the other lawyers and expenses.

The accuracy of the bill is not in dispute. Onorato said he is satisfied with the work of MacDonald, Illig, which the Schenker administration three years ago hired to negotiate the county's labor contracts. Taft has been the lead lawyer on those cases.

Taft said he aggressively pursued the Conley case because, at the time, Conley was threatening to take action against the county before the Civil Service Commission and through a union grievance.

"We were ready to go," he said of the Civil Service case. "We were ready to win the case and I am convinced we would have won if it had gone forward."

Conley withdrew her claim because the proceeding was "not in her best interest," according to a letter on file with the Civil Service Commission. Conley last week said her lawyers have told her not to comment on her case.

The $56,371 spent on the Conley case is the second large expenditure the Schenker administration has paid over OCY personnel issues in the past year. In August, in an agreement the administration initially tried to keep secret, the county paid a $100,000 settlement to fired OCY caseworker David A. Dows.

Conley, 43, had worked for the county for 13 years, including the past four years at OCY, when she resigned Sept. 10.

Conley claimed the Schenker administration forced her to resign to get back at her for being a whistleblower. Conley's ouster came about a month and a half after she testified in court against her supervisor at OCY, whom Conley said altered court records. The Schenker administration has disputed that claim.

In her Civil Service appeal, Conley said county officials told her the day of her resignation that she had violated OCY rules by using her office e-mail to disclose the telephone number of an OCY client to the client's former caseworker. Conley said she did nothing wrong.

The Schenker administration disagrees. The county's personnel director, Peter Callan, said in an October memo that Conley disclosed a confidential OCY court order "with the intent of alerting" the pregnant mother who was the subject of it.

Onorato, in an interview last week, said the county has "mounted a vigorous defense" against Conley because of her "egregious breach of confidentiality" regarding th[...] He said the county [...] Conley to return t[...]

"In essence," On[...] the $56,371 legal bill being spent in th[...] children."

ED PALATTELLA
*reached at 870-1813*

# County settles negligence

Erie Co — Children's & Youth Services EDT

Erie County has settled a lawsuit with an Erie family that charged the county's Office of Children and Youth was negligent concerning incidents of alleged sexual abuse against an adopted girl.

Under the settlement, the county will pay the girl and her adopted family $15,000.

**Couple said county agency responsible for protecting child during parental visits.**

The suit was filed in 1989 by a couple identified only as R.F. and P.F., and for their adopted daughter J.F.

The girl had been placed in the custody of Children and Youth in 1984 and was placed with foster parents, who eventually adopted her.

The couple claimed that J.F. was required to have supervised and unsupervised visits with her natural mother. During such visits, the couple alleged, the girl suffered physical and sexual abuse by the natural mother, the mother's boyfriend and the girl's brother.

The couple claimed in its suit that the county agency had a duty to protect the child from such abuse during visitations and should have recognized problems existed.

John Petulla, director of the Office of Children and Youth, said the settlement is not an acknowledgement that the agency erred in this case, but a sign that the agency agrees the parents need help in dealing with the child's special needs.

The couple filed suit after county officials refused a request for a state subsidy to help care for the child's special needs as a result of the abuse. Their lawyer, James J. Bruno, said the couple never sought anything more than the aid to which they believed they were entitled.

"These are very special people," Bruno s[...] anything[...] was enti[...]

Event[...] the fam[...] they we[...] payment[...] monthly[...]

The $[...] county, [...] County [...] vides fo[...] expense[...]

Includ[...] the famil[...] a separa[...] needs of[...] the coup[...] said the[...] needed f[...] prevent[...] similar n[...] other chi[...]

He sai[...] have bee[...] is getting[...]






HSLDA's E-lert Service:

SIGN UP TODAY

BLUE RIDGE HOME EDUCATION CONF
April 16, 2005
Winchester, Virginia

# Tennessee

April 10, 2002

## *Horn v. Brown*
## Civil rights violated through wrongful arrest

**Filed:** March 1, 2001, U.S. District Court at Jackson.

**Nature of Case:** This civil rights lawsuit for violation of the right to direct the education of one's child and for false arrest arises out of the criminal prosecution of the mother of a five-year-old. The child was not enrolled in public school, but the school official was told by the child's grandmother that the mother was planning to home school and that the child "should be in school." The attendance officer filed the criminal complaint after speaking with Mrs. Horn and learning that she was, in fact, planning to home school. The official admits knowing that the child was not yet compulsory attendance age when he filed. Mrs. Horn was arrested, but the criminal case against her was dismissed upon HSLDA's notice of representation. On March 1, 2001, HSLDA filed a lawsuit on behalf of Mrs. Horn for violation of her civil rights.

**Status:** On April 4, 2002, the parties agreed to a settlement.

**Last Updated:** April 10, 2002.

© Site Copyright 1996-2005 Home School Legal Defense Association
P.O. Box 3000 · Purcellville, VA 20134-9000 · Phone: (540) 338-5600 · Fax: (540) 338-2733 · E-mail: info@hslda.org

Supported by the



COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF PUBLIC WELFARE
HARRISBURG, PENNSYLVANIA 17120

OFFICE OF
CHILDREN, YOUTH & FAMILIES

CHILDLINE & ABUSE REGISTRY
DEPARTMENT OF PUBLIC WELFARE
HILLCREST, 2ND FLOOR
P.O. BOX 2675
HARRISBURG, PA 17105-2675
TELEPHONE NO. (717) 783-1964

Mailing Date
February 21, 2003

VICTORIA BIBBS
1725 W 14TH ST
ERIE PA 16505

Child : CHARLES BIBBS
Report No : 250011006
Agency: ERIE

DEAR MS. BIBBS :

The above named child was reported as a victim of suspected child or student abuse.

The agency listed above has investigated the report and determined it was Unfounded or Unfounded for School Employee because of one of the following : (1) the incident did not occur, (2) the injury was not of a serious nature, or (3) substantial evidence was not found.

The Child Protective Service Law states that unfounded reports must be retained one year from the date the report was made. This is to notify you that the above listed report has been expunged by this office.

We are required to inform you that this action has been taken because your name was listed on the report as the perpetrator of child abuse or student abuse. Within 120 days after the year has passed, it will be expunged by the investigating agency. However, if the investigation reveals that the child and family need social services provided or arranged by the investigating agency, the records will be retained by them.

If you have questions concerning the report, you may contact the investigating agency at (814) 451-6600.

*Issued by :* ChildLine & Abuse Registry

# $5 million in Child Service funds jeopardized

By JEFF PINSKI
Morning News staff reporter

A private accounting firm has questioned nearly $5 million in expenditures in an audit of Erie County Children's Services $5.2 million 1978 budget.

Refusal by the firm of Salvia, Schaffner and Bigelow Inc. to sign a "clean audit" could result in an order from Pa. Department of Public Welfare requiring Erie County to pay back [illegible] in questioned expenditures.

The total program for Children's Services in 1978 amounted to $5,226,208.

"We have people in motion doing everything necessary to obtain (state) certification [illegible]," said County [illegible].

[illegible] concerned, but [illegible] procedures [illegible] 1978 and [illegible]

According to Robison, "This is just a matter of reconstructing the records and we're confident that can be done."

The largest piece of the expenditures being disallowed by the accounting firm — $3.3 million — is in the area dealing with purchased services.

The private agencies from whom the Protective Services unit of Children's Services purchases services, did not have signed contracts with the county in 1978 as required by state regulations.

According to the [illegible] report submitted to county officials and members of county council [illegible] for the year ended Dec. 31, 1978, [illegible] certain that the various services purchased during the period were in accordance with [illegible]

[illegible] us, and we were unable to determine if these charges were in accordance with the applicable regulations."

The report also notes, "At Dec. 31, 1978, $4,975,805 of questioned costs are reflected in the financial statements. These costs were questioned because adequate documentation was not avilable, joint costs were not allocated to the program or within the program under a plan approved by the Department of Public Welfare, or costs were incurred in direct violation of the applicable regulations."

Robison said Children's Services Director John Petulla "was in direct contact with state officials today in an attempt to resolve this."

[illegible]

[illegible] tracts for the years 1979 and 1980 [illegible] body, including the state or other accounting firms, ever required them before."

Director of Administration Robert Pagni said he believed that the expenditures should not be disallowed.

"We believe this is something that should have been [illegible] management letter by the firm [illegible] recommendations for correction of procedures," Pagni said.

Other costs questioned by the accounting firm included wages and salaries [illegible] employee benefits [illegible]

# CHILD ABUSE PROBES

N 3-20-78

Continued From Local Page

he "control questions" and he "did you questions" central to the charge.

He said the control questions were questions that ideally should not have elicited a response but, in her case, they id. The test proved her neiher guilty nor innocent.

Carl Triola, director of Children's Services, said Roger's ccusation that he had been structed not to inform police ffered from what he (Triola) id been told by the current iseworker involved.

He said the first caseworker r Roger's children is no nger with the agency. Triola id he did have reservations out one aspect in the hanng of the case.

Regarding the court order; Roger to send the children weekend visits, Triola said, he caseworker should have d the judge directly about our investigation and not assumed that the attorney (Roger's) would tell him."

He said the caseworker said she had advised the attorney to tell the judge but Triola said she should not have assumed he would.

"She should have told the judge herself and left it up to the court to decide if the visits were safe."

Mary said she feels the children should be in a foster home until this abuse case is resolved since Roger is living with another woman.

"I told the caseworker that several times but all she said was that she didn't think it was necessary. That the children were in a situation similar to the one they had been in when Roger and I were living together."

Roger and Mary were never married, and the children are now living with their father and another woman whom Roger said is referred to as "mother" by the children, at his instruction.

The NEWS also spoke with Roger's legal wife, Judy, who has custody of a child she had while married to Roger.

She also said she had never been contacted by Children's Services.

"I went to them after these charges came out in the newspaper," she said. "I read them the riot act. A supervisor there said he'd have a caseworker contact me.

"Three weeks went by and nothing. I called and started yelling again. The supervisor said he'd forgotten to give the caseworker the message. She called the next day."

Roger's wife said she is prepared to testify in court on behalf of Mary even though Mary had lived with her husband for years.

"I really want to find out what kind of investigation Children's Services did on this case," she said angrily. "They are something else."

(To be continued)

TUCKER

Continued From Local Page

...e strengths she can to

FLORIDA?
SEE PAGE 10B

ERIE CITY AND COUNTY LIBRA
ERIE, PENNSYLVANIA 16507

Erie Co. - ~~Welfare~~ Children & Youth Services

Orlando calls for 2...

# Triola: Security breac...

By JEFF PINSKI
NEWS Staff Reporter

Erie County Children's Services Director Carl Triola said Friday the security breach that allowed confidential documents to be deposited nightly in a dumpster outside his offices is "the most devastating thing that's happened to me in 16 years of social work."

Meanwhile, State Senator Quentin Orlando of Erie called for a two-pronged probe of the Children's Services operation, one by the state and the other by the county.

The Morning News revealed Friday that, during its month-long investigation of Children's Services, it had been given highly sensitive agency papers that had been obtained by a citizen from a trash bin outside the Community Services Building at 2nd and Cherry.

The Morning News asked for a meeting Thursday with County Executive Russell "Robbie" Robison, Juvenile Court Judge Fred Anthony, and Sen. Orlando. NEWS representatives met with the three men in Robison's office, and handed over the confidential documents.

Robison told Children's Services that its disposal method would have to "stop dead in its tracks right now." He ordered the agency to immediately remove documents that were in the dumpster, and to insure that no more such papers were tossed there. The files were cleaned out Thursday evening.

The Pennsylvania Child Protective Services Law (Act 124) clearly spells out that such sensitive papers are to be destroyed.

"I must assume complete responsibility for this," Triola said Friday. "I assumed that these papers were being burned as required by the law. I should have followed up on it, but didn't, and if my job is in jeopardy because of this, it's only because it was my fault."

Triola said, "This is the ...

## ...alls for 2-pronged probe

# ...reach 'most devastating'

TN

...ylvania Child Pro... ...ces Law (Act 124) ...ls out that such ...pers are to be de...

...assume complete ...for this," Triola ..."I assumed that ...were being ...quired by the law ...followed up on ...and if my job is ...because of this ...ause it was my

..., "This is the most devastating thing that's happened to me in 16 years of social work. I've always tried to champion confidentiality in our cases and would stand behind our workers 100 percent."

He said that an incinerator was installed in the basement of the building when it was constructed specifically for destroying confidential material.

"I mean, why else would you want to put an incinerator in a small building like this? I just naturally assumed it was being burned."

According to Triola, the dumpster has been in use at the county building for about two years. He said it was possible the information has been dumped there for the entire two years.

"I have no bone to pick with the newspaper on this because I probably never would have learned of this without the help of the newspaper."

When legislators drafted Act 124, they provided that any breach of confidentiality was to be the subject of "legislative oversight," that a legislative review rather than a review by the Department of Public Welfare would be called for.

"I'll begin proceedings in the Senate to have an overview conducted by the state," Sen. Orlando said Friday. "But this should be accompanied by an investigation by the new county government into the operation of Children's Services. There is simply no reason to do this twice when it can be done together and at the same time."

Sen. Orlando said he will introduce the required resolution before the Senate on Monday.

County officials will also begin looking a shredding machines on Monday to determine if one should be purchased to destroy the documents in the future.

"I think we have to weigh the costs here and determine whether the incinerator or the shredder should be used," Triola said. "We should use whatever is economically feasible for the county."