education and training programs operated by the college are nonacademic in nature and upon notice of said determination to the community college.

(b)  Upon the Secretary of Education's notice as described in subsection (a), a dissolved community college shall cease to be a public instrumentality. If the dissolved community college desires to continue to offer degree programs, provide specialized job training or provide professional development training, those programs must be transferred to a corporate successor organized as a nonprofit corporation under 15 Pa.C.S. (relating to corporations and unincorporated associations).

(c)  The corporation successor of a dissolved community college had the continue to have the authority to grant associate degrees and certificates in those programs in which the dissolved community college had the authority to grant degrees during the last complete school year of operation as a community college. If a corporate successor desires to offer additional associate degree programs, it must apply to the Department of Education to obtain approval in accordance with applicable regulations. If a corporate successor desires to offer additional certificates, it shall apply for licensure to the State Board of Private Licensed Schools. A corporate successor of a dissolved community college Is not authorized to award baccalaureate degrees.

(d)  All indebtedness of any community college dissolved under this section shall be transferred to and become the responsibility of its corporate successor. Nothing in this section shall be construed so as to waive the obligations or debts of any dissolved community college to any entity other than the Commonwealth.  Any indebtedness of a dissolved community colleges to the Commonwealth   or to the department, determined pursuant to audits of the dissolved   community   college conducted under section   1913-A(k), shall be deferred   for one fiscal   year subsequent to dissolution.   Thereafter the amount and   terms of repayment of the indebtedness to the   Commonwealth shall be   determined by the Secretary of the Budget.

(e)  Any Workforce Development  Challenge  Grant   awarded  to a dissolved community college prior to  dissolution shall be   transferred to and become an asset of its corporate successor.

(f)  The Commonwealth shall retain the right to  have access   to and the authority to review financial records of any community   college   dissolved under this section, including records created up through   dissolution   until such time as all information required to be reviewed under   section   1913-A(k) has been reviewed and any indebtness  owed to the Commonwealth has been  repaid. Any audits prepared as result of the review conducted

under this section must be completed and issued to the corporate successor of dissolved community college within one year of dissolution.

Section 1915-A.  Work Force Development Courses.—No later than January 1, 2002, the Department of Education shall, in consultation with the community colleges and the State Workforce Investment Board, establish criteria to identify noncredit courses which emphasize work force development and for which additional reimbursement may be required above the current noncredit reimbursement factor. The department shall also provide an estimate of the number of equivalent full-time students enrolled in noncredit courses which emphasize work force development had these criteria been in effect in the 2000-2001 fiscal year. This information shall be furnished to the chairman and minority chairman of the Appropriations and Education Committees of the Senate and the chairman and minority chairman of the Appropriations and Education Committees of the House of Representatives.

Section 24.  Section 2013-A of the act, added November 12, 1982 (P.L.660, No.188), is amended to read:

Section 2013-A.  Teachers' and Employes' Retirement Plans.—Pursuant To the provisions of 24 Pa. C.S. § 8301 (relating to mandatory and optional Membership), all professional and other employes of the system and its institutions shall be accorded the right to elect participation in the Pennsylvania Public School Employees' Retirement System or the State Employees' Retirements System. Alternatively, eligible employes shall have Association of America—College Retirement Equities Fund (TIAA-CREF) retirement plan(.)or in an alternative retirement plan or plans offered by any insurance company authorized to issue annuity contracts in this Commonwealth or mutual fund company with investment options meeting the requirements of a qualified plan under the Internal Revenue Code of 1986 (Public Law 99-514, 26 U.S.C. § 1 et seq.). The alternative retirement plans shall be selected by the system pursuant to the request-for-proposal process.

Section 25.  Section 2501(14.1) of act, amended June 7, 1993 (P.L.49, No.16), is amended to read:

Section 2501.    Definitions.—For the purposes of this article the following terms shall have the following meanings:
***

(14.1)    "Market Value/Income Aid Ratio." For Purpose of reimbursement to a school district under subsection (d), (e), and (f) of section 2502, section 2502.8, section 2502.22, section 2502.25, section 2501.26 and section 2592, or to an intermediate unit or area vocational-technical school, shall be the commonwealth's method of determining the combined market value and income wealth for each pupil, and shall be computed, for the school year for which reimbursement is being paid, as

44

follows:

(a) (i) Divide the market value per weighted average daily membership of the district, intermediate unit or area vocational-technical school by the market value per weighted average daily membership of the State;

(ii) Determine the product of (a)(i) multiplied by .5;

(ii) Subtract the resultant product in (a)(ii) from 1.000 to determine the market value portion of the aid ratio.

(iv) For purposes of the calculation described in (a)(i) through (a)(iii), the market value of a district shall be the real property valuation of the district for the calendar year that concluded during the school year immediately preceding the school for which reimbursement is being paid. The market value of an intermediate unit of area vocational-technical school shall be the sum of the real property valuations of each of its component districts for the calendar year that concluded during the school year immediately preceding the school year for which reimbursement is being paid. The weighted average daily membership of a district shall be the weight average daily membership for the school year immediatel preceding the school year for which reimbursement is being paid. The weighted average daily membership of an intermediate unit or area vocational-technical school shall be the sum of the weighted average daily memberships of each of its component districts for the school year immediately preceding the school year for which reimbursement is being paid.

(b) (1) Divide the income per weighted average daily membership of the district, the intermediate unit of area vocational-technical school by the average personal income per weighted average daily membership of the State;

(ii) Determine the product of (b)(i) multiplied by .5;

(iii) Subtract the resultant product in (b)(ii) from 1.000 to determine the income aid ratio.

(iv) For purposes of the calculation described in (b)(i) through (b)(iii), the income of a district shall be the personal income valuation of the district. The income of an intermediate unit or area vocational-technical school shall be the sum of the personal income valuations of each of its component districts. The weighted average daily membership for the school year immediately preceding the school year for which reimbursement is being paid. The weighted average daily membership of an intermediate unit or area vocational-technical school shall be the sum of the weighted average daily memberships of each of its component districts for the school year immediately preceding the school year for which reimbursement is being paid.

(c) Add sixty percent (60%) of the market value aid ratio to forty per (40%) of the income aid ratio to determine the market value/income

(d) For payments beginning in the 1989-1990 school year and each school year thereafter, the Department of Education shall utilize an adjusted personal income valuation for the 1987 tax year and each tax year thereafter

respectively in computing the market value/income aid ratio for such districts. The adjusted personal income valuation shall be calculated by dividing the total out-o-State tax credits claimed by the residents of a school district by the State personal income tax rate and subtracting that amount from the total personal income valuation for the individual school district. The State total personal income valuation shall remain that as certified by the Department of Revenue and shall not be adjusted to reflect out-of-State tax credits.

(e) For the purpose of determining payments for the 1999-2000 school year and each school year thereafter, the department shall utilize the following calculation for any school district where the personal income an determined by the Department of Revenue under Article III section 303(a)(3),(4), (7) or (8) of the act of March 4, 1971 (P.L.6, No.2), known as the "Tax Reform Code of 1971," increases by at lease one thousand percent (1.000%) over such income reported for the prior tax year: the total personal income used to determined the personal income aid ratio and market value/personal income aid ratio shall be calculated using an amount for personal income as determined by the Department of Revenue under Article III, section 303(a)(3), (4), (7) or (8) of the "Tax Reform Code of 1971" that is ten percent (10%) higher than such income reported for the prior tax year.

\* \* \*

Section 26. Sections 2502.8 and 2502.13 of the act, amended or added July 10, 1986 (P.L.1270, No.117), June 26, 1999 (P.L.394, No.36) and May 10, 2000 (P.L.44, No.16), are amended to read:

Section 2502.8    Payments on Account of Pupils Enrolled in Vocational Curriculums.—(a)    For the purpose of reimbursement in accordance with This section, vocational curriculums are agriculture education, distributive Education, or any other occupational oriented program approved by the Secretary of Education.

(b)  For the 1981-1982 school year through the 1984-1985 school year, each school district so entitled shall be paid, in addition to any other subsidy to which it is entitled, an amount on account of resident pupils enrolled in vocational curriculums]—and.]; for the 1985-1986 school year [and each school year thereafter] through the 1999-2000 school year, each school district and area vocational-technical school shall be paid an amount on account of students enrolled in vocational curriculums(—); for the 2000-2001 school year and each school year thereafter, each school district, area vocational-technical school and charter school shall be paid on amount on account of students enrolled in vocational curriculums, determined as follows:

(1) Determine the increase in the weighted average daily membership by multiplying the number of students in average daily membership in vocational curriculums in area vocational-technical school by twenty-one

hundredths (.21) and the number of students in average daily membership in school district *and charter school* vocational curriculums by seventeen hundredths (.17).

(2) Multiply the lesser of the district's actual instruction expense per weighted average daily membership or the based earned for reimbursement by the market value/income aid ratio or by three hundred seventy-five thousandths (.375), whichever is greater.

(3) Multiply the increase in weighted average daily membership determined in clause (1) by the result of clause (2).

(4) For the 1985-1986 [ *school year and each school year thereafter* through 1999-2000 school years, the Commonwealth shall pay the amount required by this section to the school district or area vocational-technical school which provides the program upon which reimbursement is based.

*(5) For the 2000-2001 school year and each school year thereafter, the Commonwealth shall pay the amount required under this section to the School district, area vocational-technical school or charter school which provides the programs upon which reimbursement is based.*

(c) For the school year 1998-1999 [and each school year thereafter], any additional funding provided by the Commonwealth over the amount provided for the school year 1997-9198 will be distributed to area vocational-technical schools and to school districts with eight (8) or more vocational programs based on subsection (b).

(d) For the school year 1999-2000 and each school year thereafter], any additional funding provided by the Commonwealth over the amount provided for the school year 1998-1999 will be distributed to area vocational-technical schools, to school districts with eight (8) or more vocational programs and to school districts offering a vocational agricultural education program, based on subsection (b).

*(e) For the school year 2000-2001 and each school year thereafter, any additional funding provided by the Commonwealth over the amount provided for the school year 1998-1999 will be distributed to area vocational-technical schools, to school districts and charter schools with eight (8) or more vocational programs and to school districts and charter schools offering a vocational agricultural education program based on subsection (b).*

Section 2502.13. Small District Assistance.—For the 1984-1985 and 1985-1986 school years, the Commonwealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) of less and has a market value/income aid ratio to five thousand ten-thousandths (0.5000) or greater, an amount equal to fifty dollars ($50) multiplied by that district's average daily membership. For the 1998-1996 school year, no school district shall receive less on account of this section than it did for the 1984-1985 school year. For the school year 1986-1987, the Commonwealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less

and has a market value/income aid ratio of five thousand ten-thousandths (0.5000) or greater, or received payments under this section for the 1985-1986 school year, an amount equal to seventy-five dollars ($75) multiplied by that district's average daily membership. For the school year 1987-1988, the Commonwealth shall pay to each school district which has a average daily membership of one thousand five hundred (1,500) or less and a market value/income aid ratio of five thousand ten-thousandths (0.5000) or greater or received payments under this section for the 1986-1987 school year, an amount equal to eight-five dollars ($85) multiplied by that district's average daily membership. For the school year 1988-1989, the Commonwealth shall pay to each school district which has an average daily membership of the thousand five hundred (1,500) or less and a market value/income and aid ratio of five thousand ten thousandths (0.5000) or greater, or received payments under this section for the 1987-1988 or 1988-1989 school year, an amount equal to one hundred five dollars ($105). For the school year 189-1990, the commonwealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less and a market value/income aid ratio of five thousand ten-thousandths (0.5000) or greater, or received payments under this section for the 1987-1988 school year, an amount equal to one hundred fifteen dollars ($115) multiplied by the district's average daily membership as provided for in section 212 of the act of July 1, 1990 (P.L.1591, No.7A). known as the "General Appropriation Act of 1990." For the school year 1990-1991, the Commonwealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less and a market value/income aid ratio of five thousand ten-thousandths (0.5000) or greater, or received payments under this section for the prior school year, an amount equal to one hundred seventy dollars ($170) multiplied by the that district's average daily membership. For the school year 1990-1991 each school district with a population per square mile of less than ninety (90), which otherwise meets the average daily membership and market value/income aid ratio requirements of this section, or received payments under this section for the prior school year, shall instead receive an amount equal to one hundred ninety dollars ($190) multiplied by that district's average daily membership. For the 1987-1988 school year through the 1990-1991 school year, no school district shall received less on account of this section than it did for the prior school year. For the school year 1994-1995, the Commonwealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less and a market value/income aid ratio of five thousand ten-thousandth (0.5000) of greater, an amount equal to ninety five dollars ($95) multiplied by that district's average daily membership. For each of the school years 1997-1998 through 1999-2000, the Commonwealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less and a market value/income aid ratio of five thousand ten-thousandths (0.5000) or greater an amount equal to seventy-five dollars ($75) multiplied

by that district's average daily membership. *For the school year 2000-2001, the Commonwealth shall pay to each school district which has an average daily membership of one thousand five hundred (1,500) or less an amount equal to seventy-five dollars ($75) multiplied by that district's average daily membership.*

Section 27.  Section 2502.30 of the act, amended June 26, 1999 (P.L.394, No.36), is reenacted and amended to read:

Section 2502.30.  Temporary Special Aid to School Districts Suffering Loss of Tax Revenue Due to Reduction in Assessed Valuation of Taxable Property.—(a)  Temporary special aid shall be paid in fiscal years 1994-1995, 1995-1996, 1996-1997, 1997-1998, 1998-1999 [and], 1999-2000 *and 2001-2002* to school districts experiencing a severe reduction in local revenue due to a decline in the assessed value of taxable properties. The allocation to these districts shall be determined by multiplying the reduction in assessed value between 1985-1986 and 1992-1993 by the 1992-1993 real estate mileage rate. This aid shall be paid from undistributed funds not expended, encumbered or committed from appropriations for grants and subsidies made to the Department of Education. No other funds shall be used for assistance under this section. These funds shall be sufficient to provide temporary relief to seven school districts in fiscal year 1995-1996 to seventy-five per centum (75%) of the funds received in fiscal year 1994-1995, in fiscal year 1996-1997 at fifty per centum (50%) of the funds received in fiscal year 1994-1995, in fiscal year 1997-1998, 1998-1999 and a fiscal year 1999-2000 at twenty-five per centum (25%) of the funds received in fiscal year 1994-1995. *For fiscal year 2001-2002, to the extent funds are available as determined by the Secretary of the Budget, qualifying school districts shall receive twenty-five per centum (25%) of the funds received in fiscal year 1994-1995.*  The section shall expire October 1, [2000] *2002.*

(b)  Payments made pursuant to subsection (a) shall be paid from a restricted receipt account, which is hereby established, for such payments. Funds shall be transferred by the Secretary of the Budget to the restricted account only to the extent necessary to make the payments authorized by this section. The money in the restricted account is hereby appropriated from the account for purposes of this section.

Section 28.  The act is amended by adding a section to read:

*Section 2502.39.  Basic Education Funding for 2000-2001 School Year.—For the 2000-2001 school year, the Commonwealth shall pay to each school district a basic education funding allocation which shall consist of the following:*

*(1) An amount equal to the basic education funding allocation for the 1999-2000 school year pursuant to sections 2502.13, 2502.37 and 2502.38.*

*(2) A base supplement calculated as follows:*

(i) If the school district's 2001-2002 market    value/income aid ratio is equal to or greater than .7000:

(A) Multiply the school district's 2001-2002    market vale/income aid ratio by its 2000-2001 average daily membership.

(B) Multiply the product from (A) by $25,000.00.

(C)  Divide the product from (B) by the sum of    the product  of the 2001-2002 market value/income aid ratio multiplied    by the  2000-2001 average daily membership for all qualifying school districts.

(ii) If the school district's 2001-2002    market value/income  aid ratio is equal to or greater than .4000 and less than    .7000:

(A)  Multiply the school district's 2001-2002    market value/income  aid ratio by its 2000-2001 average daily membership.

(B) Multiply the product from (A) by $77,000.00.

(C) Divide  the  product  from  (B)  by  the  sum  of  the products  of  2001-2002 market value/income aid ratio multiply by the 2000-2001 average daily membership for all qualifying school districts.

(iii) If  the  school  district's 2001-2002 market value/income aid ratio is less than .4000:

(A)  Multiply the school district's 2001-2002 market  value/income aid ratio by its 2000-2001 average daily membership.

(B)  Multiply the product from (A) by $12,000,000.

(C)  Divide the product from (B) by the sum  of the products of 2001-2002 market  value/income  aid ratio multiplied  by  the 2000-2001 average daily membership for all qualifying school district's.

(3) An increasing aid ratio supplement to qualifying   school districts as follows:

(i) To qualify for  the increasing  aid  ratio supplement,    a school district's 2001-2002 market value/income aid ratio must have    increased by .0100 or more over the 1994-1995 market  value/income  aid ratio and the school district's 2001-2002  market value/income  aid  ratio  must be greater than or equal to the median.

(ii)  The  increasing  aid ratio supplement shall be  calculated  for qualifying school districts  as follows: multiply the  school  district's increase in market value/income aid ratio between 1994-1995 and 2001-2002 by its 2000-2001 average daily  membership  and  multiply  this product by thirty-five million dollars (#35,000,000) and  divide  the resultant product by the sum of the products of the increase  in aid ratio multiplied  by the 2000-2001 average daily membership for all   qualifying school districts.

(4) A growth supplement is calculated for qualifying school  districts as follows:

(i) *Each school district with an increase in average daily membership between the 1999-2000 and 2000-2001 school year of less than three percent (3%) shall receive an amount equal to five hundred dollars ($500) multiplied by the actual numerical increase in average daily membership between the 1999-2000 and 2000-2001 school years.*

(ii) *Each school district with an increase in average daily membership between the 1999-2000 and 2000-2001 school year equal to or greater than three percent (3%) shall receive an amount equal to one thousand dollars ($1,000) multiplied by the actual numerical increase in average daily membership between the 1999-2000 and 2000-2001 school years.*

(5) *Each school district will receive additional funding as necessary so that the sum of the amounts under section 2502.13 and under clauses (2), (3), (4) and this clause will equal at lease two percent (2%) of the amount in clause (1).*

(6) *Each school district will receive additional funding as necessary so that the sum of the amounts under section 2502.13 and under clauses (1), (2), (3), (4), (5) and this clause divided by the 2000-2001 average daily membership will equal at least one hundred one percent (101%) of the amount in clause (1) divided by its 1999-2000 average daily membership.*

Section 29. Section 2509.1 of the act is amended by adding a subsection To read:

Section 2509.1 Payments to Intermediate Units.— ***

*(b.9) Up to nine million five hundred thousand dollars ($9,500,000) may be utilized for programs administered and operated by intermediate unit during the 2001-2002 school year for institutionalized children as provided in subsection (b.1).*

***

Section 30. Section 2561 is amended by adding a clause to read:

Section 2561. Tuition Charges for Pupils of Other Districts.—A school district or vocational school district receiving elementary or high school pupils or vocational or other extension education pupils who are residents of another school district or another vocational school district shall compute the tuition charges as follows:

***

(8) *Charter School Tuition Charge. When a charge school established pursuant to Article XVII-A enrolls any eligible student in an approved private school pursuant to section 1376, its "tuition charge per elementary pupil" or its "tuition charge per secondary pupil" shall be calculated in accordance with clauses (1) through (3).*

Section 31. The act is amended by adding a section to read:

Section 2574.3 *Approved Reimbursable Annual Rental for Leases of Building or Portions of Buildings for Charter School Use.—(a) For*

leases of buildings of portions of buildings for charter school use which have been approved by the Secretary of Education on or after July 1, 2001, the Department of Education shall calculate an approved reimbursable annual rental charge. Approved reimbursable annual rental for such approved leases of buildings or portions of buildings for charter school use shall be the lesser of (i) the annual rental payable under the provisions of the approved lease agreement, or (ii) the product of the enrollment, as determined by the Department of Education, times one hundred sixty dollars ($160) for elementary schools, two hundred twenty dollars ($220) for secondary schools or two hundred seventy dollars ($220) for area vocational-technical schools. The Common wealth shall pay annual for 'the school year 2001-2002 and each' school year thereafter to each charter school which leases with the approval of the Department of Education buildings or portions of buildings for charter school use under these provisions an amount determined by multiplying the aid ratio of the charter school by the approved reimbursable annual rental.

(b) Nothing in this section shall require a charter school that has been converted from an existing public school under Article XVII-A to make rental payments to a school district.

Section 32. This act shall take effect as follows:

(1) The addition or amendment of sections 613(f), 923-A. 1311-A, 1376, 1725-A, 1855, 1913-A, 1915-A, 2013-A, 2502.8, 2502.13, 2502.30, 2502.39, 2509.1(b.9), 2561(8) and 2574.3 of the act shall take effect July 1, 2001.

(2) The remainder of this act shall take effect June 30, 2001, or immediately, whichever is sooner.

APPROVED—The 22ⁿᵈ day of June, A.D. 2001.

THOMAS J. RIDGE

Sincerely,

*Victoria Bibbs, Pro Se*

Victoria Bibbs
6023 Glade Drive
Erie, PA 16509
814- 864-4181

52

*leases of buildings of portions of buildings for charter school use which have been approved by the Secretary of Education on or after July 1, 2001, the Department of Education shall calculate an approved reimbursable annual rental charge. Approved reimbursable annual rental for such approved leases of buildings or portions of buildings for charter school use shall be the lesser of (i) the annual rental payable under the provisions of the approved lease agreement, or (ii) the product of the enrollment, as determined by the Department of Education, times one hundred sixty dollars ($160) for elementary schools, two hundred twenty dollars ($220) for secondary schools or two hundred seventy dollars ($220) for area vocational-technical schools. The Commonwealth shall pay annual for 'the school year 2001-2002 and each' school year thereafter to each charter school which leases with the approval of the Department of Education buildings or portions of buildings for charter school use under these provisions an amount determined by multiplying the aid ratio of the charter school by the approved reimbursable annual rental.*

*(b) Nothing in this section shall require a charter school that has been converted from an existing public school under Article XVII-A to make rental payments to a school district.*

Section 32. This act shall take effect as follows:

(1) The addition or amendment of sections 613(f), 923-A. 1311-A, 1376, 1725-A, 1855, 1913-A, 1915-A, 2013-A, 2502.8, 2502.13, 2502.30, 2502.39, 2509.1(b.9), 2561(8) and 2574.3 of the act shall take effect July 1, 2001.

(2) The remainder of this act shall take effect June 30, 2001, or immediately, whichever is sooner.

APPROVED—The 22nd day of June, A.D. 2001.

THOMAS J. RIDGE

Sincerely,

*Victoria Bibbs, Pro se*

Victoria Bibbs, Pro, se
6023 Glade Drive
Erie, PA 16509
814- 864-4181

52

Exhibits
A-C

# OCY expenses add to county's legal bills

# County settles negligence suit

Couple said county was responsible for protecting child during parental visits

# aw firm: OCY expenses add to county's lega...

nued from 1A

solicitor's staff?" Leone said.

ell, said John Onorato, the tor for the Schenker administration

e county has a staff of in- e lawyers on retainer. The nker administration hired Donald, Illig to handle Con- ese because of the firm's ex- se in labor law and because a unique circumstances of nley case, Onorato said. orato said he and some of county's office in-house ys, including those at OCY, involved in the personnel n against Conley and were he witnesses in a case over y's ouster. Defending the y in a case while being as a witness would be "dif- and almost impossible," o said. He said he was suf- ed to testify at the hearing.

Onorato's retainer is $31,000 a year, and the county's four as- sistant solicitors each have an- nual retainers of $25,000, ac- cording to county records. OCY has a full-time solicitor paid a salary of $71,620 a year as well as three other lawyers on retainers paid, according to county records.

The lawyers at MacDonald, Il- lig charged the county as a rate of $175 to $165 an hour in the Con- ley case, according to the bill. The cases lead lawyer, Roger Taft, worked 163 hours at an hourly rate of $175 for an individual bill of $28,525. The rest of the overall bill covered the work of the oth- er lawyers and expenses.

The accuracy of the bill is not in dispute. Onorato said he is sat- isfied with the work of MacDon- ald, Illig, which the Schenker ad- ministration three years ago hired to negotiate the county's la- bor contracts. Taft has been the lead lawyer on those cases.

Taft said he aggressively pur- sued the Conley case because, at the time, Conley was threatening to take action against the coun- ty before the Civil Service Com- mission and through a union grievance.

"We were ready to go," he said of the Civil Service case. "We were ready to win the case and her the day of her resignation. I am convinced we would have won if it had gone forward."

Conley withdrew her claim be- cause she proceeding was "not in her best interest," according to a letter on file with the Civil Ser- vice Commission. Conley last week said her lawyers have told her not to comment on her case.

The $56,371 spent on the Con- ley case is the second largest ex- penditure the Schenker admin- istration had paid over OCY per- sonnel issues in the past year. In August, in an agreement the ad- ministration initially tried to keep secret, the county paid a $100,000 settlement to fired OCY caseworker David A. Dow.

Conley, 43, had worked for the county for 13 years, including the past four years at OCY, when she resigned Sept. 10.

Conley claimed the Schenker administration forced her to re- sign to get back at her for being a whistleblower. Conley's ouster came about a month and a half after she testified in a case against her supervisor at OCY, whom Conley said altered court records. The Schenker adminis- tration has disputed that claim.

In her Civil Service appeal, Conley said county officials told her day of her resignation disclosed a confidential OCY court order "with the intent of by using her office e-mail to dis- close the telephone number of an OCY client to the client's former caseworker. Conley said she did nothing wrong.

The Schenker administration disagrees. The county's person-

nel director, Peter Callan, said in an October memo that Conley He said th that she had violated OCY rules Conley to who was the subject of it. "In esse the $56,371 Onorato, in an interview last being spe week, said the county has children." "mounted a vigorous defense" against Conley because of her ED PA "egregious breach of confiden- reached at

# County settles negligen ...

Erie Co — ( ... )

Erie County has settled a lawsuit with an Erie family that charged the county's Office of Children and Youth was negligent concerning in- cidents of alleged sexual abuse against an adopted girl.

Under the settlement, the county will pay the girl and her adopted family $15,000.

The suit was filed in 1999 by a cou- ple identified only as R.F. and P.F. and for their adopted daughter, J.F.

The girl had been placed in the custody of Children and Youth in 1994 and was placed with foster par- ents, who eventually adopted her.

The couple claimed that J.F. was required to have supervised and un- supervised visits with her natural mother. During such visits, the cou- ple alleged, the girl suffered physi- cal and sexual abuse by the natural mother, the mother's boyfriend and the girl's brother.

The couple filed suit that the county agency had a duty to pro- tect the child from such abuse dur-

## Couple said county agency responsible for protecting child during parental visits.

ing visitations and should have rec- ognized problems existed.

John Petulla, director of the Office of Children and Youth, said the set- tlement is not an acknowledgement that the agency erred in this case, but a sign that the agency agrees the parents need help in dealing with the child's special needs.

The couple filed suit after county officials refused a request for a state subsidy to help care for the child's special needs as a result of the abuse. Their lawyer, James J. Bru- no, said the couple never sought anything more than the aid to which they believed they were entitled.

"These are very special people."

   

**BLUE RIDGE HOME EDUCATION CONF**
April 16, 2005
Winchester, Virginia



# Tennessee

HOME | LAWS | ORGANIZATIONS | CASES
| LEGISLATION | HEADLINES



April 10, 2002

## *Horn v. Brown*
## Civil rights violated through wrongful arrest

**Filed:** March 1, 2001, U.S. District Court at Jackson.

**Nature of Case:** This civil rights lawsuit for violation of the
right to direct the education of one's child and for false arrest
arises out of the criminal prosecution of the mother of a five-
year-old. The child was not enrolled in public school, but the
school official was told by the child's grandmother that the
mother was planning to home school and that the child "should
be in school." The attendance officer filed the criminal
complaint after speaking with Mrs. Horn and learning that she
was, in fact, planning to home school. The official admits
knowing that the child was not yet compulsory attendance age
when he filed. Mrs. Horn was arrested, but the criminal case
against her was dismissed upon HSLDA's notice of
representation. On March 1, 2001, HSLDA filed a lawsuit on
behalf of Mrs. Horn for violation of her civil rights.

**Status:** On April 4, 2002, the parties agreed to a settlement.

**Last Updated:** April 10, 2002.

© Site Copyright 1996-2005 Home School Legal Defense Association
P.O. Box 3000 · Purcellville, VA 20134-9000 · Phone: (540) 338-5600 · Fax: (540) 338-2733 ·
E-mail: info@hslda.org
HOME | SEARCH | FEEDBACK | PRIVACY POLICY | ADVERTISING

Supported by the



COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF PUBLIC WELFARE
HARRISBURG, PENNSYLVANIA  17120

CHILDLINE & ABUSE REGISTRY
DEPARTMENT OF PUBLIC WELFARE
HILLCREST, 2ND FLOOR
P.O. BOX 2675
HARRISBURG, PA 17105-2675
TELEPHONE NO. (717) 783-8934

OFFICE OF
CHILDREN, YOUTH & FAMILIES

Mailing Date
February 21, 2003

VICTORIA BIBBS
1725 W 14TH ST
ERIE PA 16505

Child :      CHARLES BIBBS
Report No :  250011006
Agency:      ERIE

DEAR MS. BIBBS :

The above named child was reported as a victim of suspected child or student abuse.

The agency listed above has investigated the report and determined it was Unfounded or Unfounded for School Employee because of one of the following : (1) the incident did not occur, (2) the injury was not of a serious nature, or (3) substantial evidence was not found.

The Child Protective Service Law states that unfounded reports must be retained one year from the date the report was made.  This is to notify you that the above listed report has been expunged by this office.

We are required to inform you that this action has been taken because your name was listed on the report as the perpetrator of child abuse or student abuse.  Within 120 days after the year has passed,  it will be expunged by the investigating agency.  However, if the investigation reveals that the child and family need social services provided or arranged by the investigating agency,  the records will be retained by them.

If you have questions concerning the report,  you may contact the investigating agency at  (814) 451-6600.

*Issued by :* ChildLine & Abuse Registry



# CHILD ABUSE PROBES

se "control questions" and he "did you questions" central to the charge.

He said the control questions were questions that ideally should not have elicited a response but, in her case, they did. The test proved her neither guilty nor innocent.

Carl Triola, director of Children's Services, said Roger's visitation that he had been restricted not to inform police suffered from what he (Triola) had been told by the current caseworker involved.

He said the first caseworker of Roger's children is no longer with the agency. Triola said he did have reservations about one aspect in the handling of the case.

Regarding the court order for Roger to send the children weekend visits, Triola said, the caseworker should have asked the judge directly about

## TUCKER

the strengths she can to

our investigation and not assumed that the attorney (Roger's) would tell him.

He said the caseworker said she had advised the attorney to tell the judge but Triola said she should not have assumed he would.

"She should have told the judge herself and left it up to the court to decide if the visits were safe."

Mary said she feels the children should be in a foster home until this abuse case is resolved since Roger is living with another woman.

"I told the caseworker that several times but all she said was that she didn't think it was necessary. That the children were in a situation similar to the one they had been in when Roger and I were living together."

Roger and Mary were never married, and the children are now living with their father and another woman whom Roger said is referred to as "mother" by the children, at his instruction.

The NEWS also spoke with Roger's legal wife, Judy, who has custody of a child she had

while married to Roger.

She also said she had never been contacted by Children's Services.

"I went to them after these charges came out in the newspaper," she said. "I read them the riot act. A supervisor there said he'd have a caseworker contact me.

"Three weeks went by and nothing. I called and started yelling again. The supervisor said he'd forgotten to give the caseworker the message. She called the next day."

Roger's wife said she is prepared to testify in court on behalf of Mary even though Mary had lived with her husband for years.

"I really want to find out what kind of investigation Children's Services did on this case," she said angrily. "They are something else."

(To be continued)


FLORIDA?
SEE PAGE 10B

ERIE CITY AND COUNTY LIB
ERIE, PENNSYLVANIA 16507

Orlando calls for

# Triola: Security brea

ERIE, PA. TIMES-NEWS, Saturday, April 1, 1978

## olls for breach probe

# reach 'most devastating'

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Victoria Bibbs PRO SE, | ) | C.A. NO. 1:05-cv-41 |
| Plaintiff, | ) | District Judge Cohill |
| | ) | |
| Vs. | ) | Magistrate Judge Baxter |
| Susan Strohmeyer, et al., | ) | |
| Defendant | ) | |

## CERTIFICATE OF SERVICE

The undersign hereby certifies a true and correct copy of the within  Ordered Amendment and Presentation of a Partial Resolution for Approval was served upon the joint defendants Attorney's on this the ___18th   day of  July_, 2005. Via United States first class mail, postage pre-paid in accordance with the Rule of Fed. C.P.

Clerk, U.S, District Court
South Park Row
Erie, PA 16501

Patrick M. Casey Marshall,
Dennehey,Warner, Coleman
& Goggin
1001 State street, Renaissance

Richard A. Lanzillo
Knox, McLaughlin,
Gornoll & Sennett
120 West 10th Street

Suite 1400 Erie, PA 16501
David M. Donaldson
Administrative Office of
Pennsylvania Courts
1515 Market Street
Suite 1414
Philadelphia, PA 19102

Matthew J. McLaughlin
Counsel for Defendants
246 west Tenth Street
Erie, PA 16501

Respectfully,

*Victoria Bibb, Pro Se*

Victoria Bibbs, Pro Se
6023 Glade Drive
Erie, PA 16509
(814) 864- 864-4181

EXHIBIT "C"

```
                MILLCREEK TOWNSHIP POLICE DEPARTMENT        Date: 01/12/2005
                         CASE REPORT                        Page:        1
     Case Description:                          Case Number: 2004-00003674
     Assault/hands, feet, etc.

     Primary Victim: BIBBS,EDWARD,,

     Date/Time Reported: 03/22/04 11:50 Hrs.    Dispatch Incident Type:
     Date/Time Occurred: 03/22/04  0:00 Hrs.    FamChOffns
     Date/Time Between : 03/22/04  0:00 Hrs.
     Location Occurred : 6023 GLADE DR
     Area: F           Section: 4                  Grid:


     Reporting Officer :    MUNC  MUNCH,FREDERICK,,
     Primary Unit Assigned to Investigate: JUV

     Case Status: Closed/Arr  Disposition: AdltArrest  Disp. Date: 04/26/04

     No. of Offenses:  1   No. of Offenders:   1    No. of Victims:   1



     Offense Number:   1
     Crime Code: 02704 AGGRAVATED ASSAULT W/HANDS, FEET, ETC.
     Statute . : 0440                Attempted/Committed : Committed
     Stat Desc : ASSAULT/HANDS, FEET, ETC.
     Statute ORI/Group . : S          Agg Aslt/Homc Crcmst:
     Counts . . . . . . : 001         Larceny/Theft Offnse :
     Offense Date . . . : 03/20/2004  Victim Drug Related :
     Abandoned Structure : NO         Property Damage . .
     UCR Return A . . . : Aslt StArm  UCR Stolen Property :


     Offense Number:   2
     Crime Code: 02705 SIMPLE ASSAULT
     Statute . : 0800                Attempted/Committed : Committed
     Stat Desc : SIMPLE ASSAULT
     Statute ORI/Group . : S          Agg Aslt/Homc Crcmst:
     Counts . . . . . . : 001         Larceny/Theft Offnse:
     Offense Date . . . :             Victim Drug Related :
     Abandoned Structure : NO         Property Damage . .
     UCR Return A . . . : Aslt Other  UCR Stolen Property :


     Offense Number:   3
     Crime Code: 04300 FAMILY/CHILD OFFENSES
     Statute . : 2020                Attempted/Committed : Committed
     Stat Desc : FAMILY/CHILD - CHILD ABUSE
     Statute ORI/Group . : S          Agg Aslt/Homc Crcmst:
     Counts . . . . . . : 001         Larceny/Theft Offnse:
     Offense Date . . . :             Victim Drug Related :
     Abandoned Structure : NO         Property Damage . .


     SUBJECTS:

     Arrestee . : Present Information
```

MILLCREEK TOWNSHIP POLICE DEPARTMENT              Date: 01/12/2005
                    CASE REPORT                             Page:        2
Case Description:                          Case Number: 2004-00003674
Assault/hands, feet, etc.


                BIBBS,VICTORIA,,              Phone: 814-868-8429
   Arrestee     6023 GLADE DR
                ERIE                      PA 16509

      Race : Black      Sex: Female         D.O.B: 04/03/51  Age:  53
      Hgt  : 5'06"   Wgt: 175  Hair: Black     Eyes . . : Brown
      Build: Heavy      Complexion: Dark       Ethnicity:
      Dr Lic #: 18498141         St:  PA  Soc Sec #: 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
      CrimHistNo 5465

        Statement Type  :           Related Offenses :  1

      Arrest Information:
        Arrest Date/Time : 04/27/04  9:30 Hrs.  Arrest Type . : Warrant
        Arresting Officer: MUNCH,FREDERICK,,
        Arrest Location  : 9333 TATE RD #109
                           Erie, PA                        16509
        OBTS Number . . . : H8724/5-2   Booking Number. . :    11032
      Charge Number: 001
        Crime Code: 02704    AGGRAVATED ASSAULT W/HANDS, FEET, ETC.
        Statute . : 0440           Attempted/Committed : Committed
        Stat Desc : ASSAULT/HANDS, FEET, ETC.
      Charge Number: 002
        Crime Code: 02705    SIMPLE ASSAULT
        Statute . : 0800           Attempted/Committed : Committed
        Stat Desc : SIMPLE ASSAULT
      Charge Number: 003
        Crime Code: 04300    FAMILY/CHILD OFFENSES
        Statute . : 2020           Attempted/Committed : Committed
        Stat Desc : FAMILY/CHILD - CHILD ABUSE


   Arrestee . : Present Information
                BIBBS,CHARLES,E,              Phone: 814-868-8429
   Arrestee     6023 GLADE DR
                ERIE                      PA 16509

      Race : Black      Sex: Male            D.O.B: 03/01/54  Age:  50
      Hgt  : 5'10"   Wgt: 175  Hair: Black     Eyes . . : Brown
      Build: Slim       Complexion: Light      Ethnicity:
      Dr Lic #: 19246034         St:  PA  Soc Sec #: 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
      CrimHistNo 5854

   Business: GREAT LAKES PLATING              Phone:
             W 18TH AND RASPBERRY
             ERIE                  PA
        Statement Type  :           Related Offenses :  3

      Arrest Information:
        Arrest Date/Time : 05/11/04  9:00 Hrs.  Arrest Type . : Warrant
        Arresting Officer: MUNCH,FREDERICK,,
        Arrest Location  : ERIE COUNTY COURTHOUSE
                           Erie, PA                        16501
      Charge Number: 001

```
              MILLCREEK TOWNSHIP POLICE DEPARTMENT      Date: 01/12/2005
                          CASE REPORT                   Page:          3
    Case Description:                          Case Number: 2004-00003674
    Assault/hands, feet, etc.

          Crime Code: 04300    FAMILY/CHILD OFFENSES
          Statute . : 2020              Attempted/Committed : Committed
          Stat Desc : FAMILY/CHILD - CHILD ABUSE

    Victim . . . : Present Information
       Primary      BIBBS,EDWARD,,                    Phone: 814-868-8429
                    6023 GLADE DR
                    ERIE                      PA 16509

          Race : Black     Sex: Male            D.O.B: 05/31/89  Age: 15
          Dr Lic #:                    St:     Soc Sec #: 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

          Statement Type  :              Related Offenses :  1
```

Dispo - Cpl. Munch  3-22-04
Received a complaint from Children Youth Services Agent Walczak
reporting an alledged abuse.  Victim Edward Bibbs 5-31-89 possibly
being abused by his mother Victoria Bibbs 4-3-54.
See case report and supplemental by this Officer.


NAR-MUNCH-3/22/04
On 3-19-04 at 1600 hrs. this officer was advised by Lt. Carlotti that
we had received a complaint from investigator agent Gene Walczak from
the Office of Children and Youth Services.  Walczak stated he had
investigated allegations from the victim Edward Bibbs.  Walczak states
he received this information through guidance counselor Kathy
Zborgowski at JS Wilson Middle School.

Walczak faxed this office a copy of his initial investigation.  His
findings were that the mother of the victim may be responsible for
abuse, Victoria Bibbs, d.o.b. 4-3-54.  See supplemental reports from
this officer.

Investigation to continue by this officer.


NAR-SUPPLEMENTAL-MUNCH-3/22/04
On 3-19-04 at 1600 hrs. this officer was advised that we had received a
fax from Agent Gene Walczak from Children and Youth Services.
Walczak's report advised that he is investigating an alleged child
abuse case involving victim Edward Bibbs, d.o.b. 5-31-89.  Walczak
received the complaint from Kathy Zborgowski, a counselor at JS Wilson
School.  It appears from Walczak's initial report that the mother is
the perpetrator in this act.  Walczak states he counted multiple scars
on the child's back.  Walczak is alleging the mother Victoria Bibbs is
responsible.  See a copy of Walczak's report in this officer's case
file.

On 3-22-04 at 1300 hrs. this officer initiated a case report concerning
this matter.  This officer also attempted to contact Walczak at his
office.  This officer left Walczak a message on his answering machine
to contact this officer.

MILLCREEK TOWNSHIP POLICE DEPARTMENT        Date: 01/12/2005
CASE REPORT                                 Page:        4
Case Description:                           Case Number: 2004-00003674
Assault/hands, feet, etc.


NAR-SUPPLEMENTAL-MUNCH-3/24/04
On 3-19-04 at 1600 hrs. this officer was advised by Lt. Carlotti that
he had received a fax from Agent Gene Walczak of Children and Youth
Services. Walczak's report advised he is investigating an alleged
child abuse case involving victim Edward Bibbs, d.o.b. 5-31-89.
Walczak received the complaint from Kathy Zborgowski, a counselor at JS
Wilson School. It appears from Walczak's initial report that the
mother is the perpetrator in this act. Walczak states he counted
multiple scars on the child's back. Walczak is alleging the mother
Victoria Bibbs is responsible.

On 3-22-04 at 1300 hrs. this officer initiated an incident and case
report concerning this matter. This officer also attempted to contact
Walczak at his office. This officer left Walczak a message on his
answering machine.

On 3-24-04 at 0940 hrs. this officer received a call from Mr. Walczak.
Walczak advised he was going to fax me a copy of his investigation
immediately. Walczak states the victim Edward Bibbs was removed from
the home and is staying at his sister's residence, Rashedia McCalebb,
d.o.b. 7-8-72, SS #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, 301 West 12th Street, phone 455-1592,
cell phone 490-0239.

At 1000 hrs. this officer contacted Michelle Peterson of the Child
Advocacy Center, 877-4020. This officer asked Peterson if she had
planned to interview Edward Bibbs concerning the scarring and alleged
abuse Bibbs had originally claimed was caused by his mother, and that
was listed in Walczak's report. Peterson advised she had spoken to
Walczak and was in the process of picking up pictures of Bibbs from
Walczak. Peterson advised she was set up in an interview with Bibbs on
Monday, 3-29-04, at 0900 hrs.

At 1015 hrs. this officer received a faxed copy of Walczak's ongoing
report (see attached report in case file).


NAR-SUPPLEMENTAL-MUNCH-4/21/04
On 3/29/04 at 0835 hrs., this officer received a voice mail from
Michelle Peterson advising me that the appointment had been cancelled
due to the fact that when Children & Youth Services went to pick Bibbs
up, he was not at the home.

On 3/30/04 at 0914 hrs., this officer attempted to contact Mr. Gene
Walczak from Children & Youth Services, but he was not in. A message
was left on his answering machine inquiring as to when he would attempt
to interview Bibbs again.

On 3/31/04 at 1130 hrs., this officer received a telephone call from
Laura of the Childrens Advocacy Center. She stated that the Bibbs case
will be re-scheduled for 4/15/04 at 1300 hrs.

MILLCREEK TOWNSHIP POLICE DEPARTMENT          Date: 01/12/2005
CASE REPORT                             Page:        5
Case Description:                  Case Number: 2004-00003674
Assault/hands, feet, etc.

On 4/15/04 at 1300 hrs., this officer repaired to the Childrens
Advocacy Center. Upon arrival, I met with Counselor Michelle
Peterson. Shortly thereafter, Children & Youth Caseworker Janice Bell
arrived with victim Edward Bibbs. Bibbs was escorted by Peterson to
the interview room. This officer and Caseworker Bell stayed in the
interview viewing room as Peterson started the interview at 1315 hrs.
Peterson began interviewing Bibbs about the marks on his back. Bibbs
admitted initially that the marks were caused by his mother striking
him with a belt and an extension cord, but then changed his wording to
state "a little bit". Bibbs then stated he was never struck with an
extension cord, but only a belt. Bibbs stated there were no witnesses
to his mother striking him, nor did he ever see his mother strike any
of his brothers or sisters. Bibbs recanted the fact that his mother
struck him and that he received the marks from a caseworker at GECAC.
When Peterson pressed Bibbs for a name of a caseworker at GECAC, he
said he thought the man's name was Farse. Bibbs then stated the marks
were from falling on a pile of rocks when he was ten years old. Bibbs
did state that on occasion his father would hit him "once in awhile".
At one point Bibbs stated that his mother "never did hit me".

It was apparent to this officer that Bibbs was scared and unwilling to
cooperate. The interview ended at 1340 hrs. This officer then spoke
to Peterson who advised that Assistant District Attorney Stine and
Investigator Spusta would confer and contact this officer as how to
proceed.


NAR-ARREST-MUNCH-4/27/04
See Case Report and Investigative Supplementals this incident for
details.


NAR-SUPPLEMENTAL-MUNCH-4/28/04
On 4-21-04 at 1300 hrs. this officer received a telephone call from
Assistant District Attorney Stine. Stine stated she had conferred with
Detective Spusta and concluded to have both parents Victoria and
Charles Bibbs charged with Endangering the Welfare of a Child,
Recklessly Endangering, and Simple Assault.

On 4-22-04 at 0915 hrs. this officer called ADA Stine and requested she
fax me a copy of her charging letter. Stine stated that would be
handled through the Advocacy Center and Detective Spusta. I advised
Stine I would call the Advocacy Center. At 0920 hrs. this officer
contacted Michelle Peterson from the CAC and asked for her to fax the
charging letter to this officer.

At 1228 hrs. this officer received a fax from the CAC. The fax was
signed by Detective Spusta representing the District Attorney's Office
(see attached letter in the case file. The letter recommended this
officer charge both parents with Simple Assault and one Reckless
Endangering (M-2), and Endangering the Welfare of A Child.

This officer had a question on the father's charges, being in Walczak's

MILLCREEK TOWNSHIP POLICE DEPARTMENT          Date: 01/12/2005
                    CASE REPORT                            Page:        6
Case Description:                        Case Number: 2004-00003674
Assault/hands, feet, etc.

report he stated the father was a co-perpetrator by omission and my
question was when the father should actually be charged with Simple
Assault and Reckless Endangering.  At 1300 hrs. this officer left a
message at the Advocacy Center requesting Spusta contact this officer.
At 1330 hrs. this officer received a return call from Spusta.  This
officer asked about the charges on the father and I explained my
question.  ADA Stine was in the room with Spusta and they conferred on
how to proceed.  Stine stated only to file the single charge of Child
Endangerment (F-1) on Mr. Bibbs.  The three separate charges are to
remain for Mrs. Bibbs.  Spusta then requested that this officer
interview both parents and give them an opportunity to give a statement.

At 1725 hrs. this officer attempted to contact the Bibbs at their
residence via telephone.  There was no answer.  This officer then
called Rashida McCalebb, daughter of Mrs. Bibbs, at her residence via
telephone, 451-1592.  This officer asked McCalebb if she would contact
her mother and have her call this officer via telephone.  I explained
to McCalebb the reason for my call.

On 4-23-04 at 0800 hrs. this officer received a voice mail from Mrs.
Bibbs.  Bibbs stated she would be coming to the police station today at
2 p.m. to meet with me.

On 4-26-04 at 0730 hrs. this officer attempted to contact Mrs. Bibbs at
her residence via telephone but there was no answer.  Mrs. Bibbs failed
to show up for our scheduled interview on 4-23-04 at 1400 hrs.

At 0740 hrs. this officer was able to contact Bibbs' daughter Rashida
McCalebb at her residence via telephone.  I advised McCalebb that I had
set up an appointment for an arraignment tomorrow morning, 4-27-04, at
0900 hrs. at District Justice Strohmeyer's office for both Victoria and
Charles Sr.  I requested McCalebb advise her mother of the
appointment.
At 0830 hrs. this officer was able to contact Victoria Winston,
864-4798.  Winston is the daughter of Bibbs.  I also explained to her
to contact her mother and father regarding the arraignment scheduled
for tomorrow at 0930 hrs.

At 0900 hrs. this officer faxed both criminal complaints to District
Justice Strohmeyer's office (see attached fax transaction report).

At 1015 hrs. this officer repaired to District Justice Strohmeyer's
office and obtained the warrants for both Mr. and Mrs. Bibbs.

On 4-27-04 at 0930 hrs. this officer met Victoria Bibbs at District
Justice Strohmeyer's office for an arraignment.  Mr. Bibbs did not
appear.  Mrs. Bibbs was arraigned and released ROR with a preliminary
hearing date set for 5-11-04 at 1:15 p.m.  Mrs. Bibbs requested she
come in for processing at a later date because of a scheduled
appointment.  This officer asked Mrs. Bibbs where her husband was.
Mrs. Bibbs stated she "put him out" several days ago.  She believed he
was living at 1024 West 18th Street with his cousin Gwyneth Henry.
459-6714.  Mrs. Bibbs stated her husband does not have a job.

MILLCREEK·TOWNSHIP POLICE DEPARTMENT    Date: 01/12/2005
CASE REPORT           Page:     7
Case Description:         Case Number: 2004-00003674
Assault/hands, feet, etc.

At 1000 hrs. this officer, along with Ptlm. Schleicher and Fiorelli repaired to the Bibbs residence at 6023 Glade Drive. This officer knocked on the door but there was no answer. This officer then observed Mrs. Bibbs walking toward the house from Penelec Drive. Mrs. Bibbs assured this officer that Mr. Bibbs was not there. This officer asked Mrs. Bibbs if she would let us search the house. Mrs. Bibbs stated that we could not, but again stated Mr. Bibbs was not there. These officers then cleared from the Bibbs' residence at 1010 hrs.

At 1012 hrs. this officer called the Henry residence and spoke to Gwyneth Henry. Henry confirmed that Mr. Bibbs moved in with her several days ago after he had a falling out with his wife. Henry stated Mr. Bibbs was at work. This officer asked her where he worked and she stated that she did not know. This officer advised her to have Mr. Bibbs contact this officer to set up a time for an arraignment.

At 1120 hrs. this officer phoned in an arrest report on Victoria Bibbs (see arrest report for details).

On 4-28-04 at 0800 hrs. this officer had Dispatcher Haney enter Mr. Bibbs into NCIC, NIC/W525866885. Mr. Bibbs has failed to make any attempt to contact this officer. An inactive felony warrant has been entered into NCIC.

This case can be considered cleared by arrest.


NAR-SUPPLEMENTAL-MUNCH-5/11/04
On 5-11-04 at 0900 hrs. this officer attended a child custody hearing at the Erie County Courthouse involving Victoria Bibbs. Also in attendance was Mr. Charles Bibbs. This officer has a felony warrant for Mr. Bibbs. This officer took Mr. Bibbs into custody with the assistance of Deputy Sanfilippo. Mr. Bibbs was arraigned at 0930 hrs. at central court before District Justice Strohmeyer and released on his own recognizance. A preliminary hearing is scheduled for 5-18-04. See arrest report for details. Dispatcher Haney removed Mr. Bibbs from NCIC and from our computer system.


NAR-SUPPLEMENTAL-MUNCH-5/18/04
On 5-18-04 a preliminary hearing was conducted at 1400 hrs. in front of District Justice Strohmeyer at Erie Central Court. Testimony was heard from the victim Edward Bibbs. District Justice Strohmeyer, after hearing testimony, bound over the charge of Child Endangerment on his father Charles Bibbs Sr. Mrs. Bibbs did not appear at the hearing.


NAR-SUPPLEMENTAL-MUNCH-6/15/04
On 6-15-04 a preliminary hearing was set for Mrs. Bibbs at 1130 hrs. Mrs. Bibbs attended the hearing without counsel. District Justice Strohmeyer rescheduled the hearing because of this. A new hearing date is set for 7-13-04 at 1500 hrs.

MILLCREEK TOWNSHIP POLICE DEPARTMENT          Date: 01/12/2005
CASE REPORT                                   Page:        8

Case Description:                         Case Number: 2004-00003674
Assault/hands, feet, etc.


NAR-SUPPLEMENTAL-MUNCH-8/24/04
On 8-24-04 a preliminary hearing was scheduled for Mrs. Bibbs. She did
not show up for the hearing so a warrant was issued for her arrest per
the Erie County Sheriff's Department. Mrs. Bibbs' attorney is Jack
Grayer. Representing the Commonwealth was Raquel Cross. This officer
was also informed by Sanfillipo that Mr. Bibbs did not show up for his
Formal arraignment after his preliminary hearing back in May. There is
also a warrant for his arrest per the Erie County Sheriff's Department.


Supplemental-Munch-9-7-04
    On 9--4 at 1300 hrs. a Preliminary Hearing was held in front of DJ
Strohmeyer. Representing the defendant was public Defender Jack
Grayer. Representing the Commonwealth was Raquel Cross. The victim
took the stand and would not implicated his mother in the beatings. DJ
Strohmeyer dismissed the Simple Assault and Reckless Endangerment
charges, but bound over the Child Endangering Charge.


                              Respectfully Submitted By:

                              _____

                              _____

EXHIBIT "D"

COMMONWEALTH OF PENNSYLVANIA

F: Erie

**POLICE**
**CRIMINAL COMPLAINT**

Magisterial District Number: 06-03-03

District Justice Name: Hon. SUSAN STROHMEYER

Address: 9333 TATE RD SUITE 109
ERIE, PA 16509

451-651

COPY

COMMONWEALTH OF PENNSYLVANIA

DEFENDANT: NAME AND ADDRESS

Victoria  Bibbs

6023 Glade Dr.
Erie, Pa.  16509

Docket No.: CR-72-04

Date Filed: 4/26/04

OTN: H872475-2

| Defendant's Race/Ethnicity | | | Defendant's Sex | Defendant's D.O.B.: | Defendant's Social Security Number | Defendant's SID |
|---|---|---|---|---|---|---|
| ☐ White  ☐ Asian  ☒ Black | | | ☒ Female | 4-3-51 | 164 - 42 - 7667 | FBI# 134685J6 |
| ☐ Hispanic  ☐ Native America  ☐ Unknown | | | ☐ Male | | | |

| Defendant's A.K.A. | Defendant Vehicle Information | | | Defendant's Driver's License Number |
|---|---|---|---|---|
| Victoria Miller  Victoria Winston | Plate Number | State | Registration Sticker (MM/YY) | State  Pa    18498141 |

| Complaint/Incident Number | Complaint/Incident Numbers if other Participants | UCR/NIBRS Code |
|---|---|---|
| 2004- 3674 | | |

District Attorney's office    ☐ Approved    ☐ Disapproved because: _____

(The district attorney may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. Pa.R.Cr.P. 107.)

_____    _____    _____
(Name of Attorney for Commonwealth - Please Print or Type)    (Signature of Attorney for Commonwealth)    (Date)

I, Cpl. F. Munch                                          MPD #22
_____    (Officer Badge Number/I.D.)
(Name of Affiant - Please Print or Type)

of Millcreek Township Police Dept.                  PA0250300          2004-3674
(Identify Department or Agency Represented and Political Subdivision)    (Police Agency ORI Number)    (Originating Agency Case Number (OCA))

do hereby state:   (check appropriate box)

1.  ☒  I accuse the above named defendant, who lives at the address set forth above.

    ☐  I accuse the defendant whose name is unknown to me but who is described as _____

    ☐  I accuse the defendant whose name and popular designation or nickname is unknown to me and whom I have
        therefore designated as John Doe
    with violating the penal laws of the Commonwealth of Pennsylvania at    6023 Glade Dr.
                                                                            (Place-Political Subdivision)

    in  Millcreek Township _____    County on or about   From 1994 thru February 2004

Participants were: (If there were participants, place their names here, repeating the name of above defendant)
Victoria Bibbs          Charles E. Bibbs

2.  The acts committed by the accused were:
    (Set forth a summary of the facts sufficient to advise the defendant of the nature of the offense charged. A citation to the statute allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section and subsection of the statute or ordinance allegedly violated.)
    **Endangering Welfare of Children** Sec: 4304 (a) Pa. CC F-3
    **Recklessly Endangering Another Person** Sec: 2705 Pa. CC M-2
    **Simple Assault** Sec: 2701 (a) (1) Pa. CC M-1

AOPC 412A-(06/01)                          1-3



**POLICE
CRIMINAL COMPLAINT**

pertinent information. (Continuation of 2.)

Defendant Name: Victoria Bibbs

Docket Number: CR-72-04

In that the defendant being the parent of the welfare of E B, a child under the age of 18 years, to wit: age fourteen, did knowingly endanger the welfare of the child by violating a duty of care, protection or support, in that she did over an extended period of time, being 1994 thru February of 2004, strike the child repeatedly using a belt and extension chord, causing serious injury and scarring to the child. And in furtherance did intentionally knowingly or recklessly engage in the following conduct to wit: striking the child repeatedly, which conduct placed or could of placed her son EB age fourteen in danger of death or serious bodily injury. And did intentionally, knowingly or recklessly cause bodily injury to EB in that she did repeatedly over a course of time, strike the victim with a belt and extension chord.

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly, or in violation of

| | | | | | | |
|---|---|---|---|---|---|---|
| 1. | 4304 (Section) | and | (a) (Subsection) | of the | Pa. Crimes Code (PA Statute) | One (counts) |
| 2. | 2705 (Section) | and | (Subsection) | of the | Pa. Crimes Code (PA Statute) | One (counts) |
| 3. | 2701 (Section) | and | (a)(1) (Subsection) | of the | Pa. Crimes Code (PA Statute) | One (counts) |
| 4. | (Section) | and | (Subsection) | of the | (PA Statute) | (counts) |

3. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made. (In order for a warrant of arrest to issue, the attached affidavit of probable cause must be completed and sworn to before the issuing authority.)

4. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 PA. C.S. § 4904) relating to unsworn falsification to authorities.

_____ , 20 __    _____
(Signature of Affiant)

AND NOW, on this date _____ , 20 __ I certify the complaint has been properly completed and verified. An affidavit of probable cause must be completed in order for a warrant to issue.

06-03-03
(Magisterial District)

_____
(Issuing Authority)

**SEAL**

AOPC 412B-(11/00)    2-3

Defendant Name: Victoria Bibbs

Docket Number: CR-72-04



**CRIMINAL COMPLAINT**

## AFFIDAVIT of PROBABLE CAUSE

<u>Probable Cause</u>:

**Origin Of the Crime:**

On 3-19-04 this Officer received a report from Agent Gene Walczak from the Erie County Office of Children and Youth Services. Walczak's report detailed a complaint he had received from Millcreek School Officials relating to the victim E B. Walczak reported that the victim had reported to school officials at J.S. Wilson Middle School that he had been a victim of abuse from his parents for a long period of time.

**Facts of the Crime:**

Walczak subsequently interviewed the victim and the accused. Walczak's report details a continuous pattern of abuse from 1994 through February of 2004. Walczak's report states the mother used a belt and extension chord to discipline the victim. Walczak took detailed pictures of the victims back, shoulders, and arms. The report states there are over 62 scar marks to the victims back.

**Defendants Involvement:**

Walczak states he interviewed the defendant concerning the scarring. The defendant according to Walczak's report admits to using a belt to discipline the victim.

On 4-15-04 the victim was assessed and interviewed at the Child Advocacy Center. This interview was reviewed by Det. Joseph Spusta and ADA Lisa Stine from the Erie County District Attorneys Office.

On 4-22-04 this Officer was contacted by ADA Stine and advised to file the aforementioned charges.

Whereas this Affiant requests a warrant be issued as per the attached Criminal Complaint.

I,     Cpl. F. Munch _____     **BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.**

_____ *Cpl. J. Munch mps#22*
(Signature of Affiant)

Sworn to me and subscribed before me this _____ day of _____, 20 ____ .

_____        _____, District Justice
Date

My commission expires first Monday of January, _____ -        **SEAL**



PENNSYLVANIA

COUNTY OF ___ERIE___

To any authorized person:

In the name of the Commonwealth of Pennsylvania, you are commanded to take into custody

(Name): BIBBS, VICTORIA

DOB: 4/03/51 F BLACK

(Address): 6023 GLADE DRIVE
ERIE, PA 16509

If the defendant be found in said Commonwealth, and bring the defendant before us at

(Address): SUSAN D STROHMEYER
9333 TATE ROAD,
ERIE, PA 16509

to answer the complaint or citation of ___MUNCH, FRED___

charging the defendant with § 18 §4304

ENDANGERING WELFARE OF CHILDREN

and further to be dealt with according to law, and for such purposes this shall be your sufficient warrant.

Witness the hand and official seal of the issuing authority on this

_____ day of _____

_____
(Signature)

Magisterial District No.: 06-3-03

Citation/No.: (814) 451-6511

Docket No.: CR-0000072-04

OTN: H 872475-2

FILED: 4/26/04

Amount needed to satisfy collateral: $

Reason for warrant: FELONY

COPY : SHERIFF/CONSTABLE
DATE PRINTED: 4/26/04 10:15:21 AM

AOPC 411/99

MILLCREEK TWP POLICE
(Political Subdivision)

Amount required to satisfy sentence:
Fine: $
Costs: $
Other: $
Total: $

---

IS FOUND

By authority of this warrant

☒ I took into custody the within named VICTORIA BIBBS

☐ He is now at liberty on bail posted before _____

☐ He _____

☐ in the _____ jail.

☐ before you for disposition.

☐ I accepted a guilty plea and collected
$ _____ for fine and costs.

☐ I accepted a not guilty plea and collected $ _____ for collateral.

☐ I accepted the fine and costs due in the amount of
$ _____

_____
(Signature of Officer - Name & Title)

RETURN WHERE DEFENDANT
IS NOT FOUND

After careful search, I cannot find the within named defendant

_____
SIGNATURE

_____
NAME

_____
TITLE

---

WARRANT CONTROL NO.:
0656919

DOCKET NUMBER:
CR-0000072-04

COMMONWEALTH
OF
PENNSYLVANIA
VS.

BIBBS, VICTORIA

OFFENSE DATE    1/01/

CHARGE
§ 18 §4304

$ _____

I acknowledge that I am voluntarily and knowingly pleading guilty. I paid to the officer the fine and costs in the warrant in the amount of

_____
(Defendant's Signature)

I acknowledge that I am voluntarily and knowingly pleading not guilty. I paid to the officer the collateral I my appearance at trial stated in t warrant in the amount of $

_____
(Defendant's Signature)

Officer's costs:
Warrant
Miles @    ¢
Commitments
Miles @    ¢
Conveying to hearing
Miles @    ¢
Total



# WARRANT OF ARREST
## ADDITIONAL CHARGES

Mag. Dist. No.: **06-3-03**
OTN: **H 872475-2**

Defendant Name:
**BIBBS, VICTORIA**

**CR-0000072-04**    (CONTINUED)
S 18 §2705 RECKLESSLY ENDANGERING ANOTHER PERSON
S 18 §2701 §§A1 SIMPLE ASSAULT

# WARRANT OF ARREST

## ADDITIONAL CHARGES



Mag. Dist. No.:  **06-3-03**

QTN:  **H 872475-2**

Defendant Name:

**BIBBS, VICTORIA**

---

**CR-0000072-04**      (CONTINUED)

S 18 §2705 RECKLESSLY ENDANGERING ANOTHER PERSON

S 18 §2701 §§A1 SIMPLE ASSAULT