1            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3  VICTORIA BIBBS,         :
          Plaintiff     :

4                   :
         v.         :    No. 05-00041

5                   :
  SUSAN D. STROHMEYER,   :

6  FREDERICK G. MUNCH,    :
  KATHY ZBORGOWSKI, and  :

7  JOHN CAVANAGH,       :
         Defendants   :

8

9

10         Hearing held in the above-captioned matter,
     on Friday, October 28, 2005, commencing at 10:30

11  a.m., before Magistrate Judge Susan Paradise Baxter,
     in the United States Courthouse, Courtroom B, 617

12     State Street, Erie, PA.

13

14  Pro se:

15     Victoria Bibbs
     6023 Glade Drive

16     Erie, PA 16509

17  For the Defendant Frederick Munch:

18     Patrick M. Carey, Esq.
     Marshall Dennehey Warner Coleman & Goggin

19     1001 State Street,
     Renaissance Centre, Suite 1400

20     Erie, PA 16501

21  For Defendants Kathy Zborgowski and John Cavanagh:

22     Neal R. Devlin, Esq.
     Knox McLaughlin Gornall & Sennett

23     120 West Tenth Street
     Erie, PA 16501

24

25        Reported by Carol A. Holdnack, RPR
       Ferguson & Holdnack Reporting, Inc.

1          MS. WALLEN:  The case before the Court is Victoria

2   Bibbs versus Susan D. Strohmeyer, et al.  It's docketed at

3   Civil Action No. 05-41 Erie.  Representing the Plaintiff is

4   Victoria Bibbs, proceeding pro se.  Representing the

5   defendants are Patrick M. Carey and Neal Devlin.

6          THE COURT:  Good morning.  Ms. Bibbs, we are here

7   because in an effort to have a more definite statement, you

8   filed a document that was about 70 pages long.  And instead

9   of clearing it up, it actually made me more confused.  And

10  so if I'm more confused, I suspect the Defendants are as

11  well.  The Defendants then, confirming what I thought, filed

12  another Motion for a More Definite Statement.

13          And so rather than have you go through that

14  exercise again, I thought if we came into court, I would try

15  to get the claims and get them figured out here on the

16  record.  We could proceed and the case would not drag along.

17  All right.

18          MS. BIBBS:  Yeah.

19          THE COURT:  First off, why don't you come on up

20  and come up to the podium there so I can ask you some

21  questions.  All right.  Ms. Bibbs, the case is currently --

22  well, Ms. Strohmeyer has been -- District Justice Strohmeyer

23  has been terminated, under judicial immunity.  So the case

24  is proceeding against Corporal Munch, Kathy Zborgowski, and

25  John Cavanagh.  Is that your understanding?

```
 1              MS. BIBBS:  Yes.

 2              THE COURT:  Okay.  Now, what we need to do, is I

 3    need to find out what you are charging each of these people

 4    with doing.  Okay?  So let's start with Corporal Munch.

 5    What is your charge against Corporal Munch?

 6              MS. BIBBS:  False arrest.

 7              THE COURT:  False arrest.  Now, were you brought

 8    to trial on these charges?

 9              MS. BIBBS:  Yes.

10              THE COURT:  And were you found guilty?

11              MS. BIBBS:  Well, I pleaded not guilty.

12              THE COURT:  You were found guilty of what?  Can

13    you tell me what --

14              MS. BIBBS:  It was a hung -- it was a hung jury.

15              THE COURT:  Oh, it was a hung jury.

16              MS. BIBBS:  Exactly.

17              THE COURT:  So you were not convicted.

18              MS. BIBBS:  Right.

19              THE COURT:  And do you know what the charges were?

20              MS. BIBBS:  Endangering the welfare of a child.

21              THE COURT:  Okay.  I think that's what I gleaned

22    from your filing here, but I wanted to make sure there

23    wasn't anything else.  Okay.  Now, are you going to be

24    having a second trial?  With a hung jury, that can happen.

25    Do you know if that's going to happen?
```

1          MS. BIBBS:  Pretty much not.

2          THE COURT:  No.  They're not going to charge you

3    again, you're not going to go to trial again.

4          MS. BIBBS:  I don't believe so.

5          THE COURT:  Now, you're going to charge him first

6    with false arrest.  Anything else?  You spent a lot of time

7    in the document talking about the charging document.  And

8    the problem -- the Affidavit of Probable Cause and that he

9    filled it out incorrectly, or that it was false accusations.

10   Is there anything else on that, you charge him with, other

11   than false arrest?

12         MS. BIBBS:  Well, he knew nothing about the

13   situation.  He was just going by hearsay.  Okay.  He had no

14   documentations to bear the fact that anything like that ever

15   occurred in that area and to his knowledge.

16         THE COURT:  And he was brought by who; OCY or by

17   the School District?

18         MS. BIBBS:  I don't believe I know exactly which

19   one brought him, because he never appeared in court, because

20   he didn't have any information to verify his statement.  So

21   he --

22         THE COURT:  All right.

23         MS. BIBBS:  -- kind of like backed out on that.

24         THE COURT:  Then let's go to Kathy -- help me out,

25   Mr. Devlin.

1          MR. DEVLIN:  Your Honor, I've been pronouncing

2   it --

3          THE COURT:  You're her attorney, and you don't

4   know it either.

5          MR. DEVLIN:  I've been pronouncing it Zborgowski.

6          THE COURT:  Zborgowski.  Just ignore that Z; that

7   sounds good for me.  Okay.  Now, who is she?

8          MS. BIBBS:  She's the school counselor, I believe.

9          THE COURT:  School counselor, at where?

10         MS. BIBBS:  At JS Wilson.

11         THE COURT:  JS Wilson.

12         MS. BIBBS:  In Millcreek.

13         THE COURT:  And what are you charging that she did

14   to you?

15         MS. BIBBS:  Conspiring.

16         THE COURT:  She conspired with who?

17         MS. BIBBS:  With John -- what's his name?

18         THE COURT:  Cavanagh.

19         MS. BIBBS:  Yes, exactly.  And all the other ones.

20   But like you said, he brought them out of the picture, so I

21   can't ask --

22         THE COURT:  No, the only one out of the picture is

23   District Justice Strohmeyer.  She has judicial immunity.

24   But the case was only served on Mr. Munch, Ms. Zborgowski,

25   Mr. Cavanagh, and Ms. Strohmeyer.  She's been terminated.

1    So these are the people who have been served in the

2    Complaint.

3            MS. BIBBS:  Exactly.  But this is a joint venture

4    type thing.

5            THE COURT:  Okay.  It's conspired with John

6    Cavanagh and others.

7            MS. BIBBS:  Right.

8            THE COURT:  Other unnamed.

9            MS. BIBBS:  Well, the names were in the --

10            THE COURT:  And others named but not served, not

11    charged, okay, in the Complaint.  With doing what?

12            MS. BIBBS:  Conspiring to have me shut my school

13    down.  They were --

14            THE COURT:  You have a school.

15            MS. BIBBS:  Well, it's a home school, charter

16    school.

17            THE COURT:  You're home schooling.  I did read

18    that.  You were home schooling.

19            MS. BIBBS:  Exactly.

20            THE COURT:  And were you home schooling anyone

21    other than your own children?

22            MS. BIBBS:  No.  Just my one son, because he had

23    problems in school.

24            THE COURT:  Okay.

25            MS. BIBBS:  And prior to that, Your Honor, I had

1    worked with the GECAC Board of Governors.  I was on that

2    governing board for three years.  And also I worked with

3    Linda Bebko Jones in the "Walk a Mile in My Shoe Campaign."

4    And I did that for three years.  And then also I'm a

5    founder -- one of the founders of the GECAC Charter School.

6    So, you know, it wasn't no unfamiliar thing to me to be a

7    part of that initiative.

8        THE COURT:  Okay.  I understand.  And you are

9    charging them with conspiracy to charge you with endangering

10   the welfare because -- your reasoning is because you were

11   home schooling your son?

12       MS. BIBBS:  Well, let me get to this point.  The

13   main thing is my constitutional rights were violated.

14       THE COURT:  How?

15       MS. BIBBS:  Because I have a guaranteed right that

16   I have the right to pursue my business, and I can pursue

17   liberty, and peace, and all that stuff.  So I can be able to

18   do what I have to do, you know, in --

19       THE COURT:  Sure, but you're also required to send

20   your child to school; that's another one.

21       MS. BIBBS:  Exactly.  But if it were in school --

22   and also, we had a teacher, which was Rick Vager (phonetic),

23   which was a correspondent teacher over the Internet, that

24   would take his scores and stuff.  And we'd go on field trips

25   together.  We had a community activity thing.  And this

1    program was authorized by a state -- a senator.  Now, he put

2    this into effect, this Pennsylvania Virtual Charter School.

3    And gave us a right as parents to be able to teach our

4    children, if we found that they have a gap in their

5    learning.

6              And my child fell under that criteria where he had

7    a gap in his learning.  And I needed to teach him and train

8    him at home, and fill that gap up, and reinstate him back in

9    school, which is my intentions.

10             THE COURT:  All right.  So what did they do to you

11   in this conspiracy?  I mean, what did they do exactly?

12             MS. BIBBS:  Well, they asked me to send my child

13   to an alternative education school in the City of Erie,

14   which they are contracted to.  And I said, well, you know,

15   the way they're treating him and shifting him around, I

16   don't want him to get confused.  If there's problems in his

17   training because of the alternative education school, the

18   kids play all day.  He's not learning anything.

19             THE COURT:  So that's when you decided to home

20   school him.

21             MS. BIBBS:  Exactly.

22             THE COURT:  And how did they take that news?  Were

23   they -- did they do anything to you after you --

24             MS. BIBBS:  Yeah, they kept sending me letters

25   that I was truant, the kid was truant.  I took him out of

1  school according to the right procedures.  I had a doctor's

2  examination for the children.  I had them taken out of

3  school by going to the School District, having his documents

4  and his records changed over to the Virtual Charter School,

5  and as they asked me.  And everything else that there was

6  necessary, so I --

7          THE COURT:  Were you charged with truancy?

8          MS. BIBBS:  At one point, yes, we were.  We came

9  to, yeah, court with that.

10          THE COURT:  And what happened there?

11          MS. BIBBS:  Well, the time that she charged him,

12  you know, with truancy that was --

13          THE COURT:  That was before?

14          MS. BIBBS:  Yeah.  Yeah.

15          THE COURT:  So it wasn't --

16          MS. BIBBS:  That was when we first came here.

17          THE COURT:  Did you get that all straightened out

18  with them, that you were home schooling your son?

19          MS. BIBBS:  I thought I had when I went to court

20  and talked with Mrs. Susan Strohmeyer; Judge Susan

21  Strohmeyer, excuse me.  And I thought I had that all

22  straightened out.  Because she seen the documentation and

23  she said, well, I don't see anything wrong, okay, so go

24  ahead and school him.  So I went on back.  Then there's

25  incidents coming that my son was selling drugs in school.

```
 1              THE COURT:  So he went back to school then; you

 2    didn't have him in your home.

 3              MS. BIBBS:  No, no, this is the other one.  This

 4    is just --

 5              THE COURT:  This is another son.

 6              MS. BIBBS:  Okay.  Well, all of them went -- came

 7    out of the home.  I'm just saying, one thing led to another.

 8    It was first talked about -- and it's really confusing to me

 9    too, Your Honor.

10              THE COURT:  Okay.  I think I'm getting the

11    picture.  So you're saying -- let me see.  When I repeat it,

12    then that tells me we're getting somewhere.  Okay?

13              MS. BIBBS:  Okay.

14              THE COURT:  Because the one son, you decided to

15    home school, and they were charging you with truancy, you

16    feel that they then picked on the other son.  And he was

17    charged with selling drugs at another school.

18              MS. BIBBS:  Exactly.

19              THE COURT:  Is that correct?

20              MS. BIBBS:  Exactly.

21              THE COURT:  Now, was he charged with selling drugs

22    and convicted, or was he expelled, or what happened with

23    this son?

24              MS. BIBBS:  This son was told that -- apparently,

25    there was a cross-examination in the room, and they were
```

1   talking to him, scared him right up.  And when he got home,

2   he said --

3           THE COURT:  And what school was that?

4           MS. BIBBS:  This is JS Wilson also.

5           THE COURT:  This is also JS Wilson.  Any of these

6   people involved, any of these Defendants?

7           MS. BIBBS:  Yes.

8           THE COURT:  Okay.  With that discussion.  Both of

9   them?

10          MS. BIBBS:  Yes.

11          THE COURT:  Zborgowski and Cavanagh?

12          MS. BIBBS:  Yes.

13          THE COURT:  All right.  Go ahead.

14          MS. BIBBS:  And it was said that they had --

15   getting back on my track.

16          THE COURT:  That's all right.

17          MS. BIBBS:  Okay.  That my son was selling drugs

18   in school.  Sent him home.  And he was scared to tell me.

19   Because he knew it wasn't something he hadn't -- you know,

20   didn't have done.  He didn't do.  And when he tried to tell

21   me, he said, Mom, he said, please don't get angry.  He said,

22   but, you know I know you're going to punish me, put me in

23   the room.  He said, but, please, you know.  I said, what.  I

24   said, what happened.  He said, they said I was selling

25   drugs.  And I said, well --

```
 1              THE COURT:  Why did they say that?  Was he found
 2    with something in his possession, or?
 3              MS. BIBBS:  Well, they said that it had been going
 4    on for a while, that there's other kids that was doing it,
 5    but he was the one that was picked out.  And he was showing
 6    them where the location was.  And this is all he did,
 7    without my consent, without anybody there.  You know, even
 8    the interrogation was done without a parent.  And he -- I
 9    guess you would say they were saying, anyhow, he's
10    borderline mental retarded.  That's what they said, okay.
11    But now --
12              THE COURT:  Did they expel him?
13              MS. BIBBS:  Yes, they did.
14              THE COURT:  All right.  Now, did you start
15    teaching him at home?
16              MS. BIBBS:  No, I didn't.  There was no need for
17    that.
18              THE COURT:  Did you try to get him reinstated in
19    school?
20              MS. BIBBS:  Oh, yes, he went back.
21              THE COURT:  He went back.
22              MS. BIBBS:  Um-hum.
23              THE COURT:  Is he in school now?
24              MS. BIBBS:  Well, he's not - no.  He's not with
25    me.
```

```
 1              THE COURT:  Okay.  And what about the other son?
 2              MS. BIBBS:  The other son, he's not in school
 3    either.  He's not with me.
 4              THE COURT:  Okay.
 5              MS. BIBBS:  This is why I'm here, because an
 6    injustice done to me.  And I don't think they should invade
 7    my privacy or, you know, take away my rights.
 8              THE COURT:  So the children were taken away from
 9    you involuntarily?
10              MS. BIBBS:  Yes.
11              THE COURT:  Okay.  Were any other children taken
12    away from you involuntarily besides these two sons?
13              MS. BIBBS:  My other son, my younger son.
14              THE COURT:  So three sons have been taken away.
15              MS. BIBBS:  Exactly.
16              THE COURT:  And that was by the Office of Children
17    and Youth.
18              MS. BIBBS:  Yes.
19              THE COURT:  All right.  Did you have hearings to
20    that effect in the State Court?
21              MS. BIBBS:  Yes.  And when we did, at the
22    preliminary hearing in front of Judge Strohmeyer -- my
23    attorney that represented me, he was able to get everything
24    almost down.  We -- everything was throwed out at that
25    point.
```

1          THE COURT:  And who was your attorney then?

2          MS. BIBBS:  That was Jack Grayer.  There was a

3    denial that it ever happened.  My son denied it.  There

4    wasn't enough evidence to prove that.  And it went to the

5    point where one of the district attorney, I guess, aides

6    went there, and then talked to the district attorney.  And

7    they decided they wanted to take it a little further, so it

8    went further.

9          THE COURT:  Okay.

10          MS. BIBBS:  Regardless of what happened.

11          THE COURT:  You guys don't have to do discovery,

12    you know.  We're golden here.  Now, we've got all this

13    information coming out.  So who was the judge in the matter

14    where the children were taken away from you?

15          MS. BIBBS:  The master, I believe it was.

16          THE COURT:  The master.  Are you pursuing any

17    legal action to get your children back?

18          MS. BIBBS:  Well, I'm here.  This is where I'm

19    starting.

20          THE COURT:  You're starting here.

21          MS. BIBBS:  Yes.

22          THE COURT:  So let's talk about what you're asking

23    from this Court.

24          MS. BIBBS:  For my children.  First of all, I need

25    a Habeas Corpus for my children.

```
 1              THE COURT:  You want a habeas -- a Writ of Habeas
 2    Corpus to get your children back.
 3              MS. BIBBS:  Exactly.
 4              THE COURT:  All right.
 5              MS. BIBBS:  Because since they've been in one of
 6    those incarcerated places --
 7              THE COURT:  The problem is you've sued Mr. Munch
 8    and Ms. Zborgowski and Mr. Cavanagh, and I'm not sure any of
 9    those three people have your children, do they?
10              MS. BIBBS:  No, they don't.
11              THE COURT:  You want your children back.
12    Secondly, for your claims that you've had your civil rights
13    violated, what are you looking for as a relief, as your --
14    what do you want?
15              MS. BIBBS:  What I want is, I want my school
16    established.  I want everything that I need for protection
17    for -- so I don't have to be invaded ever again, in that
18    sense.  And restitution for what they've done.
19              THE COURT:  Monetary restitution.
20              MS. BIBBS:  Exactly.
21              THE COURT:  All right.
22              MS. BIBBS:  Because these rights are guaranteed.
23    I should have had my protection.  I shouldn't have had this
24    invasion.  I mean, they came to my home and searched without
25    a warrant.  Had us sit down, couldn't go to my room.  My
```

```
 1   sons had to sit down, sit down, and you can't go in your
 2   room.  I'm like, what, what for.  I said, let me see the
 3   warrant.  I mean, what are you looking for.  Well, this --
 4            THE COURT:  Who was that, who did that?
 5            MS. BIBBS:  One of the policemen from the -- Munch
 6   was there.
 7            THE COURT:  Okay.  One of the Millcreek --
 8            MS. BIBBS:  Right.
 9            THE COURT:  The Defendants have moved for a more
10   definite statement and also to dismiss on the basis of
11   qualified immunity.  Do you understand that?
12            MS. BIBBS:  I hear you.
13            THE COURT:  Qualified immunity means that -- means
14   somewhat that the people were doing their duties and not
15   expecting that they were violating your civil rights.
16   Because they have moved for that, you have a right to
17   respond to that motion.  You can answer their claim that
18   their clients have qualified immunity, and on that basis
19   can't be sued for money damages.  All right.
20            So I'm going to talk to them for a while.  But
21   while you're sitting there, you can jot some notes down to
22   make that argument to me, if you would like, today.  Why
23   they shouldn't be released from their duties on the basis of
24   qualified immunity.  And they're going to make some argument
25   to that effect.  Now, so you can listen to what they have to
```

```
 1    say, and then I will give you a chance to speak again.

 2              MS. BIBBS:  Okay.

 3              MR. CAREY:  Now, before she sits down -- and I

 4    understand this isn't a deposition.  But if I could ask the

 5    Court to clarify just a couple of things.

 6              First of all, she said that with respect to the

 7    criminal charges, they went to trial, there was a hung jury,

 8    she didn't expect to be retried.  But she initially stated

 9    that she's appealed.

10              THE COURT:  She did say that.  What did you

11    appeal, do you know?

12              MS. BIBBS:  Yes.

13              THE COURT:  Are you on appeal right now?

14              MS. BIBBS:  Pardon me?

15              THE COURT:  Are you on appeal right now in the

16    State Court?

17              MS. BIBBS:  Yes.

18              THE COURT:  What did you appeal, if you weren't

19    convicted?

20              MS. BIBBS:  The motion -- I appealed for the

21    acquittal.  Because on the point when you have a hung jury,

22    according to the rule, that you can have an acquittal --

23    motion for acquittal.

24              THE COURT:  So you've moved for acquittal --

25              MS. BIBBS:  Exactly.
```

1          THE COURT:  -- and you haven't heard from that.

2          MS. BIBBS:  Right.

3          THE COURT:  She's moved for an acquittal.

4          MR. CAREY:  I don't understand why she would do

5     that if there was a hung jury.  There was no determination

6     of guilt for her to appeal from.

7          MS. BIBBS:  Well, if they was going to go for

8     another trial.

9          THE COURT:  Well, the motion for acquittal -- I

10    don't understand how that works in the State Court.  Can you

11    be acquitted if there's a hung jury?  I mean, you can't be

12    acquitted if there's a hung jury in Federal Court, because

13    it's a hung jury.

14         MS. BIBBS:  And that's why the Appeal Board is

15    reviewing it, and seeing what went wrong, what's going on

16    and that.  And I guess that's what they really wanted to

17    know.

18         THE COURT:  Okay.  And it may be that the appeal

19    will be dismissed.

20         MR. CAREY:  In State Court, if there's a hung

21    jury, the Commonwealth has 120 days to retry the Defendant

22    unless -- actually, 365 days to retry the Defendant, unless

23    they're incarcerated.

24         THE COURT:  So how long ago has that been?  When

25    was the hung jury, Ms. Bibbs, do you remember?

1          MR. CAREY:  I don't know when the hung jury was.

2          MS. BIBBS:  I believe that was in March.

3          THE COURT:  Of this year?

4          MS. BIBBS:  Um-hum.

5          THE COURT:  So we have some time yet.

6          MR. CAREY:  And then one area, another area, Your

7    Honor.  Again, I know this isn't her deposition.

8          THE COURT:  No, I know.  But I'll decide whether

9    the question is appropriate.  Go ahead.

10          MR. CAREY:  She stated her home was searched

11    without a warrant.  But did she say it was searched by other

12    police officers or just Munch?

13          THE COURT:  She said Mr. Munch's cohorts,

14    basically.

15          MR. CAREY:  Do we know when that was or what they

16    were searching for?

17          THE COURT:  There's not a charge in her Complaint

18    on that, is there?  You're not charging any of these

19    Defendants with searching your home without a warrant.

20          MS. BIBBS:  Whatever is there.  I can't remember.

21          THE COURT:  What I'm saying; was Mr. Munch there,

22    Corporal Munch?

23          MS. BIBBS:  Yes.  He said it was all --

24          THE COURT:  Was he there searching your home?

25          MS. BIBBS:  Well, in his paper, he said he was

1    there.  I mean, when it happened with so many things that --

2    I'm sure, yes, he was there.

3         THE COURT:  So he was there, Mr. Carey,

4    apparently.  Searched your home without a warrant.  And when

5    was that searched?

6         MS. BIBBS:  I don't know.  It's on this paper that

7    he had on his report.  Everything is on there right -- right

8    now.

9         THE COURT:  Let me take a look at the paper you

10   gave us, and see if it's in there.

11        MS. BIBBS:  Well, there's reports where he

12   reported himself as being present in those areas of --

13        THE COURT:  You attached her letter from the

14   Department of Public Welfare, Office of Children and Youth

15   and Families, talking about an expungement of a charge.

16        MS. BIBBS:  Exactly.

17        THE COURT:  Was that a previous charge or this

18   one?

19        MS. BIBBS:  All this is supposed to have been the

20   same as they are saying -- they're going back and saying

21   that it happened in 1994.  Which is not true.  There's never

22   been a situation where there was abusement in my home and my

23   children were taken out.  There was lead poison, they said

24   they had found lead poison in the house.  And me and my

25   husband painted the whole house, got it ready, brought our

1    children out of foster care, wherever they was taken.  And

2    there was never an issue of what they're talking about.  You

3    know, there was a time when my son didn't get his basketball

4    game permission from me when he was going to Christian

5    Academy School.  And he came and said that I hit him with a

6    hockey stick.  I mean, that was funny because --

7              THE COURT:  Is that what this expungement was

8    about?

9              MS. BIBBS:  Right.  And so they said, we found

10   everything, he was nothing but lying.  And all that was a

11   make-up.  And he was just doing that because he was trying

12   to punish me for not permitting him to do something.  When

13   the teacher had put him on punishment, I enforced it when he

14   got home.  I said, well, if she said you're in punishment

15   because you did thus and thus, when you get home, you're not

16   going to be able to go to that game, you're going to stay

17   home.  And so he got angry and went to school, and that ball

18   rolled that way.

19             THE COURT:  Do you have any paperwork with you by

20   any chance?  I don't have anything that would show when your

21   house was searched.  We need to know when that is.

22             MS. BIBBS:  I don't believe so.

23             THE COURT:  But we at least know that there is

24   some charge, Mr. Carey, and in a Complaint, I think that's

25   probably enough.  That there is some charge that your

1    clients searched her home, with others, without a warrant.

2             MR. CAREY:  I guess the confusion on my part was

3    that in the Plaintiff's reply to our various motions, her

4    reply was filed March 2, 2005.  There are a couple of

5    letters attached.  One is to the Commission on Civil Rights.

6    And the second one is a letter which is to Pennsylvania

7    Governor's office.

8             And in both of those letters she states the police

9    stopped me without proper reason, flashed lights, searches

10   my car without a warrant, told me they were looking for my

11   husband.  And the police had a felony warrant for her

12   husband as well.  But, I mean, she's alleging that they

13   searched her car with a flashlight, a plain-view search.

14            THE COURT:  Is there another time that it was your

15   home?

16            MS. BIBBS:  Yes, there's another part in that

17   disposition where Munch is saying he asked -- he said I

18   asked Victoria whether or not I can search her home, and she

19   said no.  And then he came back or something.  Whatever.

20            THE COURT:  But he did search your home.

21            MS. BIBBS:  Exactly.

22            THE COURT:  And when he came back, did he have a

23   warrant?

24            MS. BIBBS:  No, he didn't have no warrant.  They

25   had some papers saying --

1              THE COURT:  I see a letter that says that about

2    the car.  Let's find where it says -- what she's saying it

3    says.

4              MR. CAREY:  It's Page 7 of the Millcreek police

5    report, case report.

6              THE COURT:  Where can I find that?

7              MR. CAREY:  I'll hand that up to you, Judge.

8              THE COURT:  Is it one of your exhibits?

9              MR. CAREY:  Yes.  Or do you want me to put it on

10   this thing?

11             THE COURT:  That's fine.  That would be fine.

12             MS. BIBBS:  When it speaks about "this officer,"

13   meaning Munch.  He asked --

14             THE COURT:  "I asked Mrs. Bibbs if she would let

15   us search the house.  Mrs. Bibbs stated that we could not.

16   We then (inaudible.)  These officers then cleared from the

17   Bibbs' residence at 10:10."

18             MS. BIBBS:  And knowing he wasn't there.  Because

19   they go on to say that they found him at 18 -- on West 18th

20   Street.  Knowing that, they came back to my house, going

21   through my home, upstairs, all the way through the house,

22   and downstairs.

23             THE COURT:  Was that after this active felony

24   warrant was issued?

25             MR. CAREY:  Yes, that's why they were looking for

1  | him.  They had a felony warrant for him.

2  |         MS. BIBBS:  They knew he wasn't living there, Your

3  | Honor.  They knew this.  And they also had talked to him in

4  | the residence in which he stayed.  And then that night,

5  | after I went -- I was coming home from work, they began to

6  | stop me.  And I said, Officer, I said, why did you stop me,

7  | I said, I was doing the speed limit.

8  |         And they had all these bright lights, bright, just

9  | beaming on me.  And one was coming out of the Granada

10 | Apartments with his light beaming, as if he had just came

11 | from my house.  And I asked him, you know, what are you

12 | looking for.  And he started shining his light right on my

13 | eyes, the seats, and all around.  I said, what are you

14 | looking for.  He said, no, you wasn't driving that fast.

15 | But he went on to state, you know, some things that wasn't

16 | even necessary that was pertaining to what he was looking

17 | for.

18 |         THE COURT:  All right.  I understand this charge.

19 | And I think you understand it.  Mr. Devlin.

20 |         MR. DEVLIN:  Your Honor, I just have a couple

21 | questions similar to what Mr. Carey just asked.  As I

22 | understand it, Ms. Zborgowski and Mr. Cavanagh are being

23 | charged with conspiracy related to shutting down of

24 | Ms. Bibbs' home school; is that right?  Is that the extent

25 | of the charge against them?

1          MS. BIBBS:  Yeah, they violated my civil rights,

2     included into --

3          THE COURT:  They violated your civil rights by

4     helping to shut down your school.  By what else?

5          MS. BIBBS:  By interrupting, by way of coming into

6     this whole situation and bringing forth false documents,

7     saying that my child was abused since 1994 through 2001.

8     All that in Millcreek, which I did not live there for that

9     long period of time.

10          THE COURT:  So accusing her of child abuse for

11     over ten years.

12          MS. BIBBS:  I might not be describing it right,

13     but I think you got the idea.

14          THE COURT:  Well, I just want to make sure we

15     get -- he needs to know everything so he can defend these

16     people.  Anything else?  Are you charging them with anything

17     having to do with your son's -- the charges that your son

18     was selling drugs?

19          MS. BIBBS:  Yes.  Oh, yes, indeed.

20          THE COURT:  Was that a false charge, it's your

21     claim that was a false charge, involving false charges?

22          MS. BIBBS:  Exactly.  There was nothing produced.

23     I mean, there was nothing produced, Your Honor.  What more

24     can I say?

25          THE COURT:  I guess false expulsion is in that as

1   well.

2        MS. BIBBS:  Apparently, some of this has to be

3   flushed out and examined.  And the reason being, because I'm

4   not the only parent that's in this whole situation.  I mean,

5   even -- like I said, I represented -- as a policy counsel

6   for the parents, I represented 752 families at that point,

7   with all these parents that I had.  And if this is happening

8   with me --

9        THE COURT:  When were you representing 752

10  families?

11       MS. BIBBS:  When I was on the Board of Directors

12  of GECAC.

13       THE COURT:  Of GECAC.

14       MS. BIBBS:  Yes.  I was policy to counsel for

15  three years.  President.

16       THE COURT:  All right.  Now I'm going to let them

17  talk.  Why don't you have a seat for a minute.

18       MS. BIBBS:  Okay.  Thank you.

19       THE COURT:  Thank you.  Mr. Carey, do you want to

20  go first?

21       MR. CAREY:  Sure.

22       THE COURT:  You have currently pending a Motion to

23  Dismiss the Amended Complaint or For More Specific Pleading.

24  But I'm going to hear argument on a Motion to Dismiss the

25  Complaint.  And that's based on qualified immunity; is that

1   correct?

2         MR. CAREY:  That, and also the claim of false

3   arrest or arrest without probable cause.

4         THE COURT:  Okay.

5         MR. CAREY:  And I think that if I can go to that

6   first, the allegation that this arrest was without probable

7   cause.  This is meritless.  If you look at the --

8         THE COURT:  I'm sorry, you represent Corporal

9   Munch.

10         MR. CAREY:  Yes.  If you look at the criminal

11   Complaint and the Affidavit of Probable Cause attached,

12   there is probable cause within the four corners of those

13   documents.

14         Corporal Munch was directed to file these charges

15   by the District Attorney's office, and he prepared a

16   Complaint.  It was approved by the Magisterial District

17   Judge after she found that probable cause existed.  They

18   made arrangements for Ms. Bibbs to meet them at the

19   Magistrate's office.  There was a finding of probable cause.

20         She's trying to relitigate an issue that was in

21   State Court, and that's not permitted under the

22   Rooker-Feldman Doctrine.  But I think this Court, even in

23   just looking at the documents and the history of this case,

24   can make an independent determination that there was

25   probable cause for the charges when they were filed against

1    her.

2             THE COURT:  Her comment is that, how can he make

3    an Affidavit of Probable Cause when he wasn't there.

4             MR. CAREY:  Police do it all the time.  It's upon

5    information received.  And if you look back, the criminal

6    Complaint itself and the Affidavit of Probable Cause.

7             THE COURT:  Where is that?  That's your Exhibit A?

8             MR. CAREY:  A or B.

9             THE COURT:  C.  There it is.

10            MR. CAREY:  And I can put it up on the overhead,

11   if you want me to.

12            THE COURT:  No, No.  I'm looking right at it.  I'm

13   fine.

14            MR. CAREY:  I mean, he says in the affidavit, that

15   this is based upon information that I got from the Office of

16   Children and Youth, who did their own investigation.  I've

17   reviewed their reports.

18            THE COURT:  This is how the OCY does it when they

19   bring a Complaint in this regard; they give information to

20   the police department?

21            MR. CAREY:  Yes.  I don't believe OCY has the

22   authority to file criminal charges, so they have to turn it

23   over to some police agency, be it the District's Attorney's

24   office or a municipal police department.  And they turned

25   over the report, they turned over photographs.  The

1    photographs they turned over showed that Ms. Bibbs' son had

2    62 scars on his body, and that he told them that his mother

3    and father had abused him.

4            So OCY had interviewed the child.  OCY then turned

5    it over to the DA's office.  The DA's office met with

6    Corporal Munch, and at that time, the DA's office directed

7    Corporal Munch to file the charges.  So you had independent

8    determinations of probable cause by the DA's office and the

9    Magistrate before Ms. Bibbs was arrested.

10           THE COURT:  Now, what about -- what about the

11   charge that Corporal Munch was part of this group that went

12   to her house?

13           MR. CAREY:  Well --

14           THE COURT:  How does that work with the --

15           MR. CAREY:  First of all, I think if you look at

16   the reports that were drafted in 2004, long before a civil

17   rights lawsuit was even dreamed of, it shows that they went

18   to her house at 10:00 a.m. and asked if they could search --

19   they were looking for Mr. Bibbs, they had a felony arrest

20   warrant for him.  She said he wasn't there, and she would

21   not allow them to search.  The report says they left, and

22   they went to another residence 12 minutes later.

23           First of all, they didn't have time to search.

24   But, second of all, they had a felony warrant.  And if they

25   had a reasonable suspicion that he was present in

```
 1   Mrs. Bibbs' home, the fact that they had a felony arrest

 2   warrant would have allowed them, under the law, to go in and

 3   search for him anyhow.

 4          The allegations that they did a plain-view search

 5   with a flashlight in her vehicle looking for Mr. Bibbs,

 6   that's also permitted under the law, if they have a

 7   reasonable suspicion that he's in the vehicle.  They're

 8   married.  I mean, I don't know why the police wouldn't have

 9   had a reasonable suspicion to do that.  I don't believe that

10   violated her civil rights.  And, again, I believe that these

11   matters could have been litigated, and probably were

12   litigated, in the lower Court.

13          THE COURT:  All right.  Ms. Bibbs -- Mr. Carey,

14   I'm going to interrupt you for the next few minutes.  Sorry.

15   On Page 16 and 17 of your -- of your reply to the motions,

16   you discuss a criminal statute under the civil rights law

17   for punishment for criminally violating a person's civil

18   rights.

19          This is a civil suit.  So that cannot be brought

20   here.  Criminal charges under civil rights can only be

21   brought by the US Attorney, the Department of Justice, and

22   that's not through me, and that's not through a civil

23   action.  So I just wanted to mention that if you were trying

24   to bring criminal charges, that cannot be done in a civil

25   suit.
```

1          We'll mention that, so you have to go through the

2    Department of Justice, the US Attorney's Office for that.  I

3    was just thinking about it at that point, and I remember

4    reading that in her papers.

5          All right.  Thank you, Mr. Carey.  I am going to

6    speak now with Mr. Devlin.

7          MR. CAREY:  Thank you.  Before I sit down, I just

8    would want to remind the Court that you started off by

9    wanting to hear about qualified immunity.  And my point is,

10   that these officers acted reasonably under all the

11   circumstances.  And I am talking especially about this

12   allegation of a search.  And considering the fact that they

13   had a felony warrant for Mr. Bibbs.  Mr. and Mrs. Bibbs were

14   still married at the time, may still be married.  I think

15   that they acted reasonably in their shield of qualified

16   immunity.

17           THE COURT:  All right.  Thank you.

18           MR. DEVLIN:  Good morning, Your Honor.

19           THE COURT:  Good morning.  How are you?

20           MR. DEVLIN:  Well, Your Honor, thank you.

21          Your Honor, in our original Motion to Dismiss,

22   which we reaffirmed as to the -- what would be the Amended

23   Complaint, obviously, the bulk of that was with respect to

24   specificity of the allegations.  And we raised the qualified

25   immunity because the only allegation included in the

1    original Complaint or any other Complaint against Mrs.

2    Zborgowski or Mr. Cavanagh related to a report that is

3    alleging Ms. Zborgowski authored, and which indicated

4    Ms. Bibbs' child was abused for over ten years.

5        So as far as the expulsion claim and the

6    conspiracy claim, the facts of that are new to me, but I'll

7    do my best to apply them.  As to the expulsion claim, Your

8    Honor, we would -- and I guess to the extent it requires

9    additional briefing, I'll be happy to do it.  That's a

10    pretty complex legal issue.

11        And it's one in which, quite frankly, I'm not even

12    sure these two individual Defendants can be held liable for,

13    because they certainly do not have the authority or the

14    power to expel Ms. Bibbs' child.  And based upon everything

15    that we've -- there are no facts in here talking about

16    exactly what happened with the expulsion.

17        I'm not sure if he was expelled or not.  But even

18    if he was, there's obviously federal and state regulations

19    governing how that has to go through.  I haven't

20    investigated whether those were complied with or not.  Based

21    upon the allegations, I would need to do that.

22        But with respect to qualified immunity, I believe

23    that will bear on the expulsion issue as well.  What I

24    understand the allegations to be are that Mr. Cavanagh and

25    Ms. Zborgowski learned -- received information that

1   Ms. Bibbs' son may be selling drugs.  They questioned him.

2   And I think based on what Ms. Bibbs said, he then took them

3   around and showed them maybe where these drugs were.  That

4   there were a number of people in this school selling drugs.

5             During the questioning of him, he indicated that

6   he was being abused.  They're under a state ruling.  They

7   are legally required to pass that onto CYS -- OCY.  They did

8   that.  And at that point then, obviously, Mr.  Munch and

9   everybody else comes into it, and the authorities -- law

10  enforcement authorities take from them. Those are the only

11  allegations against my client.

12            THE COURT:  My understanding was that she was

13  arguing that these are two separate sons.

14            MR. CAREY:  That wasn't my understanding.

15            THE COURT:  Okay.

16            MR. DEVLIN:  And I guess --

17            THE COURT:  I thought the one son claimed -- who

18  they claim was being abused, she then decided to home

19  school.

20            MS. BIBBS:  No.

21            THE COURT:  No?  He's right.  He's got it right.

22  Okay.  I misunderstood.

23            MR. DEVLIN:  And my understanding is that it's one

24  son, that he was -- that information came to them that he

25  might be selling drugs.  They interviewed him.  During that

1    interview, he indicated that he was being abused.  Based

2    upon that report of abuse, they --

3            THE COURT:  She started the home schooling.

4            MR. DEVLIN:  Maybe she started home schooling.

5    But with respect to my folks, they then --

6            THE COURT:  Once that happened --

7            MR. DEVLIN:  -- passed that allegation on.

8            THE COURT:  -- it goes through a specific

9    procedure.

10           MR. DEVLIN:  Correct.  And, Your Honor, I can't

11   give you that statute off the top of my head.  I'll be happy

12   to do it.  And so based upon that, Your Honor, they would

13   clearly have qualified immunity.  As a matter of fact, they

14   were legally obligated to do exactly what they did, which

15   would put them right at the core of qualified immunity.  It

16   is for that reason we would ask for dismissal.

17           THE COURT:  All right.  Thank you.  Ms. Bibbs,

18   come on up.

19           MS. BIBBS:  Can I insert something?

20           THE COURT:  Yes, you can say whatever you like in

21   response.

22           MS. BIBBS:  Okay.  Concern the scarring and all

23   this that they were bringing out.  There was no medical

24   reports on this, from the whole time, from 1994 through

25   2004.  And they've have been in football, basketball,

1    soccers, and all those different sports.  And which I was

2    coaching on the YWCA Board at one point.

3            THE COURT:  So you're saying that the reason they

4    said it's been that long is because they looked at this old

5    charge from the Christian school, which had been expunged.

6            MS. BIBBS:  Well, I --

7            THE COURT:  You don't know what they did.  You

8    don't know why they said that.

9            MS. BIBBS:  Your Honor, I'm going to tell you

10    what.  I've been persecuted since when I left Erie.  That's

11    why I moved into Millcreek.  My son had problems in Strong

12    Vincent School; they didn't want to teach him there.  And

13    this is another son now.  All four of my Bibbs boys.  I

14    think that Bibbs name has a problem in Erie.

15            Because I did report that one time to the FBI.

16    And they told me to write a letter to the police station,

17    which is Captain Bowers, and to the safety director, which

18    was Joseph -- not Walczak, but Joseph Weindorf.  He was a

19    safety director at that time.  And I did write a letter to

20    them, as I talked to the FBI, about the harassment that I

21    was getting.  And they kind of backed off.

22            THE COURT:  Okay.  Well, I got you off track.  So

23    let's go back to what your argument is.  That you had no

24    medical report saying that he had scarring, and that he had

25    been in football and soccer --

```
 1              MS. BIBBS:  And no police reports stating that
 2     there was any abuse.  And no documentations, just some
 3     pictures that -- apparently, he went to the school.  And
 4     this teacher, this counselor, supposedly had Xeroxed off of
 5     his machine.  And it didn't even look like -- somebody had
 6     just pasted some paste there, and made it look like marks
 7     and stuff.  Because if they would see his back now -- that
 8     supposedly every year for his birthday I gave him a hit on
 9     his back or something, that accumulated so many scars.
10              THE COURT:  Was this brought out in the
11     prosecution of you in the State Court?
12              MS. BIBBS:  Yes.  And the jury was hung.  Because
13     there was no evidence, nothing but just talk, hearsay.  And
14     Munch didn't even come into the court to testify what he
15     knew on the case.  Because it stated that it happened in
16     that providence of Millcreek, then there should be some
17     documentation.
18              THE COURT:  Did the other Defendants testify,
19     Cavanagh and --
20              MS. BIBBS:  None of them appeared.  None of them
21     appeared.  It was like I didn't want to be -- I don't want
22     to have nothing to do with that.  I brought you to this
23     point, but I'm not going to get up there under oath and lie
24     for you and get all entrapped.
25              THE COURT:  I understand your argument.  Do you
```

1    have any other points you would like to make on that?

2         MS. BIBBS:  Yes.  It says here about the operation

3    outside the parameters of the doctrine of qualified

4    immunity.  And it says worked in the place and position that

5    unqualified forbiddance.  All the attempts to justify the

6    behaviors are disregarded to the fact that they are

7    responsible for the conduct.  And I believe that they're

8    liable.

9         That these individuals, they knew, in the response

10   to their duty, that they should have thoroughly investigated

11   these things and found out if any of this stuff was real

12   true.  Because they had an allegation against a person.  And

13   just based upon hearsay, or I'm a friend of yours, I'm going

14   to get this information and gather it together on this

15   woman, and do whatever you need to do so I can get what I

16   want to do out of the deal.  I don't think that qualifies

17   them for being immune.  They should know.

18        I mean, you know, being a person that represents,

19   supposed to be serving and protecting the community and

20   representing the community to be a protector of our rights,

21   shouldn't go out like that and allow me to be harassed and

22   my property invaded.  You should have made a stop right

23   there.  Because, first of all, that's another territory.

24   You talking about Erie versus Millcreek in that situation.

25   And I don't think they should have been able to continue to

1  harass me.  I moved out of that providence to get some

2  peace.  I went from school to school, private school, public

3  school, to get my kids out of that environment.  Okay.

4       THE COURT:  What about the allegation what once

5  your son made that comment, they were required to go through

6  a procedure that required them to make those charges of

7  abuse?

8       MS. BIBBS:  Yeah, because I think that he was --

9  he was by hisself.  He didn't have nobody there.  And he was

10  coerced.  Because when he got to court, the District

11  Attorney said -- the girl, she said, tell us just like we

12  talked, don't get afraid, tell her, are you afraid of your

13  mother.  He said, no, I'm not afraid of her.  She said,

14  well, then say like we talked.  And she was coercing him to

15  repeat what was already rehearsed, in private.

16       And when he didn't, and when we got to the next

17  court -- after we went to the preliminary, and they did

18  that.  He did it again in the common pleas.  And she asked

19  the Judge to note him as a hostile witness.  And said, no,

20  I'm not going to do that, we're not going to put him as a

21  hostile witness.

22       I mean, you know, because he is saying what he

23  said.  He sent me a card for Christmas, Mom, sorry that, you

24  know, I lied on you like that.  I showed it to the other

25  people.  They're not -- they don't want to hear it.  I mean,

```
 1   how long is this going to go on.

 2              THE COURT:  All right.

 3              MS. BIBBS:  I got a daughter that's doing home

 4   school.  They (unintelligible), trying to run her away.  She

 5   had to go through a process.  And now she's out with her

 6   kids and everything is going well.  She is scared to go back

 7   into a home school.

 8              THE COURT:  Ms. Bibbs, I think you should also

 9   pursue whatever avenues there are in State Court to get your

10   children back.  Because I'm not sure that I have

11   jurisdiction on a Writ of Habeas Corpus.  I'm going to look

12   into that, to return your children.  So I'm just going to

13   suggest that you also look into what avenues in the State

14   Court that there are for the return of your children in that

15   regard.  All right.

16              MS. BIBBS:  Okay.

17              THE COURT:  Anything else you want to say in

18   support of your claims?

19              MS. BIBBS:  I just want the --

20              THE COURT:  I think I understand better what

21   you're saying.  This is a lot of reading.

22              MS. BIBBS:  I know, because you know what.  I'm

23   not a lawyer.  I didn't have the funds, the money, you know,

24   to actually get one at this point.  Like I said --

25              THE COURT:  We really like the short statement.
```

1    That's written into the rules.  But we wanted to make sure

2    we understood what your claims were.  Anything else from the

3    Defendants in this regard?

4              MR. DEVLIN:  No, Your Honor.

5              MR. CAREY:  No, Your Honor.

6              THE COURT:  I appreciate your time.  I will take

7    the Motions to Dismiss and For More Definite Statement under

8    advisement, and rule on those without further briefing.  I

9    think we're fine in that regard.

10             Thank you very much, and thank you for your time.

11   We're adjourned.

12             MS. WALLEN:  Court is now adjourned.

13             (Discussion held off the record.)

14             THE COURT:  There's another motion outstanding.

15   Thank you.  I had it staring at me here.  There's a Motion

16   for Default Judgment.  It is Document No. -- Motion by

17   Plaintiff for Default Judgment, Document No. 32.

18             And, Ms. Bibbs, I'm going to dismiss that Motion

19   for Default Judgment because it is moot.  It was not a

20   default.  That Defendant responded.  It doesn't matter which

21   attorney in the firm responds, as long as that Defendant

22   responds.  And that Defendant responded under the signature,

23   I believe, of Mr. Devlin, and not Mr. Lanzillo.  If you look

24   at the docket sheet, the attorneys who make their appearance

25   are actually that entire law firm.  So anyone in that law

```
 1   firm can sign for that.
 2          MS. BIBBS:  But they never made a statement in
 3   their behalf.
 4          THE COURT:  No, they did.  They moved to dismiss
 5   him for more definite statement.  We have that.  Did you not
 6   receive those?
 7          MS. BIBBS:  Yes, I did.  But it didn't mention
 8   those persons that he was representing.  It just -- I think
 9   they had just combined --
10          THE COURT:  Well, he -- yes, he joined in the
11   reasoning.  But he did come and --
12          MS. BIBBS:  It was for Munch.
13          THE COURT:  Fails to allege any claim against
14   Zborgowski and Cavanagh.  And then Mr. Carey moved to
15   dismiss on behalf of Corporal Munch.
16          MS. BIBBS:  Right.
17          THE COURT:  So Document No. 32 is dismissed as
18   moot, as those responses were timely made.  All right.
19   Thank you.  Now we're adjourned.
20              (Hearing concluded.)
21
22
23
24
25
```